**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HALEY BERRYMAN, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| READING INTERNATIONAL, INC., | |
| Defendant. | |

Plaintiff Berryman ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

<u>**NATURE OF THE ACTION**</u>

1.     This is a class action suit brought on behalf of all persons who subscribe to, view videos on, and purchase admission tickets to movie screenings on AngelikaFilmCenter.com. For persons with Facebook accounts, Reading International, Inc. ("Defendant") discloses their personally identifiable information to unrelated third-parties, and for persons purchasing admission tickets to movie screenings within the state of New York, Defendant fails to disclose the total costs of tickets (inclusive of fees), prior to the tickets being selected for purchase.

2.     Reading International, Inc. ("Defendant") owns and operates Angelika Film Centers, which are movie theaters that show independent and international films throughout the United States.  Defendant also develops, owns, and operates AngelikaFilmCenter.com, which is a website that enables cinephiles to view move trailers, learn about films, and purchase tickets to Defendant's shows.

1

3.      Plaintiff brings this action in response to Defendant's practice of knowingly disclosing its subscribers' personally identifiable information—including a record of every video clip they view and every movie ticket they purchase—to Facebook without consent.   Plaintiff also brings this action in response to Defendant's practice of failing to disclose the total cost of tickets (including any ancillary fees) to movie screens taking place in the state of New York.

4.      The United States Congress passed the Video Privacy Protection Act ("VPPA") in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers."  S. Rep. No. 100-599, at 8.  "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent."  *Id.*

5.      Defendant violated the VPPA by knowingly transmitting Plaintiff's and the putative class's personally identifiable information to unrelated third parties.

6.      The New York State legislature also passed the Arts and Cultural Affairs Law § 25.07(4) in 2022, seeking to promote ticket fee transparency.  The law provides that that "every operator … of a place of entertainment … shall disclose the total cost of the ticket, inclusive of all ancillary fees that must be paid in order to purchase the ticket."  "Such disclosure of the total cost and fees shall be displayed in the ticket listing *prior to* the ticket being selected for purchase."  *Id*. (emphasis added).  And "[t]he price of the ticket shall not increase during the purchase process."  *Id.*  This latest version of the law went into effect August 29, 2022.  *See* Exhibit A.

7.      Defendant violated New York Arts and Cultural Affairs Law § 25.07(4) by quoting movie ticket purchasers on its website a fee-less price, only to later ambush them with a $2.19 service charge per ticket at checkout.

## PARTIES

8.      Plaintiff Berryman is, and has been at all relevant times, a resident of New York, New York and has an intent to remain there, and is therefore a domiciliary of New York.

9.      Defendant Reading International, Inc. is a Nevada corporation with its principal place of business at 5995 Sepulveda Blvd., Suite 300, Culver City, CA 90230.  Defendant operates and owns Angelika Film Center theaters in New York, Texas, Virgina, Washington, D.C., and California.  Defendant develops, owns, and operates AngelikaFilmCenter.com, which is also used in New York, Texas, Virgina, Washington, D.C., and California.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over the VPPA claim pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States.

11.      This Court has subject matter jurisdiction over the New York state law claim pursuant to 28 U.S.C. § 1367(a) because the New York state law claim arises from the common nucleus of operative fact as the VPPA claim because both claims arise from the very same movie ticket purchasing process on Defendant's website.

12.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a citizen of a state different from Defendant.  Defendant sold at least 100,000 tickets to movie screenings taking place in the state of New York through its website during the

applicable class period, and is liable for a minimum of fifty dollars in statutory damages for each ticket sold.

13.     This Court has personal jurisdiction over Defendant because Defendant conducts substantial business within New York, such that Defendant has significant, continuous, and pervasive contacts with the State of New York.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

**FACTUAL BACKGROUND**

**I.      The VPPA**

15.     The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that history.  With an eye toward the digital future, Congress responded by passing the VPPA.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

16.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services

from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

## II.     Defendant is a Video Tape Service Provider

17.    Just like "department store[s]," "golf shop[s]," and "continuity club[s]," Defendant is a video tape service provider. *See* S. Rep. 100-599, at 12-13.

18.    The VPPA defines a video tape service provider as "any person, engaged in the business ... of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Congress expressly included "open-reel movies" as a type of "similar audio-visual material "covered by the VPPA. *See* S. Rep. 100-599, at 12. Defendant is a video tape service provider because it delivers open-reel movies on its brick-and-mortar silver screen and prerecorded video content on its website.

19.    Defendant owns and operates Angelika Film Center, which is a movie theater chain that features independent and foreign films in New York, Washington, D.C., Virginia, Texas, and California. Defendant also operates AngelikaFilmCenter.com (the "Website"), a website where movie-goers can purchase tickets, watch movie trailers, and learn about what is in theaters.

20.    Since its inception in 1989, Defendant has taken pride in its "curated and diverse" programming" of film. Defendant describes itself as "a true filmmaker's jewel and choice of destination for cinephiles," as well as "the most successful and recognized arthouse in North America."[1]

---

[1] *About Us*, ANGLIKA ANYWHERE, https://www.angelikaanywhere.com/page/about/ (last visited Dec. 19, 2023).

### III.    The Facebook[2] Tracking Pixel

21.    Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[3]  Facebook describes itself as a "real identity platform,"[4] meaning users are allowed only one account and must share "the name they go by in everyday life."[5]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[6]

22.    Facebook generates revenue by selling advertising space on its website.[7]

23.    Facebook sells advertising space by highlighting its ability to target users.[8] Facebook can target users so effectively because it surveils user activity both on and off its site.[9] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[10]  Facebook compiles this information into a

---

[2] In 2022, the parent company operating Facebook changed its name to Meta Platforms, Inc., and its pixel tool was renamed the Meta Tracking Pixel. For ease of readership and consistency, this Complaint continues to use the terms Facebook and Facebook Tracking Pixel.

[3] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html

[4] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[5] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[6] FACEBOOK, SIGN UP, https://www.facebook.com/.

[7] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[8] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[9] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[10] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[11]

24.    Advertisers can also build "Custom Audiences."[12]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[13] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[14]   Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[15] One such Business Tool is the Facebook Tracking Pixel.

25.    The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Facebook Tracking Pixel "tracks the people and type of actions they take."[16]  When the Facebook Tracking Pixel captures an action, it sends

---

[11] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[12] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[13] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.

[14] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[15] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[16] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

a record to Facebook.  Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

26.    Advertisers control what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views.[17]  Advertisers can also configure the Facebook Tracking Pixel to track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[18]  An advertiser can also create their own tracking parameters by building a "custom event."[19]

27.    Advertisers control how the Facebook Tracking Pixel identifies visitors.  The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[20]  HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[21]  Pixel-specific Data includes "the Pixel ID and cookie."[22]

## IV.    AngelikaFilmCenter.com And The Facebook Pixel

28.    Defendant entertains movie-goers with independent and international films at its Angelika Film Center locations across the United States.

---

[17] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

[18] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[19] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

[20] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

[21] *Id.*

[22] *Id.*

29.    Defendant monetizes the cinema experience by selling tickets on its Website, AngelikaFilmCenter.com.

30.    Defendant hosts the Facebook Tracking Pixel on its Website and transmits two distinct events to Facebook:[23]

**Figure 3**



31.    PageView transmits the Uniform Resource Locator ("URL") accessed, along with whether that webpage features a video.

**Figure 4**



32.    ViewContent likewise discloses the URL and whether the webpage features a video.

---

[23] This data derives from a tool created and offered by Facebook.

**Figure 5**



33.    The title for the video is contained in the URL, and any third party can copy and paste that locator into a web browser and determine the video that the subscriber watched.

34.    These two events, independently and jointly, permit an ordinary person to identify a video's content, title, and location.

35.    The title for the video is contained in the URL, and any third party can copy and paste that locator into a web browser and determine the video that the subscriber watched.

36.    Additionally, when a person selects a particular date and showtime for the movie depicted on the webpage containing the video movie trailer, and completes the checkout process, a new, third Purchase event is transmitted to Facebook.

**Figure 6**



37.    The Purchase event discloses to Facebook the fact that a consumer purchased a movie ticket, the currency used to purchase the ticket, and the amount spent on the ticket.

38.    Each of these Tracking Pixel events depicted in Figures 4 through 6 are transmitted in real-time to Facebook. Collectively, Figures 4 through 6 notify Facebook that a consumer spent $7.19 to purchase a ticket to Defendant's screening of the *Barbie* movie at Defendant's Village East theater on January 31, 2024.

39.    When a visitor watches a video or completes the movie ticket purchasing process on Defendant's Website while logged into Facebook, Defendant compels a visitor's browser to transmit the c_user cookie to Facebook for each distinct Facebook Tracking Pixel event generated.  The c_user cookie contains that visitor's unencrypted Facebook ID.  When accessing the above video and purchasing the above movie ticket, for example, Defendant compelled the browser to send seven cookies:

**Figure 7**

| Name | Value | Domain |
|------|-------|--------|
| datr | IKMTZDnp92T5Bkqwh2LEBedt | .facebook.com |
| sb | FXEXZF66qmf7QYrBRl0wetan | .facebook.com |
| c_user | 1528550551 | .facebook.com |
| m_ls | %7B%22c%22%3A%7B%221%... | .www.facebook.com |
| ps_n | 0 | .facebook.com |
| xs | 24%3ATWFeKjQ4G0FB5A%3A2... | .facebook.com |
| fr | 1IYeBwHTStqeUQZr6.AWUOHm... | .facebook.com |

40.    When a visitor's browser has recently logged out of Facebook, Defendant will

compel the browser to send a smaller set of cookies:

**Figure 8**

| Name | Value | Domain |
|------|-------|--------|
| datr | IKMTZDnp92T5Bkqwh2LEBedt | .facebook.com |
| sb | FXEXZF66qmf7QYrBRl0wetan | .facebook.com |
| m_ls | %7B%22c%22%3A%7B%221%22%3A%22H... | .www.facebook.com |
| ps_n | 0 | .facebook.com |
| fr | 1IYeBwHTStqeUQZr6.AWUL0xzIbOwDQEW... | .facebook.com |

41.    The fr cookie contains, at least, an encrypted Facebook ID and browser

identifier.[24]  The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a

browser.[25]  The datr cookies also identifies a browser. [26]  Facebook, at a minimum, uses the fr

and _fbp cookies to identify users.[27]

---

[24] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf.

[25] FACEBOOK, CONVERSION API, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/.

[26] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[27] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

42.     Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser.  The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser.  Facebook uses both for targeted advertising.

43.     The fr cookie will expire after 90 days unless the visitor's browser logs back into Facebook.[28]  If that happens, the time resets, and another 90 days begins to accrue.[29]

44.     The _fbp cookie will expire after 90 days unless the visitor's browser accesses the same website.[30]  If that happens, the time resets, and another 90 days begins to accrue.[31]

45.     The Facebook Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, Defendant.[32]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[33]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

46.     Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

---

[28] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[29] Confirmable through developer tools.

[30] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[31] Also confirmable through developer tools.

[32] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[33] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

47.   A Facebook ID is personally identifiable information.  Any ordinary can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook.com. Facebook admits as much on its website.

48.   Through the Facebook Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Facebook to know, among other things, what videos a user has watched on Defendant's Website.[34]

49.   Defendant's Website also uses "Advanced Matching."  When activated, the Facebook Tracking Pixel will "look for recognizable form field and other sources on your website that contain information such as first name, last name and email." [35]  The Facebook Tracking Pixel's code will collect that information, "along with the event, or action, that took place."[36]  This information is "hashed,"[37] meaning it is "[a] computed summary of digital data that is a one-way process."[38]  In other words, it "cannot be reversed back into the original data."[39]

50.   Defendant discloses this information so it can better match visitors to their Facebook profiles, which thereby allows Defendant to better track analytics and target its advertisements.

---

[34] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

[35] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

[36] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

[37] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash

[38] *Id.*

[39]  *Id.*

**Figure 9**



You can use Advanced Matching to help:

- Increase the number of attributed conversions. We can match more of the conversions that happen on your website to people on Meta. This helps you understand the impact of your ads on website conversions.

- Increase your Custom Audience size. We're able to better match your website visitors to people on Meta and increase the size of your Custom Audience.

- Decrease the cost per conversion. Conversion-optimized campaigns become more efficient because we can better identify and deliver ads to the types of people likely to take the actions you care about.

51.    Defendant's Facebook Tracking Pixel is configured to scan form fields containing a user's email, first name, and last name:[40]

**Figure 10**

```
fbq.loadPlugin("inferredevents");
fbq.loadPlugin("identity");
instance.optIn("207268761486794", "InferredEvents", true);
config.set("207268761486794", "automaticMatching", {
    "selectedMatchKeys": ["em", "fn", "ln", "ge", "ph", "ct", "st", "zp", "db", "country", "external_id"]
});
fbq.loadPlugin("inferredevents");
fbq.loadPlugin("identity");
instance.optIn("207268761486794", "AutomaticMatching", true);
fbq.loadPlugin("iwlbootstrapper");
instance.optIn("207268761486794", "IWLBootstrapper", true);
fbq.loadPlugin("cookie");
instance.optIn("207268761486794", "FirstPartyCookies", true);
fbq.loadPlugin("inferredevents");
instance.optIn("207268761486794", "InferredEvents", true);
fbq.loadPlugin("automaticmatchingforpartnerintegrations");
instance.optIn("207268761486794", "AutomaticMatchingForPartnerIntegrations", true);
```

52.    In addition to purchasing movie tickets, users can either create accounts with Defendant's Website or sign up for Defendant's newsletters.

---

[40] Facebook provides a corresponding look-up table: FACEBOOK, ADVANCED MATCHING, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching.

53.     To sign up for Defendant's Newsletters, a user can input her email address and receive a wide variety of video services including getting "weekly showtimes, film & event info, special offers & discounts, and free screening invitations."  *See* Figure 11.

**Figure 11**



54.     To subscribe to Defendant's Website, a user can create an account.  Defendant's account webpage contains form fields for first name, last name, email address, birthday, zip code, preferred theater, and password.  *See* Figure 20.

55.     Every subsequent log-in attempt requires subscribers to input their email:

**Figure 12**



56.    Defendant discloses a subscriber's email address, first name, and last name when inputted into any of the above form fields, enabling Facebook to then match those identifiers with that subscriber's subsequent activity on the site.

57.    Defendant knows that Facebook will match the Advanced Matching parameters with a subscriber's subsequent activity, thereby helping Defendant "[i]ncrease the number of attributed conversions," "[i]ncrease [its] Custom Audience size," and "[d]ecrease the cost per conversion."[41]

58.    By compelling a visitor's browser to disclose the Advanced Matching parameters alongside event data for videos, Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

59.    By compelling a visitor's browser to disclose the c_user cookie alongside event data for videos, Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

60.    By compelling a visitor's browser to disclose the fr and _fbp cookies alongside event data for videos, Defendant discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

61.    By compelling a visitor's browser to disclose the fr cookie and other browser identifiers alongside event data for videos, Defendant discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

62.    Facebook confirms that it matches activity on Defendant with a user's profile. Facebook allows users to download their "off-site activity," which is a "summary of activity that

_____

[41] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB,
https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

businesses and organizations share with us about your interactions, such as visiting their apps or websites."[42]  Here, the off-site activity report confirms that Defendant identifies an individual's reading and video viewing activities:

**Figure 13**



V.    **New York Arts and Cultural Affairs Law § 25.07(4)**

63.    Effective August 29, 2022, New York enacted Arts & Cultural Affairs Law § 25.07(4), which provides that "every operator … of a place of entertainment … shall disclose the total cost of the ticket, inclusive of all <u>ancillary fees</u> that must be paid in order to purchase the ticket, and disclose in a clear and conspicuous manner the portion of the ticket price stated in dollars that represents a <u>service charge</u>, or any other fee or surcharge to the purchaser.  Such

---

[42] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?,
https://www.facebook.com/help/2207256696182627

disclosure of the total cost <u>and fees</u> shall be displayed in the ticket listing <u>prior to</u> the ticket being <u>selected for purchase</u>." *Id.* (emphasis added). And "[t]he price of the ticket shall not increase during the purchase process." *Id.*; *Compare with* Figure 3-A.

64.    Shortly after the law was enacted, ticketing websites peppered the State of New York's Division of Licensing Services with questions about the scope of the law. As explained by the Division of Licensing Services, "the ticket purchasing process begins once a consumer visits a ticket marketplace and first sees a list of seat prices." *See* N.Y. Dep't of State, Div. Licens. Servs., *Request for Additional Guidance – New York State Senate Bill S.9461*, attached hereto as **Exhibit A**, at 1. "From the moment the prospective purchaser assesses the [] ticket lists through the final payment … there should be no price increases to the purchaser for the ticket itself." *Id.* "When a prospective purchaser selects a ticket with full disclosure of the <u>ticket price</u>, the purchaser <u>should not then have to search for the total price</u> of the ticket <u>as the purchaser proceeds through the purchasing process</u>, it should continue to be readily available to the purchaser." *Id.* at 2 (emphasis added).

## VI.    Angelika Film Center's Ticket Pricing Process

65.    When a moviegoer visits Defendant's website, https://www.angelikafilmcenter.com/, on the main page, he selects a movie he wishes to view in a theatre, including in New York. *See* Figure 14, next page.

**Figure 14**



66.     If a consumer clicks on one of the film titles listed, he is taken to a page where he can select a date and showtime. No price is displayed on this screen.  See Figure 15, next page.

**Figure 15**



67.     After a user selects a showtime, the purchase process begins and he is prompted to select the number and type of tickets (general, child, or senior) he wishes to purchase, as well as to sign into his account or purchase via "Guest Checkout."  *See* Figures 16-A & 16-B, next page.[43]  Ticket prices are displayed on this page for the first time.  *See id.*

---

[43] The screen displayed in Figure 16, *infra*, is the same regardless of whether a consumer logs into his account to complete the purchase or uses guest checkout.

**Figure 16-A**







**Figure 16-B**



68.      *After* a consumer selects the type and number of tickets she wishes to purchase for the movie she selected, at the theatre she selected, and for the showtime she selected, she is brought to a screen requiring her to select her seats.  *See* Figure 17, next page.  On this screen, a five-minute timer begins which is displayed on the upper right-hand corner of the page, requiring the consumer to complete her purchase before time runs out.  *Id.*  This screen also, for the first time, displays Defendant's $2.19 "service charge" per ticket, thereby causing the price to increase from the $18.00 per general ticket quoted in Figure 3-A to $20.19 per general ticket.  *Id.*

For a family of four, Defendant tacks on an extra $8.76 in "service charges." That is roughly equivalent to the cost of a bucket of popcorn.

**Figure 17**



69.    After the consumer selects the seat(s) associated with the ticket(s) selected, he is taken to an order confirmation screen, and then finally a payment screen to input his payment information. *See* Figures 18 & 19, next page.

**Figure 18**



**Figure 19**



70.     To make matters worse, because of the timer displayed on the upper-right hand corner of the page, consumers are often not given sufficient time to review their purchase and notice the service charges Defendant charges them after initially misquoting the purchase price. If consumers are too slow and fail to input their credit card information and complete their purchase before the timer ends, they are kicked out of the purchase process, and must begin all over again.

## VII.    Experience of Plaintiff Haley Berryman

71.    On October 5, 2022, Plaintiff Berryman subscribed to Defendant's Website by creating an account and answered the following information requests depicted in Figure 20.

**Figure 20**

72.     In or around October 7, 2013, Plaintiff Berryman created a Facebook account, which bears her real-life name.  Since creating an account, Plaintiff Berryman frequented Defendant's Website to, among other things, watch trailers and purchase movie tickets.

73.     When Plaintiff Berryman watched videos on Defendant's Website, Defendant disclosed her event data, which recorded and disclosed the video's title and URL.  Alongside this event data, Defendant also disclosed identifiers for Plaintiff Berryman, including the c_user and fr cookies.

74.     On December 2, 2023, Plaintiff purchased tickets to a movie screening at Defendant's theater located on 18 West Houston Street, New York, New York, and followed a checkout flow process substantially similar to that depicted in Figures 14-19 in this Complaint. Plaintiff was tricked into paying Defendant's "service charge" even though this charge was not disclosed to her prior to her ticket selection.

75.     By disclosing her event data and identifiers, Defendant disclosed Plaintiff Berryman's personally identifiable information to a third party.

76.     Plaintiff Berryman discovered that Defendant surreptitiously collected and transmitted his personally identifiable information in late December 2023, after she purchased her movie tickets.

## CLASS ALLEGATIONS

77.     **Class Definition:**  Plaintiff seeks to represent Five classes:

    (a) **The VPPA Movie Screening Class**: all persons in the United States who have a Facebook account and who purchased tickets to a movie screening at one of Defendant's theaters from AngelikaFilmCenter.com.

(b) **The VPPA Account Class:** all persons in the United States who have a AngelikaFilmCenter.com account and a Facebook account and who viewed videos on Defendant's Website.

(c) **The VPPA Newsletter Class:** all persons in the United States who signed up for a AngelikaFilmCenter.com newsletter and have a Facebook account and who viewed videos on Defendant's Website.

(d) **The ACAL Nationwide Class:** all persons in the United States who purchased electronic tickets to any film screenings in any theatre location in the State of New York from Defendant's website on or after August 29, 2022. Excluded from the Nationwide Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

(e) **The ACAL New York Subclass:** all persons in the state of New York who purchased electronic tickets to any film screenings in any theatre location in the State of New York from Defendant's website on or after August 29, 2022. Excluded from the Nationwide Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

78.     Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

79.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiff does not know the exact number of members of the aforementioned Classes.  However, given the popularity of Defendant's Website, the number of persons within the Classes is believed to be so numerous that joinder of all members is impractical.

80.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

(a) whether Defendant collected Plaintiff's and the Class's PII;

(b) whether Defendant unlawfully disclosed and continues to disclose its users' PII in violation of the VPPA;

(c) whether Defendant's disclosures were committed knowingly; and

(d) whether Defendant disclosed Plaintiff's and the Class's PII without consent.

81.    **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Classes because Plaintiff, like all members of the Classes, used Defendant's Website to watch videos, and had her PII collected and disclosed by Defendant.

82.    **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring. Plaintiff and her counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Classes. Neither Plaintiff nor her counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Classes. Plaintiff has raised viable statutory claims or the type reasonably expected to be raised by members of the Classes, and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes, additional claims as

may be appropriate, or to amend the definition of the Classes to address any steps that Defendant took.

83.    **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable.  Even if every member of the Classes could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes.  Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, *et seq.*

84.    Plaintiff brings this claim individually and on behalf of the members of the proposed VPPA Classes against Defendant.

85.    Defendant is a "video tape service provider" because it delivers open-reel movies on the silver screens in its many brick-and-mortar theater locations, and also delivers hundreds of videos on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual

materials." 18 U.S.C. § 2710(a)(4).  These activities show that deliver audio visual materials is the focus of defendant's work.

86.    Plaintiff and members of the Movie Screening Class are "purchasers of... services" and therefore consumers because they purchased admission tickets to Defendant's video service, the screening a movie on a cinema screen.

87.    Plaintiff and members of the Account Class are "subscribers" and therefore "consumers" because they created an account on Defendant's Website to purchase tickets to movie screenings.  18 U.S.C. § 2710(a)(1).

88.    Plaintiff and members of the Newsletter Class are "subscribers" and therefore "consumers" because they signed up for a newsletter.  Defendant's newsletters are a video service because they periodically notify subscribers of new movie screenings, provide discounts and special offers to Defendant's movie screenings, and help Defendant solicit purchases of tickets to movie screenings.  *See* Figure 10.

89.    Defendant disclosed to a third party, Facebook, Plaintiff's and the Class members' personally identifiable information.  Defendant utilized the Facebook Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like their Facebook IDs, along with Plaintiff's event data, like the title of the videos she viewed.

90.    Plaintiff and the Class members viewed video clips using Defendant's Website.

91.    Defendant knowingly disclosed Plaintiff's PII because it used that data to build audiences on Facebook and retarget her for its advertising campaigns.

92.    Plaintiff and Class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

93.    Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  In particular, Defendant's disclosures to Facebook were not

necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

94.    On behalf of herself and the Classes, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Classes by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## COUNT II
### VIOLATION OF THE NEW YORK ARTS AND CULTURAL AFFAIRS LAW § 25.07

95.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

96.    Plaintiff brings this claim individually and on behalf of the members of the ACAL Nationwide Class and ACAL New York Subclass against Defendant.

97.    Defendant is a "operator or operator's agent of a place of entertainment," because Defendant owns, operates, or controls movie theatres, or is an agent for another business entity that owns, operates, or controls movie theatres. "'Place of entertainment' means any privately or publicly owned and operated entertainment facility such as a theatre, stadium, arena, racetrack, museum, amusement park, or other place where performances, concerts, exhibits, athletic games or contests are held for which an entry fee is charged." N.Y. Arts & Cult. Aff. Law § 25.03(6) (emphasis added). "'Entertainment' means all forms of entertainment including, but not limited to… motion pictures… and all other forms of diversion, recreation or show." N.Y. Arts & Cult. Aff. Law § 25.03(1). "'Operator' means any person who owns, operates, or controls a place of entertainment." N.Y. Arts & Cult. Aff. Law § 25.03(5).

98.     Defendant violated New York Arts & Cultural Affairs Law § 25.07(4) by failing to disclose the "total cost of a ticket, inclusive of all ancillary fees that must be paid in order to purchase the ticket" after a ticket is selected, as depicted in Figure 16-A of this Complaint. Figure 16-A expressly provides the "TOTAL" "PRICE" of a ticket, excluding service charges.

99.     Defendant also violated New York Arts & Cultural Affairs Law § 25.07(4) by increasing the price of its tickets during the purchase process, as depicted in Figures 14-19 of this Complaint.

100.    Defendant's $2.19 per ticket "service charge" is an "ancillary fee[] that must be paid in order to purchase the ticket."  Arts & Cult. Aff. Law § 25.07(4).

101.    On or about December 2, 2023, Plaintiff purchased tickets on Defendant's website and was forced to pay Defendant's service charges.  Plaintiff was harmed by paying these service charges, even though the service charges were not disclosed to Plaintiff at the beginning of the purchase process, and therefore, are unlawful pursuant to New York Arts & Cultural Affairs Law § 25.07(4).

102.    On behalf of himself and members of the Nationwide Class and New York Subclass, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover his actual damages or fifty dollars, whichever is greater, and reasonable attorneys' fees.  *See* Arts & Cult. Aff. Law § 25.33.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil

Procedure, naming Plaintiff as representative of the Classes, and naming

Plaintiff's attorneys as Class Counsel to represent the Classes;

(b)    For an order declaring that Defendant's conduct violates the statutes referenced

herein;

(c)    For an order finding in favor of Plaintiff and the Classes on all counts asserted

herein;

(d)    An award of statutory damages to the extent available;

(e)    For punitive damages, as warranted, in an amount to be determined at trial;

(f)    For prejudgment interest on all amounts awarded;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees

and expenses and costs of suit.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so

triable.

Dated: February 1, 2024                    Respectfully submitted,


By: */s/ Joshua D. Arisohn*


**BURSOR & FISHER, P.A.**
Joshua D. Arisohn
Philip L. Fraietta
1330 Avenue of the Americas
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163

E-Mail: jarisohn@bursor.com
         pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stefan Bogdanovich*
1990 N. California Blvd., Suite 940
Walnut Creek, CA 94595
Tel: (925) 300-4455
Fax: (925) 407-2700
E-Mail:  sbogdanovich@bursor.com


*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Putative Class*