**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

HALEY BERRYMAN, individually and on behalf of all others similarly situated,

Plaintiff,

v.

READING INTERNATIONAL, INC.,

Defendant.

Civil Action No. 1:24-cv-00750-PAE

Hon. Paul A. Engelmayer

# PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO STRIKE

Dated: May 10, 2024

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn
Philip L. Fraietta
1330 Avenue of Americas, 32 Fl.
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: jarisohn@bursor.com
pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stefan Bogdanovich*
1990 N. California Blvd., Suite 940
Walnut Creek, CA 94595
Tel: (925) 300-4455
Fax: (925) 407-2700
E-Mail: sbogdanovich@bursor.com

**Pro Hac Vice Forthcoming*

*Attorneys for Plaintiff and the Putative Class*

## TABLE OF CONTENTS

**PAGE(S)**


INTRODUCTION ........ 1

I. PLAINTIFF PLAUSIBLY ALLEGES A VPPA CLAIM AND HER CLASSES SHOULD NOT BE STRICKEN ........ 4

A. The Film Center Is A Video Tape Service Provider Because It Delivers Movie Trailers On Its Website And Movies On Its Silver Screen ........ 4

B. Plaintiff Is A Consumer Because She Paid For Film Screening Services And Subscribed To The Newsletters About Films ........ 8

C. The Film Center's Motion To Strike Plaintiff's VPPA Classes Is Premature And Legally Incorrect ........ 11

II. PLAINTIFF'S ACAL §25.07(4) SHOULD ALSO NOT BE DISMISSED ........ 11

A. Relevant Statutory Background ........ 11

B. This Court Has Subject Matter Jurisdiction Over Plaintiff's ACAL Claim ........ 13

1. There is CAFA Jurisdiction Here ........ 13

2. Plaintiff Has Article III Standing Because She Paid An Unlawful Fee ........ 14

3. Plaintiff Has Article III Standing Because She Suffered An Informational Injury ........ 16

C. Plaintiff Plausibly Alleges A Violation Of ACAL § 25.07(4) ........ 18

D. The Voluntary Payment Doctrine Is Inapplicable To ACAL § 25.07(4) Claims ........ 22

E. Plaintiff's ACAL § 25.07(4) Should Not Be Stricken On The Basis Of The Voluntary Payment Doctrine ........ 25

CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Allco Fin. Ltd. v. Klee*,
861 F.3d 82 (2d Cir. 2017) .......... 14

*Caro Capital, LLC v. Koch*,
653 F. Supp. 3d 108 (S.D.N.Y. 2023) .......... 24

*Carter v. Scripps Networks, LLC*,
670 F. Supp. 3d 90 (S.D.N.Y. 2023) .......... 10

*Charles v. Color Factory, LLC*,
2024 WL 1693236 (S.D.N.Y. Apr. 19, 2024) .......... Passim

*Christopherson v. Cinema Ent. Corp.*,
2024 WL 1120925 (D. Minn. Mar. 6, 2024) .......... 2, 4

*Collins v. Pearson Educ., Inc.*,
2024 WL 895316 (S.D.N.Y. Mar. 1, 2024) .......... 1, 11

*Dallio v. Spitzer*,
343 F.3d 553 (2d Cir. 2003) .......... 15

*Dougherty v. North Fork Bank*,
301 A.D.2d 491 (2d Dep't 2003) .......... 22, 23

*Dowd v. Alliance Mtge. Co.*,
32 A.D.3d 894 (2d Dep't 2006) .......... 23

*Ellis v. Cartoon Network, Inc.*,
803 F.3d 1251 (11th Cir. 2015) .......... 9

*Fan v. NBA Properties Inc.*,
2024 WL 1297643 (N.D. Cal. Mar. 26, 2024) .......... 8

*Fed. Election Comm'n v. Akins*,
524 U.S. 11 (1998) .......... 16

*Fink v. Time Warner Cable*,
810 F. Supp. 2d 633 (S.D.N.Y. 2011) .......... 22

*First Nat. Bank of Chicago v. Silver*,
73 A.D.3d 162 (2d Dep't 2010) .......... 15

*Garza v. Alamo Intermediate II Holdings, LLC*,
2024 WL 1171737 (N.D. Cal. Mar. 19, 2024) .......... 2, 5, 6, 7

*Golden v. NBCUniversal Media, LLC*,
2023 WL 5434378 (S.D.N.Y. Aug. 23, 2023)....................Passim

*Goldstein v. Fandango Media, LLC*,
2023 WL 3025111 (S.D. Fla. Mar. 7, 2023) .................... 2, 5

*Harty v. W. Point Realty, Inc.*,
28 F.4th 435 (2d Cir. 2022) .................... 16, 17

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019).................... 6, 8

*Kassman v. KPMG LLP*,
925 F. Supp. 2d 453 (S.D.N.Y. 2013) .................... 11, 25

*Lebakken v. WebMD, LLC*,
640 F. Supp. 3d 1335 (N.D. Ga. 2022).................... 10

*Louth v. NFL Enterprises LLC*,
2022 WL 4130866 (D.R.I. Sept. 12, 2022) .................... 2, 6

*MacDonnell v. PHH Mortg. Corp.*,
45 A.D.3d 537 (2d Dep't 2007).................... 23

*Metcalf v. TransPerfect Translations Int'l, Inc.*,
632 F. Supp. 3d 319 (S.D.N.Y. 2022) .................... 13

*Mollett v. Netflix, Inc.*,
795 F.3d 1062 (9th Cir. 2015) .................... 8

*Nunez v. JPMorgan Chase Bank, N.A.*,
2024 WL 244624 (S.D.N.Y. Jan. 23, 2024) .................... 14

*OL USA LLC v. MAERSK A/S,*
2024 WL 1704706 (S.D.N.Y. Apr. 19, 2024) .................... 13

*Osheske v. Silver Cinemas Acquisition Co.*,
2023 WL 8188464 (C.D. Cal. Oct. 31, 2023) .................... 2, 4, 7

*Salazar v. Nat'l Basketball Ass'n*,
2023 WL 5016968 (S.D.N.Y. Aug. 7, 2023).................... 10, 11

*Scherer v. Equitable Life Assurance Soc'y of U.S.*,
347 F.3d 394 (2d Cir. 2003) .................... 14

*Schwartz v. Torrenzano*,
49 Misc. 3d 943 (Sup. Ct., Suffolk Cnty. 2015).................... 24

*Sellers v. Bleacher Rep., Inc.*,
2023 WL 4850180 (N.D. Cal. July 28, 2023) .......... 5, 11

*Spagnola v. Chubb Corp.*,
574 F.3d 64 (2d Cir. 2009) .......... 23

*Talarico v. Port Auth. of New York & New Jersey*,
367 F. Supp. 3d 161 (S.D.N.Y. 2019) .......... 11

*Tawam v. Feld Ent. Inc.*,
2023 WL 5599007 (S.D. Cal. July 28, 2023) .......... 7

*Tyler v. Hennepin Cnty., Minnesota*,
598 U.S. 631 (2023) .......... 15

*US Airways, Inc. v. Sabre Holdings Corp.*,
105 F. Supp. 3d 265 (S.D.N.Y. 2015) .......... 18

*Young v. Metro. Learning Inst., Inc.*,
2023 WL 1928001 (S.D.N.Y. Feb. 10, 2023) .......... 17

**STATUTES**

18 U.S.C. § 2710 .......... 1

18 U.S.C. § 2710(a)(1) .......... 8, 9

18 U.S.C. § 2710(a)(3) .......... 1

18 U.S.C. § 2710(a)(4) .......... 2, 4, 7

28 U.S.C. § 1332(d) .......... 13

New York Arts & Cultural Affairs Law (“ACAL”) .......... Passim

**RULES**

CPLR § 3005 .......... 24

**OTHER AUTHORITIES**

S. Rep. 100-599 .......... 2, 6, 7, 8

N.Y. Dep’t of State, Div. Licens. Servs., *Request for Additional Guidance – New York Senate Bill S.9461* .......... 12, 22, 24

## INTRODUCTION

AngelikaFilmCenter.com is a website operated by Defendant Reading International, Inc. ("Film Center"). On this website, individuals can watch movie trailers and buy tickets to movie screenings at the Film Center's brick-and-mortar theaters. The Film Center programmed the Meta Tracking Pixel on its website to disclose the titles of specific movie trailers individuals watch on its website, the titles of the movies individuals purchase tickets to see, and their Facebook IDs to Meta without obtaining individuals' informed written consent. As this Court has recognized, this precise kind of disclosure can run afoul of the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). *Collins v. Pearson Educ., Inc.*, -- F. Supp. 3d --, 2024 WL 895316, at *8 (S.D.N.Y. Mar. 1, 2024) (Engelmayer, J.).

Plaintiff used angelikafilmcenter.com to watch movie trailers and to purchase tickets to a movie in one of Defendant's theaters. Unbeknownst to her, when she did so, Defendant used the Meta Tracking Pixel to disclose her personally identifiable information— "includ[ing] information which identifies a person as having requested or obtained specific video materials or services from" Defendant, 18 U.S.C. § 2710(a)(3)—to Meta in violation of the VPPA.

Plaintiff's injury did not end there. The Film Center lured her into buying the movie tickets by advertising an artificially low price. After she selected her tickets for purchase, the Film Center snuck in a $2.19 "service charge" per ticket. Worse yet, the Film Center put her on a five-minute shot clock that required her to click through several convoluted screens, answer various questions, input her personal information, and complete the transaction, within the allotted time, all of which made it even more difficult to even notice these service charges. After discovering these service charges were illegal under New York State's newly enacted Arts & Cultural Affairs Law ("ACAL") § 25.07(4), Plaintiff sued.

The Film Center moves to dismiss Plaintiff's VPPA claim and to strike her VPPA

classes, arguing that "the VPPA has never been stretched to cover movie theaters selling tickets in any jurisdiction." Memorandum In Support of Motions to Dismiss and Strike, ECF No. ("MTD") at 10. This misses the mark. The complaint alleges that the Film Center also plays movie trailers on its website and that Plaintiff watched those trailers. Courts have uniformly held that if a movie theater operator plays prerecorded streaming videos on its website, it can be a video tape service provider ("VTSP"), defined as "any person engaged in the business of … delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4) (emphasis added). *See Christopherson v. Cinema Ent. Corp.*, 2024 WL 1120925, at *3 (D. Minn. Mar. 6, 2024); *Osheske v. Silver Cinemas Acquisition Co.*, -- F. Supp. 3d --, 2023 WL 8188464, at *6 (C.D. Cal. Oct. 31, 2023) *appeal filed* 23-3882 (9th Cir.); *Garza v. Alamo Intermediate II Holdings, LLC,* 2024 WL 1171737, *1 n.1 (N.D. Cal. Mar. 19, 2024), *appeal filed* No. 24-2165 (9th Cir.); *see also Goldstein v. Fandango Media, LLC*, 2023 WL 3025111, at *3 (S.D. Fla. Mar. 7, 2023) (holding the VPPA could apply to a website that streamed videos and sold movie tickets).

To be sure, the Film Center can also be considered a VTSP for a second reason: it delivers open-reel movies and similar audio visual materials on the silver screen. After all, the definition of a VTSP "looks to a video's format, rather than … the provider's identity." *Golden v. NBCUniversal Media, LLC*, -- F. Supp. 3d --, 2023 WL 5434378, at *4 (S.D.N.Y. Aug. 23, 2023) (emphasis added) (Engelmayer, J.). The 1988 "Senate Report recommending passage of the VPPA specifically identifies 'open-reel movies,' as the types of technologies that provide 'similar audio visual materials,' beyond video cassette tapes." *Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (cleaned up) (quoting S. Rep. 100-599, at 12) (emphasis added). Simply put, "people ought to be able to … watch films without the whole world knowing." S. Rep. 100-599, 7 (quoting Rep. Al McCandless). And Plaintiff is a

consumer under the VPPA because she [1] "purchased admission tickets to Defendant's video service, the screening a movie on a cinema screen," [2] "created accounts to Defendant's purchase tickets to movie screenings," and [3] "signed up for a newsletter" that "provide[d] discounts and special offers" and "free screening invitations" to the Film Center's theaters screenings. Complaint, ECF No. 1 ("Compl.") ¶¶ 53-55, 71, 86-88.

The Film Center's arguments against the ACAL § 25.07(4) claim also fail. The law says that "[e]very operator … of a place of entertainment … shall disclose the total cost of the ticket, inclusive of all ancillary fees … prior to the ticket being selected for purchase." ACAL § 25.07 (emphasis added). The Film Center violated this provision by not disclosing its $2.19 per ticket service charge on its "TICKET SELECTION" screen depicted in Figure 16 of the complaint. The Court independently has jurisdiction to hear the ACAL claim under the Class Action Fairness Act. Plaintiff has standing to bring her ACAL claim because it involves the payment of an unlawful fee. *Charles v. Color Factory, LLC*, 2024 WL 1693236, at *3 (S.D.N.Y. Apr. 19, 2024). And such a claim is not barred by the voluntary payment doctrine. *Id*. In fact, the New York state lawmaker who wrote the law and sponsored the bill, Senator James Skoufis, submitted a letter in another federal case stating that "the Voluntary Payment Doctrine should not bar a Plaintiff's various claims under the Arts and Cultural Affairs Law. The Legislature never intended for this doctrine to shield bad actors [for] … consciously misleading customers through deceptive pricing models." *Charles v. Color Factory, LLC*, Case No. 1:24-cv-00322, ECF No. 21 (S.D.N.Y. Apr. 5, 2024) ("Sen. Skoufis Letter").

## ARGUMENT

### I. PLAINTIFF PLAUSIBLY ALLEGES A VPPA CLAIM AND HER CLASSES SHOULD NOT BE STRICKEN

#### A. The Film Center Is A Video Tape Service Provider Because It Delivers Movie Trailers On Its Website And Movies On Its Silver Screen

The Film Center argues it is not a video tape service provider ("VTSP") because it "alleged simply to operate movie theaters and to provide a website through which movie tickets are sold." MTD at 2; *see* also MTD at 8-9. This is incorrect both as a matter of law and fact. As a matter of law, this Court recognized in *Golden v. NBCUniversal Media, LLC* that the definition of VTSP "looks to a video's format, rather than … the provider's identity." -- F. Supp. 3d --, 2023 WL 5434378, at *4 (S.D.N.Y. Aug. 23, 2023) (Engelmayer, J.); *see* 18 U.S.C. § 2710(a)(4) (defining a VTSP as "<u>any person</u>, engaged in the business … of rental, sale, or delivery of prerecorded video cassette tapes or <u>similar audio visual materials.</u>"). And as a matter of fact, the Film Center entirely ignores the complaint's allegations that the Film Center plays "hundreds of videos on its website," like pre-recorded "movie trailers." Compl. ¶¶ 19, 85.

As the Court in *Cinema Entertainment Corporation* put it, if a movie theater operator's "website offers a mechanism through which an individual may view a video on said website, then the operator of said website may be reasonably classified as a 'video tape service provider' of the purposes of the VPPA." 2024 WL 1120925, at *3 (D. Minn. Mar. 6, 2024); *accord Osheske v. Silver Cinemas Acquisition Co.*, 2023 WL 8188464, at *6 (C.D. Cal. Oct. 31, 2023) *appeal filed* 23-3882 (9th Cir.) ("movie theaters can potentially be considered VTSPs if they engage in other prohibited conduct, such as disseminating online movies or trailers and then disclosing a viewer's home-viewing history."). This Court reached the same conclusion, noting "that websites that provide video content … are video tape service providers under the VPPA." *Golden*, 2023 WL 5434378, at *4 (S.D.N.Y. Aug. 23, 2023) (quoting *Sellers v. Bleacher Rep.,*

*Inc.*, 2023 WL 4850180, at *6 (N.D. Cal. July 28, 2023)) (collecting cases). In *Golden*, this Court held that Today.com was a VTSP because it operated a website that played pre-recorded videos. *Id*. Likewise, here, the Film Center is a VTSP because it too operates a website "where movie-goers can …watch movie trailers." Compl. ¶ 19. And Plaintiff "frequented Defendant's Website to … watch trailers and [buy] movie tickets." *Id.* ¶ 72.

The Film Center argues Plaintiff "conflates consistently the sale of movie tickets, which are not actionable under the VPPA for the reasons stated herein, and the peripherally offered move trailers as the basis for bringing her VPPA claim." MTD at 3. This is inappropriate at the pleadings stage. "To the extent [defendant] factually disputes the [Complaint's] averments as to [the website's] operation and business model, that argument is premature on a motion to dismiss stage." *Golden*, 2023 WL 5434378, at * 4. Indeed, the Court in *Fandango* similarly denied a motion to dismiss on the grounds that a website that played movies and sold movie tickets could be a VTSP. 2023 WL 3025111, at *3 (S.D. Fla. Mar. 7, 2023). *Fandango* held that:

> [T]o answer the question of whether Defendant is a "video tape service provider," the Court must determine the nature of Defendant's business. That determination, however, requires a factual inquiry that goes beyond the pleadings. For example, Defendant claims its business is selling movie tickets and the videos serve to promote this business. However, without additional information regarding how much business Defendant devotes to each of these goals, the Court cannot ascertain the nature of Defendant's business.

2023 WL 3025111, at *3.

The Film Center also argues "this case is no different than" *Garza v. Alamo Intermediate II Holdings, LLC,* 2024 WL 1171737, (N.D. Cal. Mar. 19, 2024), *appeal filed* No. 24-2165 (9th Cir.), a one-page order holding the VPPA did not cover movie theaters selling movie tickets. MTD at 8. Except this case *is* different. In *Alamo*, the Court acknowledged that the movie theater could be a VTSP to the extent it "used to run a streaming service, which could involve the rental, sale, or delivery of movies," but noted that Plaintiff "never used the streaming

service." 2024 WL 1171737, at *1, n.1. Here, in contrast, Plaintiff *does* allege she watched streaming movie trailers on the Film Center's website. Compl. ¶ 72.

To be sure, the Film Center is *also* independently a VTSP because it is engaged in the business of delivering movies on the silver screen. As this Court noted, the definition of VTSP "looks to a video's format." *Golden*, 2023 WL 5434378, at *4. To that end, the "Senate Report recommending passage of the VPPA specifically identifies 'open-reel movies,' as the types of technologies that provide 'similar audio visual materials,' beyond video cassette tapes." *Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (cleaned up) (quoting S. Rep. 100-599, at 12) (emphasis added). The open-reel movie was the video format theaters primarily used to play movies in 1988, and to this day, many theaters still use them.

The court in *Alamo* acknowledged that the dictionary definitions of the word "delivery" could cover the projection of movies on the silver screen, but said "it would be quite a stretch to say that movie theaters 'send' movies by projecting them onto a screen." 2024 WL 1171737, at *1 (Chhabria, J.). However, that same judge also held that "Facebook 'regularly delivers' video content to users" via the internet. *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 799 (N.D. Cal. 2019) (Chhabria, J.). Movie theaters "send" movies to moviegoers by projecting light onto a screen, which bounces off the screen and to the moviegoers in their cinema seats. Facebook (and other websites) "send" videos through a much more circuitous route – sending signals of data from Facebook's servers to satellites in outer space, which then send those same signals to a consumer's browser, which are then projected from the computer screen to the consumer. If anything, it is more of a "stretch" to say Facebook delivers videos than it is to say Defendant delivers movies. For this same reason, even under the *Alamo* court's preferred definition of "delivery" as the act of "bringing something to a … place," it is no stretch to say theaters "bring" movies to the silver screen. 2024 WL 1171737, at *1.

*Alamo* was concerned that reading the word "'delivery' [as] a catch-all term that refers to the act of 'producing a promised result,'" would mean "that the statute sweeps in any business that provides access to audiovisual content." 2024 WL 1171737, at *1. But other courts have not had such qualms. "The requirement that a defendant be 'engaged in the business … of the … delivery' of video content is typically straightforward to apply in cases in which the defendant directly rents or sells … access to [video] content over the internet." *Tawam v. Feld Ent. Inc.*, -- F. Supp. 3d --, 2023 WL 5599007, at *4 (S.D. Cal. July 28, 2023) (collecting cases). Nor would it entitle anyone under the sun to sue; the VPPA only protects the privacy of a "consumer" that "rent[s], purchase[s], or subscribe[s]" to a VTSP's "goods or services." 18 U.S.C. 2710(a)(1).

*Alamo* finally holds that movie theaters cannot be a VTSP because "people go to the movies, not the other way around." 2024 WL 1171737, at *1. But as this Court knows, "the statute … was prompted by disclosure of the list of videos Judge Bork rented" from "a brick-and-mortar video store." *Golden*, 2023 WL 5434378, at *7 and n.9. Judge Bork went to this "video store," not the other way around. The Senate Report also lists the "department store," the "golf shop," and the "continuity club," as examples of businesses that could be VTSPs. Compl. ¶ 17 (citing S. Rep. 100-599, at 12-13). People also go to these places, not the other way around. A VTSP is "any person, engaged in the business … of the … rental, sale, or delivery of" certain kinds of "similar audio visual materials." 18 U.S.C. § 2710(a)(4) (emphasis added).[1]

[1] The only other decision that held a movie theater is not a VTSP for conducting film screenings is *Osheske v. Silver Cinemas*, *supra*, which the Film Center never cites. This Court need not decide at this time whether *Osheske* was correctly decided because *Osheske* held its "order does not extend" to cases like this one, which involve the disclosure of "movie trailers." 2023 WL 8188464, at *5. And it may be reversed by the time this Court revisits it at summary judgment.

That said, *Osheske* largely based its decision on the mistaken belief "that the VPPA intended to address private video viewing habits—not public acts like attending a theater." 2023 WL 8188464, at *5. This is incorrect. The VPPA is "transaction-oriented," S. Rep. 100-599, at 12, and applies to public acts like Judge Bork renting VHS tapes from his local D.C. area video store. As such, other courts have held plaintiffs had plausible claims against social media

### B. Plaintiff Is A Consumer Because She Paid For Film Screening Services And Subscribed To The Newsletters About Films

The Film Center also argues that Plaintiff does not "establish through her pleadings that she is a 'consumer,'" MTD at 9, or in the alternative, that two of Plaintiff's three proposed VPPA classes should be stricken because those defined classes are not "consumers" under the VPPA. MTD at 17-18. This is incorrect. Plaintiff plausibly alleges she is a consumer for three independent reasons, and proposes a different VPPA class based on each one of these independent reasons.

Under the VPPA, "the term 'consumer' means any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).

<u>Consumers Pay For Movie Screenings</u>: Plaintiff specifically alleges she purchased tickets to a movie screening on December 2, 2023, Compl. ¶ 74, and seeks to represent a class of "all persons in the United States who [had their personally identifiable information disclosed] and who purchased tickets to a movie screening at one of Defendant's theaters," *id*. ¶ 77(a). The Complaint thus asserts the Plaintiff and members of the Movie Screening Class are "consumers" because they "purchase[d] [a] service"—namely, "the screening [of] a movie on a cinema screen." Compl. ¶ 86. The Film Center argues these individuals cannot be consumers because

---

platforms for sharing their video consumption habits to unauthorized third-party companies, even though they selectively shared some of those consumption habits to other people in their social networks. *See in re Facebook*, *supra*, 402 F. Supp. 3d at 799 and *Fan v. NBA Properties Inc.*, 2024 WL 1297643, at *3, n.5 (N.D. Cal. Mar. 26, 2024).

The privacy right the VPPA protects is not the right to keep one's video consumption completely secret, but to "allow[] consumers to <u>maintain control</u> over personal information … generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8 (emphasis added); *accord Mollett v. Netflix, Inc.*, 795 F.3d at 1065-66 (9th Cir. 2015) ("protection is merited when the consumer <u>lacks control</u> over the dissemination of the information at issue") (emphasis added). That principle applies with equal force to movies shown in theaters. Simply because moviegoers wish to see a movie in a theater with friends and strangers does not mean they wish to have digital marketing companies reuse that same information to build consumer profiles and target advertising. After all, the spotlight is supposed to be on the movie, not on the consumer.

the "only alleged 'purchase' was of a movie ticket—not cassette tapes or similar audio-visual materials." MTD at 9. But the term consumer does not limit itself to purchasers of audio-visual materials themselves. The definition of consumer includes any "purchaser" of either "goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). People do not buy movie tickets from the Film Center's website to admire how the tickets look on their phones. People buy movie tickets to obtain a specific video service: the immersive experience of watching a film in the cinema (for which the home television is no substitute). In other words, the movie ticket is not the good being purchased, it is the proof one purchased a specific video service.[2]

Consumers Subscribe To Angelika Film Center Accounts: Plaintiff alleges she created an account with the Film Center's Website in October 2022 to purchase movie tickets, Compl. ¶ 71, and seeks to represent a class of "all persons in the United States who have a AngelikaFilmCenter.com account" and had their personally identifiable information disclosed, *id*. ¶ 77(b). Plaintiff and members of this class are "'subscribers' and therefore, 'consumers'" because they "created an account on Defendant's Website to purchase tickets to movie screenings." Compl. ¶ 87. While the VPPA does not define the term "subscriber," courts generally hold that "the act of 'subscription' entails 'some or most of the following factors: payment, registration, commitment, delivery, expressed association, and/or access to restricted content.'" *Golden*, 2023 WL 5434378, at *10 (citing *Ellis v. Cartoon Network, Inc*., 803 F.3d 1251, 1256 (11th Cir. 2015)). These factors are all present here. Class members create accounts to pay for movie tickets, Compl. ¶ 87, they register by inputting various pieces of personal information, *id*. ¶¶ 54 and 71, Fig. 20, they show a commitment and association by logging into their accounts and earning "Membership Rewards" on movie ticket purchases, *id*. ¶¶ 54-55, Figs.

[2] Similarly, the Film Center's argument that the movie screening class members are not "subscribers" under the law is a non-sequitur. MTD at 17. Plaintiff alleges they are "purchasers" of services. Compl. ¶ 86.

12 and 20, the Film Center delivers movies to these account holders when they visit its theaters, and class members gain access to restricted content by using their tickets to access particular movie screenings in theaters. The Film Center does not seek to strike this class or otherwise challenge it other than by noting that one can create an account for free. MTD at 9. But class members create accounts in connection with movie ticket purchases. And in any event, as this Court noted, a subscription "does not necessarily require payment." *Golden*, 2023 WL 5434378, at *10 (quoting *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1339 (N.D. Ga. 2022)).

Consumers Sign Up For the Film Center's Newsletter: Plaintiff alleges she "signed up for … Defendant's newsletter," Compl. ¶ 88, and seeks to represent "all persons in the United States who signed up for a AngelikaFilmCenter.com newsletter" and had their personally identifiable information disclosed, *id*. ¶ 77(c). Plaintiff and members of this class are "'subscribers' and therefore, 'consumers'" because they signed up for a newsletter that gave them "discounts and special offers to Defendant's movie screenings," as well as "free screening invitations." Compl. ¶¶ 53, 88, Fig. 11. Like the Account class members, the Newsletter class members are subscribers who register, commit, and associate with the Film Center and receive "discounts and special offers" in connection with their film screening purchases. In addition, they receive "access to restricted content" by receiving "free [film] screening invitations."

Attempting to strike this class, the Film Center relies on *Carter v. Scripps Networks, LLC*, 670 F. Supp. 3d 90 (S.D.N.Y. 2023) and *Salazar v. Nat'l Basketball Ass'n*, -- F. Supp. 3d --, 2023 WL 5016968 (S.D.N.Y. Aug. 7, 2023). *See* MTD at 18. But both cases are distinguishable. In *Carter*, the court held that people who signed up for newsletters were not subscribers because "there is no assertion that a newsletter [gave individuals] extra benefits as viewers" "or that it enhanced or in any way affected their viewing experience." 670 F. Supp. 3d at 99. Similarly, the individuals that signed up for newsletters in *Salazar* also received no extra

"access to the videos on the NBA.com site that any member of the public would not otherwise have." 2023 WL 5016968, at *9. Here in contrast, people who signed up for the Film Center's newsletter received free movie screenings and special offers and discounts out of their association. These perks plausibly allege a subscription to video services that the VPPA covers.

### C. The Film Center's Motion To Strike Plaintiff's VPPA Classes Is Premature And Legally Incorrect

Defendant's attempt to strike Plaintiff's Movie Screening and Newsletter VPPA classes is premature. *See*, *e.g.*, *Collins*, *supra*, 2024 WL 895316, at *10 (denying motion to strike VPPA class as premature); *Sellers v. Bleacher Rep., Inc.*, 2023 WL 4850180, at *8 (N.D. Cal. July 28, 2023) (also denying motion to strike VPPA class as premature). Indeed, courts in this Circuit have consistently held that challenges to class certification at the pleading stage are premature. *See, e.g.*, *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 464 (S.D.N.Y. 2013).

Moreover, as discussed above in Section I.B, the complaint plausibly states that Plaintiff and members of the movie screening and newsletter classes are consumers under the VPPA. "Therefore, to the extent that the [Defendant] argues that [Plaintiff's] class allegations should be struck for failure to articulate more than the sort of 'conclusory' claims that are properly addressed at the pleadings stage, that argument fails." *Talarico v. Port Auth. Of New York & New Jersey*, 367 F. Supp. 3d 161, 174 (S.D.N.Y. 2019).

## II. PLAINTIFF'S ACAL §25.07(4) SHOULD ALSO NOT BE DISMISSED

### A. Relevant Statutory Background

Effective August 29, 2022, New York enacted Arts & Cultural Affairs Law § 25.07(4), which provides that:

> Every operator or operator's agent of a place of entertainment … shall disclose the total cost of the ticket, inclusive of all ancillary fees that must be paid in order to purchase the ticket, and disclose in a clear and conspicuous manner <u>the portion of the ticket price stated in dollars that represents a service charge</u>, or <u>any other fee</u> or surcharge to the purchase. Such <u>disclosure</u> of the <u>total cost</u> and fees shall be displayed in the ticket listing <u>prior to</u> the ticket being <u>selected for purchase</u>. … The price of the ticket shall not increase during the purchase process.

*Id.* (emphasis added).

The law was passed in response to a "2020-21 legislative investigation into the state's live event ticket industry due to concerns about potentially unfair, deceptive, and anti-consumer practices occurring in the primary and secondary markets." Fraietta Decl., Ex. B, Sponsor Memo. That investigative committee concluded that "[b]y not having a true picture of the price of a ticket until checkout, the customer lacks timely and valuable information to be able to make a fully informed purchase based on 'shopping around' among similar resellers." Fraietta Decl., Ex. A at 26. The committee added that "all-in pricing would at least make fees more predictable to the everyday consumer and potentially could facilitate 'reasonableness' of fees by requiring heightened visibility." *Id.* And the committee noted:

> [S]everal primary and secondary platforms offered support for all-in pricing models and acknowledged actively using such technology. However, these businesses stressed the competitive disadvantages compared to other platforms that did not display the total price of tickets at the onset of a transaction. Primary and secondary platforms largely expressed approval for the adoption of all-in pricing but only if it was an industry-wide standard.

*Id.* at 26-27. ACAL § 25.07(4) ensures an "industry-wide standard" to level the playing field. *See also* Sen. Skoufis Letter at 1-2 (describing same).

Shortly after the law was enacted, ticketing websites peppered the State of New York's Division of Licensing Services with questions about the scope of the law. *See* N.Y. Dep't of State, Div. Licens. Servs., *Request for Additional Guidance – New York Senate Bill S.9461*, Compl., Ex. A (ECF No. 1-1). As explained by the Division of Licensing Services, "the ticket purchasing process begins once a consumer visits a ticket marketplace and first sees a list of seat prices." Compl., Ex. A at 1. "From the moment the prospective purchaser assesses the [] ticket lists through the final payment … there should be no price increases to the purchaser for the ticket itself." *Id.* "When a prospective purchaser selects a ticket with full disclosure of the ticket

price, the purchaser should not then have to search for the total price of the ticket as the purchaser proceeds through the purchasing process, it should continue to be readily available to the purchaser." *Id*. at 2 (emphasis added). "In short, the ticket listing must include the total cost of the ticket, with a breakdown of all service charges, fees and surcharges, that the purchaser must pay just to purchase the ticket." *Id.* (emphasis added).

**B. This Court Has Subject Matter Jurisdiction Over Plaintiff's ACAL Claim**

1. There is CAFA Jurisdiction Here

Citing paragraphs 10 and 11 of the Complaint, the Film Center incorrectly argues that "the dismissal of the VPPA claim removes the only alleged basis for this Court's jurisdiction." Motion, at 10 (emphasis added). Defendant overlooks paragraph 12 of the Complaint:

> This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a citizen of a state different from Defendant. Defendant sold at least 100,000 tickets to movie screenings taking place in the state of New York through its website during the applicable class period, and is liable for a minimum of fifty dollars in statutory damages for each ticket sold.

Compl. ¶ 12.

In a footnote, the Film Center incorrectly argues these allegations insufficiently plead in "conclusory and speculative fashion that a proposed class action would exceed $5,000,000.00." MTD at 2, n.2. The Film Center fundamentally misunderstands the standard. "Federal courts recognize 'a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy.'" *OL USA LLC, v. MAERSK A/S*, 2024 WL 1704706, at *4, n.2 (S.D.N.Y. Apr. 19, 2024) (Engelmayer, J.); *accord Metcalf v. TransPerfect Translations Int'l, Inc*., 632 F. Supp. 3d 319, 334 (S.D.N.Y. 2022) (noting the same in the class action context). "To overcome the face-of-the-complaint presumption, the party opposing jurisdiction

must show 'to a legal certainty' that the amount recoverable does not meet the jurisdictional threshold. Our cases have set a high bar for overcoming this presumption. The legal impossibility of recovery must be so certain as virtually to negative the plaintiff's good faith in asserting the claim." *Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003). The Film Center puts forth nothing to meet its "high bar." Thus, [b]ecause "the Court cannot say 'to a legal certainty' that [plaintiff's] claim 'does not meet the jurisdictional threshold,'" the Film Center's argument must be rejected. *Nunez v. JPMorgan Chase Bank, N.A.*, 2024 WL 244624, at *4 (S.D.N.Y. Jan. 23, 2024) (Engelmayer, J.).

2. <u>Plaintiff Has Article III Standing Because She Paid An Unlawful Fee</u>

The Film Center argues Plaintiff lacks standing to pursue her ACAL § 25.07(4) claim. MTD at 11. Not so. *Charles v. Color Factory, LLC* establishes that Plaintiff has Article III standing because "[t]he allegation that plaintiff paid an unlawful fee is a sufficiently concrete economic injury to confer standing." 2024 WL 1693236, at *3 (S.D.N.Y. Apr. 19, 2024); *accord Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 95-96 & n.11 (2d Cir. 2017).

In both this case, as in *Color Factory*, "Defendant … entirely overlooks that the complaint alleges that plaintiff suffered an economic injury that flowed from defendant's purported violation of the statute." 2024 WL 1693236, at *3. "Specifically, the complaint alleges that plaintiff was injured when she was charged and paid a fee that was rendered unlawful by defendant's failure to disclose the 'total cost … to [p]laintiff at the beginning of the purchase process' … in violation of New York Arts & Cultural Affairs Law § 25.07(4)." *Id.* Plaintiff here made the very same allegation: the Film Center's "service charges were not disclosed to Plaintiff at the beginning of the purchase process, and therefore, are <u>unlawful</u> pursuant to New York Arts & Cultural Affairs Law § 25.07(4)." Compl. ¶ 101 (emphasis added). "Plaintiff was harmed by paying these service charges." *Id.* "This is a classic

pocketbook injury sufficient to give her standing." *Tyler v. Hennepin Cnty., Minnesota*, 598 U.S. 631, 636 (2023).

ACAL § 25.07(4) creates a condition precedent to a service charge's lawfulness by its use of "shall." "Every operator… of a place of entertainment" that wishes to impose a service charge "shall disclose the total cost of the ticket… and disclose in a clear and conspicuous manner the portion of the ticket price stated in dollars that represents a service charge … prior to the ticket being selected for purchase." ACAL § 25.07(4) (emphasis added). "[I]n the legal context … 'Shall' is universally understood to indicate an imperative or mandate.'" *Dallio v. Spitzer*, 343 F.3d 553, 562 (2d Cir. 2003) (citing Black's Law Dictionary, 1375 (6th ed. 1998)). So courts interpreting New York statutes with similar kinds of notice provisions consistently hold that the word "shall" signals a condition precedent to the lawfulness of the action that is the subject of the notice. For example, New York courts have held that the New York Home Equity Theft Protect Act's "notice requirement [is] a mandatory condition or condition precedent" to foreclosure where the statute used the language, "the notice required by this section shall be delivered." *First Nat. Bank of Chicago v. Silver*, 73 A.D.3d 162, 166 (2d Dep't 2010) (collecting cases). In other words, a foreclosure is illegal if the prior notice was not given. *Id*.

This mirrors how "courts have treated other statutory notice requirements" in other New York laws like RPAPL §§ 735, 749, Real Property Law § 232–a, Vehicle and Traffic Law § 313, and General Municipal Law § 50–e. *First Nat. Bank*, 73 A.D.3d at 167-69 (summarizing several cases). The common thread was that "all of these statutes contain the word 'shall.'" *Id*. at 169. These cases illustrate that actions like foreclosures (Real Property Law § 265-a; RPAPL § 1303), evictions (RPAPL §§ 735, 749, Real Property Law § 232–a), insurance coverage terminations (Vehicle and Traffic Law § 313), and certain tort claims (General Municipal Law § 50–e) can be lawful, but only if statutory notice is provided beforehand. So it is here: a

"reasonable service charge" can be lawful, but only if "total cost of the ticket" and the "portion … that represents a service charged" is disclosed "prior to the ticket being selected for purchase." ACAL § 25.07(4).

The Film Center seems to contend that its "service charges" were permitted under ACAL § 25.29(1)(a). *See* MTD at 13. But a "defendant's challenge[] [to] the merits undergirding plaintiff's theory that the fees were unlawful … is not a proper inquiry for the Court to undertake," because "'standing in no way depends on the merits of plaintiff's contention that particular conduct is illegal.'" *Color Factory*, 2024 WL 1693236, at *3 (citation omitted).[3]

3. Plaintiff Has Article III Standing Because She Suffered An Informational Injury

"[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998). This "informational injury" is "sufficiently concrete" and particularized to create Article III standing. *Id.* at 12. "An 'informational injury'… give[s] rise to standing [when] plaintiff [] identif[ies] 'downstream consequences from failing to receive the required information.'" *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 444 (2d Cir. 2022) (citation omitted)

[3] In any event, ACAL § 25.29 does not aid the Film Center because that provision does not deem all service charges categorically lawful. In fact, the default rule is the opposite: "No operator of any place of entertainment … shall … exact, demand, accept or receive, directly or indirectly, any premium or price in excess of the established price plus lawful taxes." ACAL § 25.29(1) (emphasis added). Section 25.29(1)(a) is an exception that says a "reasonable service charge … for special services" is not prohibited. (Emphasis added). Defendant submits no evidence explaining what its service charges are for, so it is impossible to determine whether they even falls under ACAL § 25.29(1)(a).

Even if they did, that would still not render them lawful. ACAL§ 25.29(1)(a) simply says "nothing in this article shall be construed to prohibit a reasonable service charge," and Plaintiff's reading of ACAL § 25.07(4) does not prohibit reasonable charges either. ACAL § 25.07(4) simply provides that, if service charges are going to be imposed, then the "total cost of the ticket" and "a clear and conspicuous" breakdown of the "service charge" "shall" be disclosed beforehand. As the State Senate's Report found, "all-in pricing… could facilitate 'reasonableness' of fees by requiring heightened visibility." Fraietta Decl., Ex. A at 26.

(emphasis added). This means "a plaintiff may properly allege an 'informational injury' where the defendant has deprived him of information required to make a 'meaningful choice' on the subject of his inquiry." *Young v. Metro. Learning Inst., Inc.*, 2023 WL 1928001, at *5 (S.D.N.Y. Feb. 10, 2023) (*citing Harty*, 28 F.4th at 444). This is the exact injury Plaintiff suffered and the exact injury Section 25.07(4) seeks to stop.

Prior to enacting the current version ACAL § 25.07(4), the New York State Senate commissioned an investigation on ticketing practices and concluded "all-in pricing in New York for both primary and second ticketing platforms" would "ensure an informed purchasing process." Fraietta Decl., Ex. A at 27. "By not having a true picture of the price of a ticket until checkout, the customer lacks timely and valuable information to be able to make a fully informed purchase based on 'shopping around' among similar resellers." *Id.* at 26. "As Consumer Reports stated in its written testimony, 'hidden fees charged by ticket sellers are frustrating to consumers, and <u>they distort the marketplace and cause consumer harm</u>.'" *Id.* (emphasis added)

As applied here, Plaintiff suffered an informational injury by failing to receive all-in pricing at the outset of the transaction. She did not know about how much her trip to the movies would cost her before she selected the ticket for purchase. *See* Compl. ¶¶ 9-15 and Figures 1-8; 32-34. As such, she could not "make a 'meaningful choice' on the subject of her inquiry," *Young*, 2023 WL 1928001, at *5, because she was deprived of the "timely and valuable information [needed] to make a fully informed purchase based on 'shopping around' among similar resellers," Fraietta Decl., Ex. A at 26. She could not compare the true costs of her trip to the movies from the Film Center, AMC, Regal, Fandango, or some other video service provider.

The downstream consequence of the Film' Center's untimeliness is market distortion and consumer harm. In other words, because Plaintiff "cannot shop around," the Film Center can reduce price competition and cause consumers to overpay. Fraietta Decl., Ex. A at 26. This kind

of injury is a close cousin to the typical antitrust injury that has long been cognizable under common law. *See, e.g.*, *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 285 (S.D.N.Y. 2015), *aff'd*, 938 F.3d 43 (2d Cir. 2019) (holding that plaintiff had "standing to pursue its claim for booking fee overcharges" because defendant's "computerized reservation system" cause defendant to "pay above-market prices, and possibly increas[ed] ticket prices.").

### C. Plaintiff Plausibly Alleges A Violation Of ACAL § 25.07(4)

The Film Center argues it complied with ACAL § 25.07(4) because it disclosed its service charges on its seat selection page on Figure 17 of the Complaint. *See* MTD at 11. This fails because it should have disclosed those service charges earlier, on the "TICKET SELECTION" page, Figure 16-A. The law says "[t]he total cost and fees shall be displayed in the <u>ticket listing</u> prior to the ticket being <u>selected for</u> purchase." ACAL § 25.07(4)(emphasis added). As the bill sponsor aptly put it, this means "the first price you see for a ticket should be the price you pay for a ticket." Sen. Skoufis Letter, at 1. That is not what happens here.

Plaintiff's complaint plausibly alleges Defendant violated ACAL § 25.07(4). "On December 2, 2023, Plaintiff purchased tickets to a movie screening at Defendant's theater located on 18 West Houston Street, New York, New York, and followed a checkout flow process substantially similar to that depicted in Figures 14-19 in this Complaint." Compl. ¶ 74. Figure 16-A of the Complaint is "ticket listing" where "the ticket [is] being selected for purchase." The top bar on Figure 16-A shows that the Film Center has split up the movie ticket purchase process into five steps: (1) "MOVIE SELECTION", (2) "TICKET SELECTION", (3) "SEAT SELECTION", (4) "ORDER CONFIRMATION", and (5) "PAYMENT." *See* below.




Figure 16-A.

Because the "> TICKET SELECTION >" bar is illuminated in blue, Figure 16-A clearly denotes that this screen is where "the ticket [is] being selected for purchase." ACAL § 25.07(4). This means that the ticket's "total cost and fees" must included on this screen, on or a prior screen, so it is seen "prior to the ticket being selected for purchase." "Such disclosure" must state, "in a clear and conspicuous manner the portion of the ticket price stated in dollars that represents a <u>service charge</u>." ACAL § 25.07(4) (emphasis added).

However, as shown below, the service charge is nowhere to be found on Figure 16-A




Figure 16-A.

Because "the portion of the ticket price stated in dollars that represents a service charge" is not displayed on this "ticket listing" page as "the ticket [is] being selected for purchase," Plaintiff plausibly alleges a violation of ACAL § 25.07(4).

"*After* a consumer selects the type and number of tickets she wishes to purchase for the movie she selected, at the theatre she selected, and for the showtime she selected, she is brought to a screen requiring her to select her seats." Compl. ¶ 68 (citing Figure 17, reproduced below).




Figure 17.

However, that is not all. ACAL § 25.07(4) provides that "[d]isclosures of sub<u>totals</u> … shall not be false or misleading." (Emphasis added). And yet Figure 16-A falsely states that the "TOTAL" cost of the ticket is $36.00, when in fact, this is only a subtotal that does not include the Film Center's $4.38 service charge. On Figure 17, the "TOTAL" cost of the ticket increases to $40.38. This too, independently establishes a violation of ACAL§ 25.07(4).

The Film Center's argument to the contrary consists of nothing more than selectively quoting the New York Department of Licensing Services' guidance out of context to confuse the

issues and the Court. *See* MTD at 11 (quoting Compl. ¶ 64, which in turn, quotes the Department letter). The Department's letter was discussing the application of the law in the context of a "ticket marketplace" like Ticketmaster.com where tickets and seats are presumably are shown on the same page, *i.e.*, a listing of different tickets for seats at Madison Square Garden for seats to a Knicks game. Any ambiguity is clarified by the two immediately following sentences: "From the moment the prospective purchaser assesses the [] ticket lists through the final payment … there should be no price increases to the purchaser for the ticket itself. When a prospective purchaser selects a ticket with full disclosure of the ticket price, the purchaser should not then have to search for the total price of the ticket as the purchaser proceeds through the purchasing process, it should continue to be readily available to the purchaser." Compl. ¶ 64 (quoting N.Y. Dep't of State, Div. Licens. Servs., Request for Additional Guidance – New York State Senate Bill S.9461).

### D. The Voluntary Payment Doctrine Is Inapplicable To ACAL § 25.07(4) Claims

The Film Center also argues Plaintiff's claim is barred by the voluntary payment doctrine. MTD at 14-15. This fails for several reasons.

First, as the Court in *Color Factory* noted, "'the voluntary payment doctrine does not apply when a plaintiff's claim is predicated on a lack of full disclosure by defendant.' And that is exactly what plaintiff alleges occurred here." *Color Factory*, 2024 WL 1693236, at *4 (quoting *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 649 (S.D.N.Y. 2011)). In *Color Factory*, defendant had lumped its "Taxes & Fees" together into a single category, and put consumers on a shot clock of "eight minutes to reserve the ticket." *Id*. at *1 and *4. Here, Plaintiff also alleges a "lack of full disclosure." The Film Center failed to disclose the "total cost of a ticket, inclusive of all ancillary fees" in Figure 16-A, and *after* a consumer selects their ticket on Figures 16-A and 16-B (same screen), "a five-minute timer begins." Compl. ¶ 68.

"[B]ecause of the timer displayed on the upper-right hand corner of the page, consumers are often not given sufficient time to review their purchase and notice the service charges Defendant charges them after initially misquoting the purchase price." Compl. ¶ 70. It is thus far from clear that Plaintiff was even aware of the service charges. Resolving these questions "would require the Court to make factual determinations … which would not be appropriate on a motion to dismiss." *Color Factory*, 2024 WL 1693236, at *4; *accord Spagnola v. Chubb Corp.*, 574 F.3d 64, 73 (2d Cir. 2009) (the motion to dismiss stage "is too early in this case" to adjudge the "voluntary payment doctrine" because "pleadings before the district court do not establish whether [plaintiff] knew or should have known [of] the increased amounts" charged).

Second, the voluntary payment doctrine does not apply ACAL § 25.07(4) claims because such claims concern the imposition of unlawful fees.[4] New York courts have refused to apply the doctrine in cases alleging the imposition of unlawful fees under Real Property Law § 274-a(2)(a). *See, e.g.*, *Dougherty v. North Fork Bank*, 301 A.D.2d 491, 492 (2d Dep't 2003) ("Pursuant to Real Property Law § 274-a(2)(a), North Fork was prohibited from charging the plaintiff for providing mortgage related documents. The assertion that the plaintiff voluntarily agreed to pay those fees is not a defense to this claim.") (quotation omitted); *MacDonnell v. PHH Mortg. Corp.*, 45 A.D.3d 537, 539 (2d Dep't 2007) (same); *Dowd v. Alliance Mtge. Co.*, 32 A.D.3d 894, 895-96 (2d Dep't 2006) (same).

And while New York courts have not yet considered application of the doctrine in the ACAL context, the same rationale applies. Defendant's imposition of the fees was unlawful. *See supra*, Section II.B.2.b. "The assertion that the plaintiff voluntarily agreed to pay those fees is not a defense to this claim." *Dougherty*, 301 A.D.2d at 492.

---

[4] *Color Factory* expressly noted it "need not decide" this issue because defendant's argument failed at the outset. 2024 WL 1693236, at *4.

Third, the doctrine does not apply in cases like this one, where a Plaintiff is charged an unlawful fee, but did not know such fee was unlawful, or even that it was imposed (because she is rushed by a timer to complete the purchase). *Caro Capital, LLC v. Koch*, 653 F. Supp. 3d 108, 130 (S.D.N.Y. 2023) ("By statute, the voluntary payment doctrine does not preclude recovery when a payment is made under a mistake of law or under a mistake of fact.") (citing CPLR § 3005) ("When relief against a mistake is sought in an action … relief shall not be denied merely because the mistake is one of law rather than one of fact."). *Schwartz v. Torrenzano* is directly on point here. There, the Plaintiff sought "reimbursement for rent paid for four years on premises without the benefit of a rental permit," as required by Southampton Town Code Chapter 270. *Schwartz v. Torrenzano*, 49 Misc. 3d 943, 950 (Sup. Ct., Suffolk Cnty. 2015). Relying on CPLR 3005, the Court held that "[t]he common law voluntary payment doctrine, which bars recovery of payments made with full knowledge of the facts, and in the absence of fraud or mistake of material fact or law … may have no application here, since plaintiff insists that she had no knowledge of the Town Code prohibition at issue." *Id.* at 703-04 (citations omitted). The voluntary payment doctrine should have no application here either where Plaintiff had no knowledge of the existence of N.Y. Art & Cultural Affairs Law § 25.07(4) when she purchased her tickets to the Film Center.

As Senator Skoufis, the lead sponsor, drafter, and negotiator for Senate Bill 9461 / Chapter Laws 358 of 2022 clarified: "the Voluntary Payment Doctrine should not bar a Plaintiff's various claims under the Arts and Cultural Affairs Law. The Legislature never intended for this doctrine to shield bad actors [for] … consciously misleading customers through deceptive pricing models." *See* Sen. Skoufis Letter, at 2.

**E. Plaintiff's ACAL § 25.07(4) Should Not Be Stricken On The Basis Of The Voluntary Payment Doctrine**

The Film Center argues that, even if Plaintiff's ACAL claims are not barred by the voluntary payment doctrine, she cannot pursue a class on this basis because determining whether the doctrine applies "would require individualized inquiry not capable of class-wide resolution." MTD at 20. However, as noted, challenges to class certification at the pleading stage are premature. *See, e.g., Kassman*, *supra*, 925 F. Supp. 2d at 464.

And as discussed above in Section D, New York courts have held, *as a matter of law*, that the doctrine does not apply in cases alleging the imposition of statutorily unlawful fees. And as discussed above in Section B.2, if the Film Center fails to disclose the service charges prior to the ticket being selected for purchase, then the resulting service charge is unlawful. Resolving this question would not require any individualized inquiry. The Film Center's website displays the service charges in an automated way. It does not vary from person to person. So, those service charges would be unlawful for each and every class member and thus, the voluntary payment doctrine would not apply to any class member. Thus, the ACAL classes should not be stricken.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Film Center's motions to dismiss and strike should be denied. In the alternative, Plaintiff should be given leave to amend.

Dated: May 10, 2024

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Philip L. Fraietta*
Philip L. Fraietta

Joshua D. Arisohn
Philip L. Fraietta
1330 Avenue of the Americas, 32 Fl.
New York, NY 10019
Telephone: (646) 837-7150

Facsimile: (212) 989-9163
Email: jarisohn@bursor.com
pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stefan Bogdanovich*
1990 N. California Blvd., Suite 940
Walnut Creek, CA 94595
Tel: (925) 300-4455
Fax: (925) 407-2700
E-Mail: sbogdanovich@bursor.com

**Pro Hac Vice Forthcoming*

*Attorneys for Plaintiffs*