UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HALEY BERRYMAN, individually and on behalf of all others similarly situated,

                         Plaintiff,

        -v-

READING INTERNATIONAL, INC.,

                         Defendant.

24 Civ. 750

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

    Plaintiff Haley Berryman brings this putative class action against Reading International, Inc. ("Reading"), a movie theater chain operator, for violations of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. Berryman alleges, *inter alia*, that Reading disclosed private data about her online viewing consumption to Meta Platforms, Inc. ("Facebook") without her knowledge or consent. She also claims that Reading failed to disclose to her the total cost of its theater tickets, inclusive of ancillary fees, at the outset of the online purchasing process, in violation of § 25.07(4) of the New York Arts and Cultural Affairs Law ("NYACAL").

    Reading moves to dismiss all claims under Federal Rule of Procedure 12(b)(6). It separately argues that the Court should dismiss the NYACAL claim for lack of standing under Rule 12(b)(1). Reading also seeks to strike the Complaint's class allegations under Rule 12(f).

    For the reasons that follow, the Court denies both motions to dismiss. The Court denies in substantial part the Rule 12(f) motion as premature.

## I. Background[1]

### A. Reading's Website

Reading owns and operates Angelika Film Centers ("Angelika"), a nationwide movie theater chain that features independent and foreign films. Compl. ¶ 2. Reading also owns and operates Angelika's website, AngelikaFilmCenter.com, which permits users to view movie trailers, search for information about films, subscribe to a newsletter, and purchase movie theater tickets. *Id.*

AngelikaFilmCenter.com installed on its website a product called the Meta Pixel (the "Pixel"), a tracking tool developed by Facebook. *Id.* ¶ 25. The Pixel "tracks the people and type of actions they take" on the website, including pages visited, hyperlinks clicked, and information uploaded. *Id.* ¶ 25. The Pixel links a user's website-related data to the user's unencrypted Facebook ID, which is then transmitted to Facebook using a "c_user" cookie. *Id.* ¶¶ 45–46. The Pixel tracks and transmits to Facebook information about users' activity on the website. *Id.* ¶ 48. That includes the videos they watched, the tickets they purchased, and the amount they paid for the tickets. *Id.* ¶¶ 37–38, 47–49. Facebook in turn uses this data to feature targeted ads. *Id.* ¶¶ 25–26.

To purchase theater tickets on the AngelikaFilmCenter.com site, users select a movie, date, and showtime. *Id.* ¶ 65. The user is then taken to a "ticket selection" page where the user selects the number of tickets they wish to purchase. *Id.* ¶¶ 66–67. On this page, ticket prices are

---

[1] The following facts are drawn primarily from the Complaint. *See* Dkt. 1 ("Compl."). *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").

2

displayed to the user for the first time. *Id.* ¶ 67. After selecting the desired number of tickets, the user is prompted to select seats. *Id.* ¶ 68. On the "seat selection" page, the user is notified, for the first time, that a purchase must pay an additional "service charge" of $2.19 per ticket. *Id.* The user is given five minutes to reserve the ticket by completing the purchase. *Id.* ¶¶ 68–69.

### B.     Berryman's Experience

Berryman is an AngelikaFilmCenter.com account holder and newsletter subscriber. *Id.* ¶¶ 71–72. She subscribed to the website's services by providing, among other information, her name and email address to register for a web account. *Id.* ¶ 71. She is also a Facebook user. *Id.* ¶ 72.

Berryman contends that, without users' consent, Reading knowingly disclosed to Facebook (1) subscribers' personally identifiable information, including hers, and (2) data revealing the users' activity—including the trailers watched and the movie theater tickets purchased—on the AngelikaFilmCenter.com website. *Id.* ¶¶ 3, 73. Berryman also contends that Reading failed to disclose to her the total cost of theater tickets, inclusive of ancillary fees, at the outset of the purchase process. *Id.* ¶¶ 3, 74.

### C.     Procedural History

On February 1, 2024, Berryman filed the Complaint, alleging violations of the VPPA and NYACAL. Dkt. 1. The Complaint is styled as a putative class action on behalf of five defined subclasses, which it terms (1) the VPPA movie screening class, *id.* ¶ 77(a); (2) the VPPA account class, *id.* ¶ 77(b); (3) the VPPA newsletter class, *id.* ¶ 77(c); (4) the NYACAL nationwide class, *id.* ¶ 77(d); and (5) the NYACAL New York subclass, *id.* ¶ 77(e). The Complaint seeks, *inter alia*, statutory damages, injunctive and declaratory relief, and punitive damages. *Id.* ¶¶ 94, 102.

3

On April 5, 2024, Reading moved to dismiss the Complaint or, in the alternative, to strike its class allegations. Dkt. 9 ("D. Mem."). On April 8, 2024, the Court issued an order providing Berryman the opportunity to amend the Complaint by April 26, 2024, stating that no further opportunities to amend would ordinarily be granted, and setting a schedule for briefing the motion to dismiss in the event that Berryman elected not to amend. Dkt. 11. On May 10, 2024, Berryman, having foregone the opportunity to amend, filed an opposition to the motion to dismiss. Dkt. 17 ("Pl. Mem."). On June 7, 2024, Reading replied. Dkt. 23 ("D. Reply").

On October 18, 2024, this Court ordered supplemental briefing on the VPPA claim in light of an intervening decision by the Second Circuit, sustaining a similar VPPA claim, that appeared to undermine Reading's arguments for dismissal. *See Salazar v. Nat'l Basketball Assoc.*, 118 F. 4th 533, 552 (2d Cir. 2024). On November 14, 2024, following an extension, Reading filed its supplemental letter. Dkt. 30 ("Supp. D. Mem."). On December 5, 2024, Berryman responded. Dkt. 31 ("Supp. Pl. Mem."). On December 13, 2024, Reading replied. Dkt. 32.

## II. Motion to Dismiss the VPAA Claim

The Court first addresses Reading's motion to dismiss the VPPA claim under Rule 12(b)(6).

### A. Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where,

4

as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pled facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *see also A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party.").

**B. Discussion**

The VPPA was enacted in 1988 following a newspaper profile on Supreme Court nominee Judge Robert Bork's video rental history. *See Salazar*, 118 F.4th 544–45 (citing S. Rep. No. 100-599, at 5–6 (1988)). Seeking to "preserve personal privacy with respect to the rental, purchase, or delivery of video tapes or similar audio visual materials," the VPPA creates a private right of action for consumers to sue video tape service providers who disclose personally identifiable information about the consumers' video-watching habits. *Id.* at 545 (quoting S. 2361, 100th Cong. (1988)). Under the Act, "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person[.]" 18 U.S.C. § 2710(b)(1). As further defined by the Act,

> (1) "consumer" means any renter, purchaser, or subscriber of goods or services from a video tape service provider; . . .
>
> (3) "personally identifiable information" includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider; and
>
> (4) "video tape service provider" means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials[.]

5

18 U.S.C. § 2710(a).

Reading moves to dismiss Berryman's VPPA claim on the grounds that, as pled, Reading does not qualify as a "video tape service provider," and Berryman does not qualify as a "consumer," under the Act. Neither argument is persuasive.

### 1.    "Video Tape Service Provider"

Reading first argues that it is not subject to the VPPA because, as pled, it does not qualify as a "video tape service provider." That argument, however, runs up against the Second Circuit's decision in *Salazar*, which emphasized the breadth of that statutory term:

> The definition of "video tape service provider" is broad, encompassing "*any* person[] *engaged in the business* . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4) (emphasis added). That definition is not limited to entities that deal *exclusively* in audiovisual content; rather, audiovisual content need only be *part* of the provider's book of business. 18 U.S.C. § 2710(a)(4). Thus, by its plain terms, the statute applies equally to a business dealing primarily in audiovisual materials (think Blockbuster) and one dealing in primarily *non*-audiovisual materials (think a general store that rents out a few movies). Congress cast a wide net in defining "video tape service provider," to ensure that businesses dealing in audiovisual goods or services satisfy the definition even if they *also* deal in non-audiovisual goods or services.

*Salazar*, 118 F.4th at 548. (emphases in original).

Here, Berryman's Complaint alleges that Reading qualifies as a "video tape service provider" in two ways: *first*, because it delivers "hundreds of videos on its website"; and *second*, because it shows "open-reel movies on the silver screens in its many brick-and-mortar theater locations." Compl. ¶ 85. Only the first of these theories states a claim.

The term "video tape service provider" has widely been held by courts in this District to include websites and streaming services that deliver online video content to consumers. *See Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 156 (S.D.N.Y. 2023) ("[W]ebsites that provide video content . . . are video tape service providers under the VPPA." (collecting

6

cases)); *Lamb v. Forbes Media LLC*, No. 22 Civ. 6319, 2023 WL 6318033, at *13 (S.D.N.Y. Sept. 28, 2023) (Forbes website "comes within the VPPA's definition of a video tape service provider" because it "hosts and delivers thousands of videos" (citation omitted)). The Complaint here alleges that Reading does just that: its website delivers pre-recorded audio visual materials to its customers, offering, in fact, "hundreds of videos." *See* Compl. ¶ 85. Reading protests that its offering of videos on its website is "peripheral" relative to the other offerings on and purposes of the website. Supp. D. Mem. at 2. But even if so, *Salazar* teaches that it is no defense that the video tape service provider had other offerings. As the Circuit put the point, an entity may qualify as a video provider under the statute even where the entity does not "deal *exclusively* in audiovisual content," and where the audiovisual content is only "*part* of the provider's book of business," or even where the business merely "dabble[s] in" such content. *Salazar*, 118 F.4th at 548–49 (emphases in original). Reading's delivery of audiovisual materials on its website, even if only a "peripheral" feature of the site, subjects it to the VPPA.

The alternative theory in Berryman's Complaint—that Reading's role as a brick-and-mortar film operator subjects it to the VPPA—does not, however, pass muster. The statute applies only to entities that engage in the "*rental, sale,* or *delivery* of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4) (emphases added). A movie theater operator does not rent or sell films; rather, it sells *tickets* to theatergoers. Nor does a movie theater "deliver" films to theatergoers. To "deliver" refers to "[t]he formal act of voluntarily transferring something; esp. the act of bringing goods, letters, etc. to a particular person or place." Black's Law Dictionary (11th ed. 2019). As Judge Chhabria recognized in dismissing a similar claim in *Garza v. Alamo Intermediate II Holdings, LLC*, No. 23 Civ. 5849, 2024 WL 1171737 (N.D. Cal. Mar. 19, 2024), "movie theaters do not 'bring' movies to any

7

person or place—people go to the movies, not the other way around." *Id.* at *1; *accord Osheske*, 700 F. Supp. 3d at 925 ("[T]o say a movie theater 'delivers' movies is to stretch the natural meaning of the verb beyond recognition.").

The legislative history of the VPPA is in accord. As reviewed above, the statute was aimed at safeguarding consumer information with respect to the audiovisual content consumed "in the privacy of the home." 134 Cong. Rec. S16312-01, 1988 WL 177971; *see also* S. Rep. No. 100-599, at 4 ("[A] State has no business telling a man, sitting alone in his house, what books he may read or what films he may watch." (quoting *Stanley v. Georgia*, 394 U.S. 557, 565 (1969)); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) (the VPPA "codifies a context-specific extension of the substantive right to privacy"). The legislative history is devoid of any indication that Congress intended the VPPA to reach the "public act" of attending a movie theater showing. *Osheske*, 700 F. Supp. 3d at 927 (citing *Paris Adult Theatre I*, 413 U.S. at 65 ("[I]t is unavailing to compare a theater, open to the public for a fee, with the private home[.]"). On the contrary, theaters have long been held "places of public accommodation," and "not protected by any constitutional doctrine of privacy." *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 50 (internal quotation marks omitted); *see also id.* at 66 ("[T]he idea of a 'privacy' right and a place of public accommodation are, in this context, mutually exclusive.").

The Court, although allowing Berryman's VPPA claim to move forward based on its website's offering of videos, thus prunes from the case the alternative theory based on the public act of viewing a movie at a theater. *Accord Osheske v. Silver Cinemas Acquisition Co.*, 700 F. Supp. 3d 921, 926 n.4 (C.D. Cal. 2023) ("Theater patrons . . . have no constitutionally protected privacy interest in what movies they may view in a public theater."). This decision accords with the reported cases addressing this question, each of which has dismissed claims based on this

theory. *See, e.g., Garza*, 2024 WL 1171737, at *1; *Osheke*, 700 F. Supp.3d at 926–27; *Christopherson v. Cinema Ent. Corp.*, No. 23 Civ. 3614, 2024 WL 4492021, at *6 (D. Minn. Sept. 17, 2024); *Hoge v. VSS-S. Theaters LLC*, No. 23 Civ. 346, 2024 WL 4547208, at *2–3 (M.D.N.C. Sept. 10, 2024); *Walsh v. Calif. Cinema Invs. LLC*, No. 23 Civ. 9608, 2024 WL 3593569, at *4 (C.D. Cal. July 29, 2024).

### 2. "Consumer"

Reading initially moved to dismiss the VPPA claim on the additional ground that Berryman, as pled, did not qualify as a "consumer." D. Mem. at 9–10. Following *Salazar*, Reading has abandoned that argument in support of its motion. *See* Supp. D. Mem. at 1 n.1 (noting that Reading "disagrees with the *Salazar* decision and preserves the argument for appeal"); *see also* Supp. Pl. Mem. at 1 (noting Reading's concession). Reading correctly reads *Salazar* to preclude such an argument. The Second Circuit there held that the plaintiff plausibly pled that he was a "subscriber," and thus a "consumer," under the VPPA, where the plaintiff supplied a website with personal information upon enrolling in the website's newsletter, and thereafter watched videos on the website. *See Salazar*, 118 F.4th at 552–53. Like the *Salazar* plaintiff, Berryman here pleads that she provided Reading with personal information in exchange for access to the website's newsletter and online video content. Compl. ¶ 71, 73. That is all that was required of her at the pleadings stage.

### III. Motions to Dismiss the NYACAL Claim

Reading also moves to dismiss the Complaint's NYACAL claim, under Rules 12(b)(1) and 12(b)(6). The NYACAL was designed to guard against "unfair, deceptive, and anti-consumer practices" occurring in the entertainment ticketing industry. N.Y. Spons. Memo., 2022 S.B. 9461 (2022). The relevant NYACAL provision requires that:

9

> [e]very operator or operator's agent of a place of entertainment . . . shall disclose the total cost of the ticket, *inclusive of all ancillary fees* that must be paid in order to purchase the ticket, and disclose in a clear and conspicuous manner the portion of the ticket price stated in dollars that represents a service charge, or any other fee or surcharge to the purchaser.

NYACAL § 25.07(4) (emphasis added). Salient here, the NYACAL requires that the "disclosure of the total cost and fees shall be displayed in the ticket listing *prior to the ticket being selected for purchase*" and that "[t]he price of the ticket shall *not increase during the purchase process*." *Id.* (emphases added). Berryman's Complaint alleges that Reading violated the NYACAL by disclosing the $2.19 per-ticket service charge only at the end of the ticket-purchasing process, *after* she had selected the ticket for purchase. *See* Compl. ¶¶ 98–101.

Reading makes three arguments for dismissal. None is persuasive.

### A. Lack of Subject Matter Jurisdiction

First, Reading argues that subject matter jurisdiction is lacking. A case is properly dismissed for lack of such jurisdiction under Rule 12(b)(1) where the district court lacks the statutory or constitutional power to adjudicate it. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted). "The court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Id.* (cleaned up). On a motion challenging jurisdiction under Rule 12(b)(1), the Court may properly refer to matter outside the pleadings. *Makarova*, 201 F.3d at 113.

10

Reading argues that the Complaint does not allege that Berryman suffered an injury sufficient to confer Article III standing to bring her NYACAL claim.[2] The focus of this argument is Berryman, not the putative class.[3] Reading argues that Berryman did not suffer a cognizable injury because, as pled, she had "ample" notice of the service charge before buying the ticket, and a "bare procedural violation" of the NYACAL is not a cognizable injury absent "concrete harm resulting from the timing of the disclosure of the total cost of a ticket, inclusive of fees." *See* D. Mem. at 12.

That argument fails as a basis to dismiss because, as alleged, Berryman experienced a concrete economic injury: the payment of a fee made unlawful by Reading's failure to timely disclose it. *See* Compl. ¶ 101. As the Second Circuit has observed, the payment of an "unlawful

---

[2] Reading separately argued that, if the Court dismissed the VPPA claim, it should decline to exercise supplemental jurisdiction over the NYACAL claim. Because the Court has sustained the VPPA claim, that argument is moot. That argument, in any event, is problematic, insofar as the Complaint plausibly alleged jurisdiction over the NYACAL claims based on the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), *et seq. See* Compl. ¶ 12. The three prerequisites for CAFA jurisdiction are that the purported class contain "no fewer than 100 members," "minimal diversity," and "$5 million in controversy." *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 57 (2d Cir. 2006). As pled, the putative class of persons covered by the NYACAL claim contains more than 100 class members, the aggregate amount in controversy exceeds $5 million, and at least one class member is a citizen of a state different from the defendant. *See* Compl. ¶ 12; *see also Nunez v. JPMorgan Chase Bank, N.A.*, 2024 WL 244624, at *4 (S.D.N.Y. Jan. 23, 2024) (court should not dismiss CAFA claim where it cannot say "to a legal certainty" that the claim does not meet the jurisdictional threshold).

[3] In a putative class action, "only one of the named Plaintiffs is required to establish standing in order to seek relief on behalf of the entire class." *Cent. States Se. and Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007) (quoting 1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 2:6 n. 3 (4th ed. 2002) ("To establish Article III standing in a class action, it is not required that each named plaintiff must have a claim against each named defendant. Rather, for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant, and at that point standing is satisfied and only then will the inquiry shift to a class action analysis.").

11

fee[]" is an economic injury sufficiently "concrete" and "particularized" so as to qualify as an injury in fact. *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 95 (2d Cir. 2017) (citation omitted); *Charles v. Color Factory, LLC*, No. 24 Civ. 322, 2024 WL 1693236, at *3 (S.D.N.Y. Apr. 19, 2024) (Rakoff, J.) (an "economic injury that flowed from defendant's purported violation of [the NYACAL]" constituted "a sufficiently concrete economic injury to confer standing"); *Vasell v. Seatgeek, Inc.*, No. 24 Civ. 932, 2025 WL 240912, at *12 (E.D.N.Y. Jan. 17, 2025) (in NYACAL case, "Plaintiff's allegations of paying an unlawful fee to transact with defendant meet the low threshold required to sufficiently plead concrete economic injury." (collecting cases)). Berryman's Complaint alleges that the fee she paid to secure her tickets was unlawful insofar as the total purchase price was not disclosed at the outset. *See* Compl. ¶ 101. Such qualifies as a "pocketbook injury" sufficient to give rise to Article III standing. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 441–42 (2021) (allegations that a plaintiff suffered "downstream consequences" resulting from defendant's statutory violation sufficient to confer Article III standing); *see also id.* at 425 (describing "monetary harms" as "[t]he most obvious" concrete injuries under Article III).

Reading protests that the fee was not unlawful. *See* D. Reply at 8. But that is a merits question that has no bearing on the threshold Article III standing inquiry. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal."). Although Reading will be at liberty to test the proposition in discovery, the Complaint here alleges a "concrete, economic injury resulting from a defendant's violation of a statutory provision," which gives rise to Article III standing

12

"regardless of the merits of [the party's] statutory interpretation." *Dubuisson v. Stonebridge Life Ins. Co.*, 887 F.3d 567, 574 (2d Cir. 2018).[4]

### B. Website Disclosure on Seat Selection Page

Reading next argues, under Rule 12(b)(6), that the Complaint fails to state a NYACAL claim because its website discloses the service fee on the "seat selection" page, before the final "order confirmation" page is shown and payment is requested. D. Mem. at 11. But as Berryman notes, the statute requires more: "disclosure of the total cost and fees shall be displayed in the ticket listing *prior to* the ticket being *selected* for purchase." NYACAL § 25.07(4) (emphases added); *see also id.* (prohibiting any inflation of ticket price "during the purchase process"). Insofar as the Complaint alleges that the ticket selection page, which *precedes* the seat selection page, omits the fee, it plausibly states a claim. *See* Compl. ¶ 68; *see also Charles*, 2024 WL 1693236, at *1–3 (claim stated under NYACAL § 25.07(4) where ticket price increased from initial selection to final checkout).

### C. The Voluntary Payment Doctrine

Finally, Reading argues, also under Rule 12(b)(6), that the NYACAL claim is barred under the "voluntary payment doctrine." That doctrine "bars recovery of payments voluntarily

---

[4] Although the Complaint, in generally alleging price impact, does not spell out this theory, Berryman further argues that Reading's practice of not disclosing the service charge to prospective purchasers also harmed her by driving up the "all-in" price of tickets, causing her to pay a price premium. *See* Dkt. 18 ("Fraietta Decl.") (citing New York State Senate, *Final Investigative Report: Live Event Ticketing Practices* (May 18, 2021)). Such a theory of pricing injury is cognizable where "a misrepresentation artificially inflated the market price of a product, causing a plaintiff to pay more for it than she otherwise would have—regardless of whether she even saw the misrepresentation." *Carovillano v. Sirius XM Radio Inc.*, 715 F. Supp. 3d 562, 582 (S.D.N.Y. 2024) (citation omitted). Berryman argues that had Reading disclosed the all-in ticket price at the outset of the purchasing process, it would have faced downward price pressure from its competitors—such as "AMC, Regal, Fandango, or some other video service provider." Pl. Mem. at 17.

13

made with full knowledge of the facts, and in the absence of fraud or mistake of material fact or law." *Spiro v. Healthport Techs., LLC*, 73 F. Supp. 3d 259, 276 (S.D.N.Y. 2014) (quoting *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 100 N.Y.2d 525, 526 (2003)). Reading argues that the doctrine blocks Berryman's claim because she was aware of the fee when she purchased her ticket. *See* D. Mem. at 14–15. But the voluntary payment doctrine "does not apply when a plaintiff's claim is predicated on a lack of full disclosure by defendant." *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 649 (S.D.N.Y. 2011). Such is the allegation here: Reading allegedly omitted the service charge until the final stage of the purchasing process. *See Charles*, 2024 WL 1693236, at *4 ("[T]he complaint adequately alleges a lack of full disclosure, which would render the voluntary payment doctrine inapplicable."); *cf. Spagnola v. Chubb Corp.*, 574 F.3d 64, 73 (2d Cir. 2009) (premature, before fact discovery, to resolve whether the voluntary payment doctrine defeats NYACAL claim).

The Court accordingly denies the motion to dismiss the NYACAL claim.

### III. Motion to Strike Under Rule 12(f)

Reading, finally, moves to strike the Complaint's class allegations under Rule 12(f), as to both the VPPA and NYACAL claims. *See* D. Mem. at 15–20. It argues that two proposed VPPA classes—of accountholders who purchased tickets to view movies at Reading theaters, and of accountholders who signed up for a newsletter and watched videos on Reading's website—are "facially overbroad" and "not ascertainable," because these do not appear to be limited to persons whose personal information was disclosed to Facebook. D. Mem. at 16.[5] It also argues that the NYACAL classes—of persons who purchased movie theater tickets through

---

[5] Reading also moves to strike the VPPA classes on the premises rejected above: that the VPPA purportedly does not apply to Reading or cover Berryman. *See id.* at 17–18.

14

Reading's website in New York or nationwide—are overbroad, because these are "not limited to persons who paid the service charge without knowledge of the service charge," and because they include persons whose claims would be barred by the voluntary payment doctrine. *Id.* at 19–20.

Under Rule 12(f), a court may on a motion, "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Motions to strike are viewed with disfavor and infrequently granted." *Emilio v. Sprint Spectrum L.P.*, 68 F. Supp. 3d 509, 514 (S.D.N.Y. 2014) (cleaned up). "A motion to strike class allegations under Rule 12(f) is disfavored because it requires a reviewing court to preemptively terminate the class aspects of litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." *Blagman v. Apple Inc.*, No. 12 Civ 5453, 2013 WL 2181709, at *2 (S.D.N.Y. May 20, 2013) (cleaned up). But a court may grant the motion to strike class allegations where the "class allegations fail as a matter of law . . . in essence, that *no discoverable facts exist* that would allow the certification of the alleged class." *Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) (emphasis added); *see also PFT of Am., Inc. v. Tradewell, Inc.*, No. 98 Civ. 6413, 1999 WL 179358, at *1 (S.D.N.Y. Mar. 31, 1999) (striking class claims where the complaint contained "no facts from which it [could] be determined that there is any basis other than speculation as to whether there are other members of the class").

The Court grants Reading's motion to strike in one respect: the proposed VPPA movie screening class cannot survive because, as reviewed above, Reading's role as an operator of brick-and-mortar movie theaters does not qualify it as a "video tape service provider." The Court denies the balance of the motion as premature. *See Collins v. Pearson Educ., Inc.*, 721 F.

Supp. 3d 274, 290 (S.D.N.Y. 2024) (denying motion to strike VPPA class as premature); *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 464 (S.D.N.Y. 2013) (rejecting challenge to class certification at pleading stage as premature). Discovery has the potential to adduce facts supporting certification of the proposed classes. *See* Compl. ¶¶ 79–83. The Court's denial of the motion to strike is without prejudice to Reading's right to pursue the same or similar such relief later in this litigation.

## CONCLUSION

For the foregoing reasons, the Court denies Reading's motions to dismiss under Rules 12(b)(1) and 12(b)(6), and, except as to the VPPA movie screening class which the Court strikes, denies the Rule 12(f) motion to strike. The Clerk of Court is respectfully directed to close all pending motions. By separate order, the Court will schedule a case management conference.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: January 28, 2025
New York, New York