**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HALEY BERRYMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>READING INTERNATIONAL, INC.,<br><br>Defendant. | Case No. 1:24-cv-750-PAE<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**[1]<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Haley Berryman ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

**NATURE OF THE ACTION**

1. This is a class action suit brought on behalf of all persons who subscribe to, view videos on, and purchase admission tickets to movie screenings on AngelikaFilmCenter.com. For persons with Facebook accounts, Reading International, Inc. ("Defendant") discloses their personally identifiable information to unrelated third-parties, and for persons purchasing admission tickets to movie screenings within the state of New York, Defendant fails to disclose the total costs of tickets (inclusive of fees), prior to the tickets being selected for purchase.

2. Defendant owns and operates Angelika Film Centers, which are movie theaters that show independent and international films throughout the United States. Defendant also develops, owns, and operates AngelikaFilmCenter.com, which is a website that enables

[1] Pursuant to Rule 15(a)(2) and ECF No. 57, this amended complaint is filed with Defendant's written consent.

cinephiles to view movie trailers, learn about films, and purchase tickets to Defendant's movie screenings.

3. Plaintiff brings this action in response to Defendant's practice of knowingly disclosing its subscribers' personally identifiable information—including a record of every video clip they view—to Facebook, without its subscribers' consent. Plaintiff also brings this action in response to Defendant's practice of failing to disclose the total cost of tickets (including any ancillary fees) to movie screenings taking place in the state of New York.

4. The United States Congress passed the Video Privacy Protection Act ("VPPA") in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

5. The New York Legislature went one step further, passing the Video Consumer Privacy Act. *See* N.Y. G.B.L. § 670, *et seq*. ("NY VCPA"). The NY VCPA's language largely mirrors the VPPA's language (*compare* 18 U.S.C. § 2710 *with* N.Y. G.B.L. §§ 672-674), with one notable exception—the definition of "personally identifiable information."

6. Unlike the federal VPPA, the NY VCPA covers "***any*** information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." N.Y. G.B.L. § 672(3) (emphasis added). The NY legislature was concerned that the VPPA "is flawed in" what forms of "personally identifiable information" it intended to protect from disclosure. *See* Assembly Bill 5904-A Sponsor's Memorandum, p. 3, attached hereto as Exhibit A.

7. Defendant violated both the VPPA and the NY VCPA by knowingly transmitting Plaintiff's and the putative class's personally identifiable information to unrelated third parties.

8. The New York State legislature also passed the Arts and Cultural Affairs Law § 25.07(4) in 2022, seeking to promote ticket fee transparency. The law provides that "every operator … of a place of entertainment … shall disclose the total cost of the ticket, inclusive of all ancillary fees that must be paid in order to purchase the ticket."

9. "Such disclosure of the total cost and fees shall be displayed in the ticket listing *prior to* the ticket being selected for purchase." *Id*. (emphasis added). And "[t]he price of the ticket shall not increase during the purchase process." *Id.* This latest version of the law went into effect August 29, 2022. *See* Exhibit B.

10. Defendant violated New York Arts and Cultural Affairs Law § 25.07(4) by quoting movie ticket purchasers on its website a fee-less price, only to later ambush them with a $2.19 service charge per ticket at checkout.

## PARTIES

11. Plaintiff Berryman is, and has been at all relevant times, a resident of New York, New York and has an intent to remain there, and is therefore a domiciliary of New York.

12. Defendant Reading International, Inc. is a Nevada corporation with its principal place of business at 5995 Sepulveda Blvd., Suite 300, Culver City, CA 90230. Defendant operates and owns Angelika Film Center theaters in New York, Texas, Virgina, Washington, D.C., and California. Defendant develops, owns, and operates AngelikaFilmCenter.com, which is also used in New York, Texas, Virgina, Washington, D.C., and California.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over the VPPA claim pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States.

14. This Court has subject matter jurisdiction over the New York state law claims pursuant to 28 U.S.C. § 1367(a) because the New York state law claim arises from the common nucleus of operative fact as the VPPA claim because both claims arise from the very same movie ticket purchasing process on Defendant's website.

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a citizen of a state different from Defendant. Defendant sold at least 100,000 tickets to movie screenings taking place in the state of New York through its website during the applicable class period, and is liable for a minimum of fifty dollars in statutory damages for each ticket sold.

16. This Court has personal jurisdiction over Defendant because Defendant conducts substantial business within New York, such that Defendant has significant, continuous, and pervasive contacts with the State of New York.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

### I. The VPPA

18. The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a

movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that history. With an eye toward the digital future, Congress responded by passing the VPPA. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

19. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

## II. Defendant is a Video Tape Service Provider

20. Just like "department store[s]," "golf shop[s]," and "continuity club[s]," Defendant is a video tape service provider. *See* S. Rep. 100-599, at 12-13.

21. The VPPA defines a video tape service provider as "any person, engaged in the business ... of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Congress expressly included "open-reel movies" as a type of "similar audio-visual material "covered by the VPPA. *See* S. Rep. 100-599, at 12. Defendant is a

video tape service provider because it delivers open-reel movies on its brick-and-mortar silver screen and prerecorded video content on its website.

22. Defendant owns and operates Angelika Film Center, which is a movie theater chain that features independent and foreign films in New York, Washington, D.C., Virginia, Texas, and California. Defendant also operates AngelikaFilmCenter.com (the "Website"), a website where movie-goers can purchase tickets, watch movie trailers, and learn about what is in theaters.

23. Since its inception in 1989, Defendant has taken pride in its "curated and diverse" programming" of film. Defendant describes itself as "a true filmmaker's jewel and choice of destination for cinephiles," as well as "the most successful and recognized arthouse in North America."[2]

## III. The NY VCPA

24. The NY VCPA and the VPPA are substantially similar. Both laws provide that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person." *See* 18 U.S.C. § 2710 (b)(1); *accord* N.Y. G.B.L. § 673(1) (using identical language) (emphases added). Both laws also define the terms, "video tape service provider," "consumer," and "personally identifiable information." *See* 18 U.S.C. § 2710(a); N.Y. G.B.L. § 672. The VPPA and the NY VCPA define "video tape service provider" and "consumer" identically. *Compare* 18 U.S.C. §§ 2710(a)(1) and (a)(4) *with* N.Y. G.B.L. §§ 672(1) and (4).

25. Significantly, however, the NY VCPA defines the term "personally identifiable information" differently than the VPPA. *Compare* 18 U.S.C. § 2710(a)(3) *with* N.Y. G.B.L. §

---

[2] *About Us*, ANGLIKA ANYWHERE, https://www.angelikaanywhere.com/page/about/ (last visited Dec. 19, 2023).

672(3).

- **<u>VPPA definition of PII</u>**: "the term 'personally identifiable information' ***includes*** information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C.§ 2710 (a)(3) (emphasis added).
- **<u>NY VCPA definition of PII</u>**: "The term 'personally identifiable information' ***means any*** information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." N.Y. G.B.L. § 672(3) (emphasis added).

26. "Courts across the country, including lower courts in this circuit, have observed that the VPPA is 'not well drafted,' and that its definition of personally identifiable information is 'oblique' and not 'clear.'" *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 48 (2d Cir. 2025) (internal brackets and citations omitted).

27. As this Court observed: "The VPPA does not precisely delineate 'the scope of information encompassed by PII, and how, precisely, this information must identify a person.'" *Collins v. Pearson Educ., Inc.*, 721 F. Supp. 3d 274, 287 (S.D.N.Y. 2024). Rather than expressly state what information counts as PII, the VPPA "provid[es] only that it '*includes* information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider.'" *Solomon*, 136 F.4th at 48 (emphasis added). The VPPA's use of the word "*includes*" in the definition of "personally identifiable information" has led to a Circuit split over what kinds of information is included. *See id.* ("Of the VPPA's key terms, the most ink has probably been spilled over the question of what constitutes personally identifiable

information.") (internal brackets and citation omitted).[3]

[3] Broadly speaking, at least four approaches have emerged as to what is covered under the definition of PII:

- **First Circuit**: "information reasonably and foreseeably likely to reveal which … videos [a consumer] has obtained" from a video tape service provider. *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016).
- **Ninth and Third Circuits**: "information that 'readily permits an ordinary person to identify a particular individual as having watched certain videos,'" ***with the aid of "modern technology" and "without regard to [the] recipient's capabilities."*** *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985-86 (9th Cir. 2017) (quoting *In re Nickelodeon Consumer Privacy Litig*., 827 F.3d 262, 290 (3d Cir. 2016) (internal brackets omitted) (emphasis added). Because this approach evolves with the times, courts in the Ninth Circuit have uniformly "decline[d] to adopt the approach of the Second Circuit in *Solomon*." *Plotsker v. Envato Pty Ltd.*, 2025 WL 2481422, at *8 (C.D. Cal. Aug. 26, 2025); *Garcia v. Bandai Namco Ent. Am. Inc*., 2025 WL 2451033, at *8 (C.D. Cal. Aug. 7, 2025); *Archer v. NBCUniversal Media, LLC*, 2025 WL 2601509, at *5 (C.D. Cal. July 2, 2025); *Balestrieri v. SportsEDTv, Inc.*, 2025 WL 2776356, at *9 (N.D. Cal. Sept. 16, 2025). These courts all held that a Facebook ID disclosed through the Pixel would constitute PII, because the Ninth "Circuit in *Eichenberger v. ESPN, Inc*., however, has made clear that … 'a Facebook link … may very well readily enable an 'ordinary person' to identify an individual.'" *Plotsker*, 2025 WL 2481422, at *8. "*Solomon* is contrary to the weight of authority in th[e] [Ninth] Circuit. 'Most, if not all, courts to address the question have all found… that Facebook IDs are PII.'" *Balestrieri*, 2025 WL 2776356, at *9 (collecting cases); *accord Collins v. Pearson Educ., Inc.*, 721 F. Supp. 3d 274, 287 (S.D.N.Y. 2024) (before *Solomon* created its own new test, noting that "courts in this District have uniformly held that disclosure of a 'Facebook ID [] would readily permit an ordinary person to identify a specific individual's video-watching behavior.'")
- **Second Circuit**: "information that would readily permit an ordinary person to identify a specific individual's video-watching behavior" ***assuming the recipient is incapable of accessing or reading "lines of computer code."*** *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 49 and 54 (2d Cir. 2025) (emphasis added). "Considering how code is the primary communication medium for data sharing technologies and a growing proportion of the public has the technological fluency to discern information from lines of code, particularly with the advent of artificial intelligence tools," the Second Circuit's approach in *Solomon* effectively renders the VPPA a dead letter in the 21st Century. *Garcia*, 2025 WL 2451033, at *8. In other words, absent further word from the Second Circuit or the Supreme Court—at least in this Circuit—the "VPPA is [,in fact, a] dinosaur statute" that will "gather dust next to our VHS tapes." *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 553 (2d Cir. 2024).
- **Other District Courts**: information that is "closely associated with a unique individual and can be used to trace the individual." *Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 255 (S.D.N.Y. 2025); *Manza v. Pesi, Inc.*, 784 F. Supp. 3d 1110, 1117–18 (W.D. Wis. 2025). In other words, "ID numbers uniquely associated

28. The NY VCPA does not have the same problem. Instead, it specifically defines "personally identifiable information" to "*mean*[] '*any* information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider.'" N.Y. G.B.L. § 672(3). "[R]ead naturally, the word 'any' has an expansive meaning." *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 546 (2d Cir. 2024) (quoting *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 219 (2008)).

29. In interpreting New York statutes, the New York Court of Appeals "ha[s] repeatedly held that 'the word '*any* ' means 'all' or 'every' and *imports no limitation.*'" *Kimmel v. State*, 29 N.Y.3d 386, 393 (2017) (citation omitted) (emphasis in original).

30. Because the NY VCPA's definition uses the word "any," the Court need not engage in any guesswork about (1) what an "ordinary person" who lacks any intellectual curiosity might be able to figure out without the aid of online resources, *see Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 48 (2d Cir. 2025), (2) what an "ordinary person" could figure out with the help of "modern technology," like ChatGPT, Google, or his or her own computer's browser developer tools, *see Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985-86 (9th Cir. 2017), (3) what a sophisticated technology company like "Adobe" might be able "reasonably and foreseeably" infer by pooling together data points from multiple sources, *see Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016), or (4) what an "enterprising investigator without the resources of a Meta or Google would be able to develop … to identify a unique individual," *see Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 260 (S.D.N.Y. 2025).

31. Because the NY VCPA's use of the word "any" "*imports no limitation*," *Kimmel*,

---

with a specific customer qualify as PII under the VPPA when they are paired with the names of videos the customer obtained from the defendant." *Manza*, 784 F. Supp. 3d at 1123.

29 N.Y.3d at 393, information qualifies as PII under the statute if it meets the Second Circuit's narrowest approach in *Solomon*, the Ninth Circuit's broader approach in *Eichenberger*, the First Circuit's even broader approach in *Yershov*, or the broadest approach articulated in *Lee* and *Manza*.

32. Because the word "any" imports no limitation, *any* "ID numbers uniquely associated with a specific customer qualif[ies] as PII under the [NY VCPA] when they are paired with the names of videos the customer obtained from the defendant." *Manza*, 784 F. Supp. 3d at 1123.

33. The New York Legislature intended for the NY VCPA's definition of PII to be broader than the definition put forth in the VPPA. Before passing the NY VCPA, the Bill's Sponsor, Anthony Genovesi, expressly stated that New York needed to pass its own video privacy law because "the Video Privacy Protection Act of 1988, P.L. 100-618 … is flawed in that it allows disclosure of personally identifiable information to any person" in certain circumstances. *See* Assembly Bill 5904-A Sponsor's Memorandum, pp. 2-3, attached hereto as Exhibit A.

34. More generally, the NY legislature passed the law in response to "dozens of complaints from consumers who have received unsolicited direct mail advertisements for … video movies … It is suspected that a source of these direct mail companies' access to individuals' name and addresses has been video clubs, who disclose lists of customers … Thus, a separate state law is needed in New York to give her citizens meaningful protection from unwanted intrusions." Exhibit A, at 3. "Consumers should be entitled to view movies and tapes of their own choosing within their own homes without their personal choices … finding their way to a … mailing list. They should not be put in the position of self-censorship out of concern over public disclosure of their choices of video movies. Enactment of this bill would mean that video consumers could rent or purchase video tapes and movies without fear that information connecting them or members of

their families to any particular titles could become public or appear on an unwanted mailing list." *Id.*

35. Today, the Meta Tracking Pixel is the digital analogue of the early 1990s "unsolicited direct mail advertisements," the New York Legislature tried to stop. As the Second Circuit explains: when video tape service provider like Angelika "discloses users' personal viewing information to Meta, [Meta] then harnesses that information 'to show the user targeted ads'—ads that Meta chooses for its own commercial purposes." *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 543 (2d Cir. 2024). "By possessing the video title and URL of watched videos associated with a given FID, Meta can link a given Facebook profile to those watched videos. And with that information, Meta can send a user targeted advertisements." *Id.* at 538.

## IV. The Meta/Facebook[4] Tracking Pixel

36. Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[5] Facebook describes itself as a "real identity platform,"[6] meaning users are allowed only one account and must share "the name they go by in everyday life."[7] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[8]

---

[4] In 2022, the parent company operating Facebook changed its name to Meta Platforms, Inc., and its pixel tool was renamed the Meta Tracking Pixel from the Facebook Tracking Pixel.

[5] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html

[6] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[7] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[8] FACEBOOK, SIGN UP, https://www.facebook.com/.

37. Facebook generates revenue by selling advertising space on its website.[9]

38. Facebook sells advertising space by highlighting its ability to target users.[10] Facebook can target users so effectively because it surveils user activity both on and off its site.[11] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[12] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[13]

39. Advertisers can also build "Custom Audiences."[14] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[15] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[16] Unlike

---

[9] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[10] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[11] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[12] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[13] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[14] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[15] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.

[16] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[17] One such Business Tool is the Facebook Tracking Pixel.

40. The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website. Once activated, the Facebook Tracking Pixel "tracks the people and type of actions they take."[18] When the Facebook Tracking Pixel captures an action, it sends a record to Facebook. Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

41. Advertisers control what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views.[19] Advertisers can also configure the Facebook Tracking Pixel to track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[20] An advertiser can also create their own tracking parameters by building a "custom event."[21]

---

[17] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[18] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

[19] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

[20] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[21] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

42. Advertisers control how the Facebook Tracking Pixel identifies visitors. The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[22] HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[23] Pixel-specific Data includes "the Pixel ID and cookie."[24]

## IV. AngelikaFilmCenter.com And The Facebook Pixel

43. Defendant entertains movie-goers with independent and international films at its Angelika Film Center locations across the United States.

44. Defendant monetizes the cinema experience by selling tickets on its Website, AngelikaFilmCenter.com.

45. Defendant hosts the Facebook Tracking Pixel on its Website and transmits two distinct events to Facebook:[25]

**Figure 3**




46. PageView transmits the Uniform Resource Locator ("URL") accessed, along with whether that webpage features a video.

---

[22] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

[23] *Id.*

[24] *Id.*

[25] This data derives from a tool created and offered by Facebook.

**Figure 4**




47. ViewContent likewise discloses the URL and whether the webpage features a video.

**Figure 5**



48. The title for the video is contained in the URL, and any third party can copy and paste that locator into a web browser and determine the video that the subscriber watched.

49. These two events, independently and jointly, permit an ordinary person to identify a video's content, title, and location.

50. The title for the video is contained in the URL, and any third party can copy and paste that locator into a web browser and determine the video that the subscriber watched.

51. Additionally, when a person selects a particular date and showtime for the movie depicted on the webpage containing the video movie trailer, and completes the checkout process, a new, third Purchase event is transmitted to Facebook.

**Figure 6**




52. The Purchase event discloses to Facebook the fact that a consumer purchased a movie ticket, the currency used to purchase the ticket, and the amount spent on the ticket.

53. Each of these Tracking Pixel events depicted in Figures 4 through 6 are transmitted in real-time to Facebook. Collectively, Figures 4 through 6 notify Facebook that a

consumer spent $7.19 to purchase a ticket to Defendant's screening of the *Barbie* movie at Defendant's Village East theater on January 31, 2024.

54. When a visitor watches a video or completes the movie ticket purchasing process on Defendant's Website while logged into Facebook, Defendant compels a visitor's browser to transmit the c_user cookie to Facebook for each distinct Facebook Tracking Pixel event generated. The c_user cookie contains that visitor's unencrypted Facebook ID. When accessing the above video and purchasing the above movie ticket, for example, Defendant compelled the browser to send seven cookies:

**Figure 7**

| Name | Value | Domain |
|---|---|---|
| datr | IKMTZDnp92T5Bkqwh2LEBedt | .facebook.com |
| sb | FXEXZF66qmf7QYrBRI0wetan | .facebook.com |
| c_user | 1528550551 | .facebook.com |
| m_ls | %7B%22c%22%3A%7B%221%... | .www.facebook.com |
| ps_n | 0 | .facebook.com |
| xs | 24%3ATWFeKjQ4G0FB5A%3A2... | .facebook.com |
| fr | 1IYeBwHTStqeUQZr6.AWUOHm... | .facebook.com |

55. When a visitor's browser has recently logged out of Facebook, Defendant will compel the browser to send a smaller set of cookies:

**Figure 8**

| Name | Value | Domain |
|---|---|---|
| datr | IKMTZDnp92T5Bkqwh2LEBedt | .facebook.com |
| sb | FXEXZF66qmf7QYrBRI0wetan | .facebook.com |
| m_ls | %7B%22c%22%3A%7B%221%22%3A%22H... | .www.facebook.com |
| ps_n | 0 | .facebook.com |
| fr | 1IYeBwHTStqeUQZr6.AWUL0xzIbOwDQEW... | .facebook.com |

56. The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[26] The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser.[27] The datr cookies also identifies a browser. [28] Facebook, at a minimum, uses the fr and _fbp cookies to identify users.[29]

57. Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser. The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser. Facebook uses both for targeted advertising.

58. The fr cookie will expire after 90 days unless the visitor's browser logs back into Facebook.[30] If that happens, the time resets, and another 90 days begins to accrue.[31]

59. The _fbp cookie will expire after 90 days unless the visitor's browser accesses the same website.[32] If that happens, the time resets, and another 90 days begins to accrue.[33]

---

[26] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[27] FACEBOOK, CONVERSION API, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/.

[28] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[29] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[30] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[31] Confirmable through developer tools.

[32] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[33] Also confirmable through developer tools.

60. The Facebook Tracking Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, Defendant.[34] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[35] The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

61. Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

62. A Facebook ID is personally identifiable information. Any ordinary can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook.com. Facebook admits as much on its website.

63. Through the Facebook Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Facebook to know, among other things, what videos a user has watched on Defendant's Website.[36]

64. Defendant's Website also uses "Advanced Matching." When activated, the Facebook Tracking Pixel will "look for recognizable form field and other sources on your website that contain information such as first name, last name and email."[37] The Facebook Tracking Pixel's code will collect that information, "along with the event, or action, that took

---

[34] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[35] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

[36] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

[37] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

place."[38] This information is "hashed,"[39] meaning it is "[a] computed summary of digital data that is a one-way process."[40] In other words, it "cannot be reversed back into the original data."[41]

65. Defendant discloses this information so it can better match visitors to their Facebook profiles, which thereby allows Defendant to better track analytics and target its advertisements.

**Figure 9**

You can use Advanced Matching to help:

- Increase the number of attributed conversions. We can match more of the conversions that happen on your website to people on Meta. This helps you understand the impact of your ads on website conversions.
- Increase your Custom Audience size. We're able to better match your website visitors to people on Meta and increase the size of your Custom Audience.
- Decrease the cost per conversion. Conversion-optimized campaigns become more efficient because we can better identify and deliver ads to the types of people likely to take the actions you care about.

66. Defendant's Facebook Tracking Pixel is configured to scan form fields containing a user's email, first name, and last name:[42]

---

[38] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

[39] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash

[40] *Id.*

[41] *Id.*

[42] Facebook provides a corresponding look-up table: FACEBOOK, ADVANCED MATCHING, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching.

**Figure 10**

```
fbq.loadPlugin("inferredevents");
fbq.loadPlugin("identity");
instance.optIn("207268761486794", "InferredEvents", true);
config.set("207268761486794", "automaticMatching", {
    "selectedMatchKeys": ["em", "fn", "ln", "ge", "ph", "ct", "st", "zp", "db", "country", "external_id"]
});
fbq.loadPlugin("inferredevents");
fbq.loadPlugin("identity");
instance.optIn("207268761486794", "AutomaticMatching", true);
fbq.loadPlugin("iwlbootstrapper");
instance.optIn("207268761486794", "IWLBootstrapper", true);
fbq.loadPlugin("cookie");
instance.optIn("207268761486794", "FirstPartyCookies", true);
fbq.loadPlugin("inferredevents");
instance.optIn("207268761486794", "InferredEvents", true);
fbq.loadPlugin("automaticmatchingforpartnerintegrations");
instance.optIn("207268761486794", "AutomaticMatchingForPartnerIntegrations", true);
```

67. In addition to purchasing movie tickets, users can either create accounts with Defendant's Website or sign up for Defendant's newsletters.

68. To sign up for Defendant's Newsletters, a user can input her email address and receive a wide variety of video services including getting "weekly showtimes, film & event info, special offers & discounts, and free screening invitations." *See* Figure 11.

**Figure 11**




69. To subscribe to Defendant's Website, a user can create an account. Defendant's account webpage contains form fields for first name, last name, email address, birthday, zip code, preferred theater, and password. *See* Figure 20.

70. Every subsequent log-in attempt requires subscribers to input their email:

**Figure 12**




71. Defendant discloses a subscriber's email address, first name, and last name when inputted into any of the above form fields, enabling Facebook to then match those identifiers with that subscriber's subsequent activity on the site.

72. Defendant knows that Facebook will match the Advanced Matching parameters with a subscriber's subsequent activity, thereby helping Defendant "[i]ncrease the number of attributed conversions," "[i]ncrease [its] Custom Audience size," and "[d]ecrease the cost per conversion."[43]

[43] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

73. By compelling a visitor's browser to disclose the Advanced Matching parameters alongside event data for videos, Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

74. By compelling a visitor's browser to disclose the c_user cookie alongside event data for videos, Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

75. By compelling a visitor's browser to disclose the fr and _fbp cookies alongside event data for videos, Defendant discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

76. By compelling a visitor's browser to disclose the fr cookie and other browser identifiers alongside event data for videos, Defendant discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

77. Facebook confirms that it matches activity on Defendant with a user's profile. Facebook allows users to download their "off-site activity," which is a "summary of activity that businesses and organizations share with us about your interactions, such as visiting their apps or websites."[44] Here, the off-site activity report confirms that Defendant identifies an individual's reading and video viewing activities:

---

[44] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?, https://www.facebook.com/help/2207256696182627

**Figure 13**




## V. New York Arts and Cultural Affairs Law § 25.07(4)

78. Effective August 29, 2022, New York enacted Arts & Cultural Affairs Law § 25.07(4), which provides that "every operator … of a place of entertainment … shall disclose the total cost of the ticket, inclusive of all <u>ancillary fees</u> that must be paid in order to purchase the ticket, and disclose in a clear and conspicuous manner the portion of the ticket price stated in dollars that represents a <u>service charge</u>, or any other fee or surcharge to the purchaser. Such <u>disclosure</u> of the total cost <u>and fees</u> shall be displayed in the ticket listing <u>prior to</u> the ticket being <u>selected for purchase</u>." *Id.* (emphasis added). And "[t]he price of the ticket shall not increase during the purchase process." *Id.*; *Compare with* Figure 3-A.

79. Shortly after the law was enacted, ticketing websites peppered the State of New York's Division of Licensing Services with questions about the scope of the law. As explained

by the Division of Licensing Services, "the ticket purchasing process begins once a consumer visits a ticket marketplace and first sees a list of seat prices." *See* N.Y. Dep't of State, Div. Licens. Servs., *Request for Additional Guidance – New York State Senate Bill S.9461*, attached hereto as **Exhibit B**, at 1. "From the moment the prospective purchaser assesses the [] ticket lists through the final payment … there should be no price increases to the purchaser for the ticket itself." *Id.* "When a prospective purchaser selects a ticket with full disclosure of the ticket price, the purchaser should not then have to search for the total price of the ticket as the purchaser proceeds through the purchasing process, it should continue to be readily available to the purchaser." *Id*. at 2 (emphasis added).

**VI. Angelika Film Center's Ticket Pricing Process**

80. When a moviegoer visits Defendant's website, https://www.angelikafilmcenter.com/, on the main page, he selects a movie he wishes to view in a theatre, including in New York. *See* Figure 14, next page.

**Figure 14**




81. If a consumer clicks on one of the film titles listed, he is taken to a page where he can select a date and showtime. No price is displayed on this screen. See Figure 15, next page.

**Figure 15**




82. After a user selects a showtime, the purchase process begins and he is prompted to select the number and type of tickets (general, child, or senior) he wishes to purchase, as well as to sign into his account or purchase via "Guest Checkout." *See* Figures 16-A & 16-B, next page.[45] Ticket prices are displayed on this page for the first time. *See id.*

[45] The screen displayed in Figure 16, *infra*, is the same regardless of whether a consumer logs into his account to complete the purchase or uses guest checkout.

**Figure 16-A**


VILLAGE EAST
BY ANGELIKA
SHOWTIMES
CINEMA INFO
SIGNATURE PROGRAMMING
HOST AN EVENT
GIFT CARDS
MEMBERSHIP
BLOG
ANGELIKA TICKETING
MOVIE SELECTION
TICKET SELECTION
SEAT SELECTION
ORDER CONFIRMATION
PAYMENT
Transaction ID This is the id for the current transaction: LXXZ5ZD. Save it. It can help if you have an issue.
SHOWTIME DETAIL
OPPENHEIMER
R | 3 hours 0 minutes
Closed Captioning, Descriptive Audio
WEDNESDAY, JAN 17 2024, 9:45 PM
Village East by Angelika
CHANGE SHOWTIME
TICKET DETAIL
Ticket selections will appear in this box on the following page
SELECT YOUR TICKETS
Sign In now to take advantage of FREE Angelika Member Benefits! Sign In
TYPE
AMOUNT
PRICE
TOTAL
RES GENERAL
2
X
$18.00
$36.00
Child
0
X
$16.00
$0.00
Senior
0
X
$16.00
$0.00

**Figure 16-B**




83. *After* a consumer selects the type and number of tickets she wishes to purchase for the movie she selected, at the theatre she selected, and for the showtime she selected, she is brought to a screen requiring her to select her seats. *See* Figure 17, next page. On this screen, a five-minute timer begins which is displayed on the upper right-hand corner of the page, requiring the consumer to complete her purchase before time runs out. *Id*. This screen also, for the first time, displays Defendant's $2.19 "service charge" per ticket, thereby causing the price to increase from the $18.00 per general ticket quoted in Figure 3-A to $20.19 per general ticket. *Id*.

For a family of four, Defendant tacks on an extra $8.76 in "service charges." That is roughly equivalent to the cost of a bucket of popcorn.

**Figure 17**




84. After the consumer selects the seat(s) associated with the ticket(s) selected, he is taken to an order confirmation screen, and then finally a payment screen to input his payment information. *See* Figures 18 & 19, next page.

**Figure 18**


VILLAGE EAST
BY ANGELIKA
SHOWTIMES
CINEMA INFO
SIGNATURE PROGRAMMING
HOST AN EVENT
GIFT CARDS
MEMBERSHIP
BLOG
ANGELIKA TICKETING
MOVIE SELECTION
TICKET SELECTION
SEAT SELECTION
ORDER CONFIRMATION
PAYMENT
COMPLETE YOUR ORDER IN
1:06
Transaction ID This is the id for the current transaction: 5XXPQMZ. Save it. It can help if you have an issue.
SHOWTIME DETAIL
OPPENHEIMER
R | 3 hours 0 minutes
Closed Captioning, Descriptive Audio
WEDNESDAY, JAN 17 2024, 9:45 PM
Village East by Angelika
CHANGE SHOWTIME
TICKET DETAIL
RES GENERAL 2 x $18.00 = $36.00
SERVICE CHARGE 2 x $2.19 = $4.38
NUMBER OF TICKETS 2 TOTAL: $40.38
SEATS H2, H1
CHANGE SEATS
CHANGE TICKETS
PLEASE REVIEW YOUR ORDER
PURCHASES
QTY ITEMS PRICE AMOUNT
2 RES GENERAL $36.00 $36.00
2 SERVICE CHARGE $4.38 $4.38
PURCHASE TOTAL: $40.38
CONTINUE TO PAYMENT

**Figure 19**




85. To make matters worse, because of the timer displayed on the upper-right hand corner of the page, consumers are often not given sufficient time to review their purchase and notice the service charges Defendant charges them after initially misquoting the purchase price. If consumers are too slow and fail to input their credit card information and complete their purchase before the timer ends, they are kicked out of the purchase process, and must begin all over again.

## VII. Experience of Plaintiff Haley Berryman

86. On October 5, 2022, Plaintiff Berryman subscribed to Defendant's Website by creating an account and answered the following information requests depicted in Figure 20.

**Figure 20**


FIRST NAME*

LAST NAME*

EMAIL*

CONFIRM EMAIL*

DATE OF BIRTH*

Complete for Membership Rewards*

DAY* MONTH* YEAR

PHONE NUMBER*

Complete for Membership Rewards*

CITY

ZIP CODE*

PICK YOUR FAVORITE THEATER*

Angelika New York

CREATE A PASSWORD*

Must be at least 8 characters.

CONFIRM PASSWORD*

87. In or around October 7, 2013, Plaintiff Berryman created a Facebook account, which bears her real-life name. Since creating an account, Plaintiff Berryman frequented Defendant's Website to, among other things, watch trailers and purchase movie tickets.

88. When Plaintiff Berryman watched videos on Defendant's Website, Defendant disclosed her event data, which recorded and disclosed the video's title and URL. Alongside this event data, Defendant also disclosed identifiers for Plaintiff Berryman, including the c_user and fr cookies.

89. On December 2, 2023, Plaintiff purchased tickets to a movie screening at Defendant's theater located on 18 West Houston Street, New York, New York, and followed a checkout flow process substantially similar to that depicted in Figures 14-19 in this Complaint. Plaintiff was tricked into paying Defendant's "service charge" even though this charge was not disclosed to her prior to her ticket selection.

90. By disclosing her event data and identifiers, Defendant disclosed Plaintiff Berryman's personally identifiable information to a third party.

91. Plaintiff Berryman discovered that Defendant surreptitiously collected and transmitted his personally identifiable information in late December 2023, after she purchased her movie tickets.

## CLASS ALLEGATIONS

92. **Class Definition:** Plaintiff seeks to represent six classes:

1. **The VPPA Account Class:** all persons in the United States who have a AngelikaFilmCenter.com account and a Facebook account and who viewed videos on Defendant's Website.

2. **The VPPA Newsletter Class:** all persons in the United States who signed up for a AngelikaFilmCenter.com newsletter and have a Facebook account and who viewed videos on Defendant's Website.

3. **The NY VCPA Account Class:** all persons in the state of New York who have a AngelikaFilmCenter.com account and a Facebook account and who viewed videos on Defendant's Website.

4. **The NY VCPA Newsletter Class:** all persons in the state of New York who signed up for a AngelikaFilmCenter.com newsletter and have a Facebook account and who viewed videos on Defendant's Website.

5. **The ACAL Nationwide Class:** all persons in the United States who purchased electronic tickets to any film screenings in any theatre location in the State of New York from Defendant's website on or after August 29, 2022. Excluded from the Nationwide Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

6. **The ACAL New York Subclass:** all persons in the state of New York who purchased electronic tickets to any film screenings in any theatre location in the State of New York from Defendant's website on or after August 29, 2022. Excluded from the Nationwide Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

93. Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

94. **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiff does not know the exact number of members of the aforementioned Classes. However, given the popularity of Defendant's Website, the number of persons within the Classes is believed to be so numerous that joinder of all members is impractical.

95. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

(a) whether Defendant collected Plaintiff's and the Class's PII;

(b) whether Defendant unlawfully disclosed and continues to disclose its users' PII in violation of the VPPA;

(c) whether Defendant's disclosures were committed knowingly; and

(d) whether Defendant disclosed Plaintiff's and the Class's PII without consent.

96. **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Classes because Plaintiff, like all members of the Classes, used Defendant's Website to watch videos, and had her PII collected and disclosed by Defendant.

97. **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring. Plaintiff and her counsel are committed to vigorously prosecuting this class action. Moreover,

Plaintiff is able to fairly and adequately represent and protect the interests of the Classes. Neither Plaintiff nor her counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Classes. Plaintiff has raised viable statutory claims or the type reasonably expected to be raised by members of the Classes, and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes, additional claims as may be appropriate, or to amend the definition of the Classes to address any steps that Defendant took.

98. **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable. Even if every member of the Classes could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, *et seq.*

99. Plaintiff brings this claim individually and on behalf of the members of the proposed VPPA Classes against Defendant.

100. Defendant is a "video tape service provider" because it delivers hundreds of videos on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

101. Plaintiff and members of the Account Class are "subscribers" and therefore "consumers" because they created an account on Defendant's Website to purchase tickets to movie screenings. 18 U.S.C. § 2710(a)(1).

102. Plaintiff and members of the Newsletter Class are "subscribers" and therefore "consumers" because they signed up for a newsletter. Defendant's newsletters are a video service because they periodically notify subscribers of new movie screenings, provide discounts and special offers to Defendant's movie screenings, and help Defendant solicit purchases of tickets to movie screenings. *See* Figure 10.

103. Defendant disclosed to a third party, Facebook, Plaintiff's and the Class members' personally identifiable information. Defendant utilized the Facebook Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like their Facebook IDs, along with Plaintiff's event data, like the title of the videos she viewed.

104. Plaintiff and the Class members viewed video clips using Defendant's Website.

105. Defendant knowingly disclosed Plaintiff's PII because it used that data to build audiences on Facebook and retarget her for its advertising campaigns.

106. Plaintiff and Class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

107. Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

108. On behalf of herself and the Classes, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Classes by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

**COUNT II**
**VIOLATION OF THE NEW YORK VIDEO CONSUMER PRIVACY ACT**
**NEW YORK GENERAL BUSINESS LAW § 671, *et seq.***

109. Plaintiff brings this claim individually and on behalf of the members of the proposed NY VCPA Classes against Defendant.

110. Defendant is a "video tape service provider" because it delivers hundreds of videos on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." New York Gen. Bus. Law § 672(4).

111. Plaintiff and members of the Account Class are "subscribers" and therefore "consumers" because they created an account on Defendant's Website to purchase tickets to movie screenings. New York Gen. Bus. Law § 672(1).

112. Plaintiff and members of the Newsletter Class are "subscribers" and therefore "consumers" because they signed up for a newsletter. Defendant's newsletters are a video service because they periodically notify subscribers of new movie screenings, provide discounts and special offers to Defendant's movie screenings, and help Defendant solicit purchases of tickets to movie screenings. *See* Figure 10.

113. Defendant disclosed to a third party, Facebook, Plaintiff's and the Class members' personally identifiable information. Defendant utilized the Facebook Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like their Facebook IDs, along with Plaintiff's event data, like the title of the videos she viewed.

114. Plaintiff and the Class members viewed video clips using Defendant's Website.

115. Defendant knowingly disclosed Plaintiff's PII because it used that data to build audiences on Facebook and retarget her for its advertising campaigns.

116. Plaintiff and Class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

117. Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." New York Gen. Bus. Law § 672(2).

118. On behalf of herself and the Classes, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the

Classes by requiring Defendant to comply with NY VCPA's requirements for protecting a consumer's PII; (iii) statutory damages of $500 for each violation of the VCPA pursuant to New York Gen. Bus. Law § 675(1); and (iv) reasonable attorneys' fees and costs and other litigation expenses pursuant to New York Gen. Bus. Law § 675(1).

## COUNT III
## VIOLATION OF THE NEW YORK ARTS AND CULTURAL AFFAIRS LAW § 25.07

119. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

120. Plaintiff brings this claim individually and on behalf of the members of the ACAL Nationwide Class and ACAL New York Subclass against Defendant.

121. Defendant is a "operator or operator's agent of a place of entertainment," because Defendant owns, operates, or controls movie theatres, or is an agent for another business entity that owns, operates, or controls movie theatres. "'Place of entertainment' means any privately or publicly owned and operated entertainment facility such as a theatre, stadium, arena, racetrack, museum, amusement park, or other place where performances, concerts, exhibits, athletic games or contests are held for which an entry fee is charged." N.Y. Arts & Cult. Aff. Law § 25.03(6) (emphasis added). "'Entertainment' means all forms of entertainment including, but not limited to… motion pictures… and all other forms of diversion, recreation or show." N.Y. Arts & Cult. Aff. Law § 25.03(1). "'Operator' means any person who owns, operates, or controls a place of entertainment." N.Y. Arts & Cult. Aff. Law § 25.03(5).

122. Defendant violated New York Arts & Cultural Affairs Law § 25.07(4) by failing to disclose the "total cost of a ticket, inclusive of all ancillary fees that must be paid in order to purchase the ticket" after a ticket is selected, as depicted in Figure 16-A of this Complaint. Figure 16-A expressly provides the "TOTAL" "PRICE" of a ticket, excluding service charges.

123. Defendant also violated New York Arts & Cultural Affairs Law § 25.07(4) by increasing the price of its tickets during the purchase process, as depicted in Figures 14-19 of this Complaint.

124. Defendant's $2.19 per ticket "service charge" is an "ancillary fee[] that must be paid in order to purchase the ticket." Arts & Cult. Aff. Law § 25.07(4).

125. On or about December 2, 2023, Plaintiff purchased tickets on Defendant's website and was forced to pay Defendant's service charges. Plaintiff was harmed by paying these service charges, even though the service charges were not disclosed to Plaintiff at the beginning of the purchase process, and therefore, are unlawful pursuant to New York Arts & Cultural Affairs Law § 25.07(4).

126. On behalf of herself and members of the Nationwide Class and New York Subclass, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover her actual damages or fifty dollars, whichever is greater, and reasonable attorneys' fees. *See* Arts & Cult. Aff. Law § 25.33.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a) For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d) An award of statutory damages to the extent available;

(e) For punitive damages, as warranted, in an amount to be determined at trial;

(f) For prejudgment interest on all amounts awarded;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated: October 6, 2025

Respectfully submitted,

By: */s/ Philip L. Fraietta*____

**BURSOR & FISHER, P.A.**
Philip L. Fraietta
50 Main Street, Suite 475
White Plains NY 10606
Telephone: 914-874-0708
Facsimile: (914) 206-3656
E-Mail: pfraietta@bursor.com

Alec M. Leslie
1330 Avenue of the Americas, 32nd Floor
New York, NY 100019
Telephone: (646) 837-7126
Facsimile: (212) 989-9163
E-Mail: aleslie@bursor.com

Stefan Bogdanovich
1990 N. California Blvd., 9th Floor
Walnut Creek, CA 94595

Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: sbogdanovich@bursor.com

*Attorneys for Plaintiff and the Putative Class*