UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HALEY BERRYMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>READING INTERNATIONAL, INC.,<br><br>Defendant. | Case No.: 1:24-cv-00750-PAE |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT READING INTERNATIONAL, INC.'S MOTION TO DISMISS COUNTS I AND II OF THE FIRST AMENDED CLASS ACTION COMPLAINT

**GREENBERG TRAURIG, LLP**
One Vanderbilt Avenue
New York, New York 10017
Tel. (212) 801-9200
*Attorneys for Defendant*
*Reading International, Inc.*

# TABLE OF CONTENTS

**Pages**


I. INTRODUCTION .......... 1

II. RELEVANT ALLEGATIONS .......... 3

A. Plaintiff's VPPA Allegations .......... 3

B. Plaintiff's NY VCPA Allegations .......... 4

III. LEGAL STANDARD .......... 6

A. Motion to Dismiss .......... 6

B. Motion for Judgment On The Pleadings .......... 6

IV. ARGUMENT .......... 7

A. Plaintiff's VPPA Claim Should be Dismissed for Failure to State a Claim .......... 7

B. Plaintiff's NY VCPA Claim Should be Dismissed .......... 11

1. The NY VCPA applies only to "rentals" and "sales" .......... 11

2. Plaintiff does not plausibly identify any PII that was disclosed .......... 13

V. CONCLUSION .......... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ... 6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ... 6

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ... 5

*Golden v. NBCUniversal Media, LLC*,
No. 1:22-cv-09858-PAE, 2025 WL 2530689 (S.D.N.Y. Sept. 3, 2025) ... 1, 2, 9

*Hughes v. National Football League*,
No. 24-2656, 2025 WL 1720295 (2d Cir. June 20, 2025) ... 2, 8

*In re Lehman Brothers Holdings Inc.*,
855 F.3d 459 (2d Cir. 2017) ... 14

*In re Nickelodeon Consumer Privacy Litigation*,
827 F.3d 262 (3d Cir. 2016) ... 9

*Kalin v. Xanboo, Inc.*,
526 F. Supp. 2d 392 (S.D.N.Y. 2007) ... 1, 6

*Kimmel v. State*,
29 N.Y.3d 386 (2017) ... 8, 14

*Mollett v. Netflix, Inc.*,
795 F.3d 1062 (9th Cir. 2015) ... 7

*Nixon v. Pond5, Inc.*.,
No. 1:24-cv-05823 (JLR), 2025 WL 2030303 (S.D.N.Y. July 21, 2025) ... 2

*Salazar v. National Basketball Association*,
No. 1:22-cv-07935 (JLR), 2025 WL 2830939 (S.D.N.Y. Oct. 6, 2025) ... 7, 11

*Solomon v. Flipps Media, Inc.*,
136 F.4th 41 (2d Cir. 2025) ... 2, 5, 7, 9, 14, 16

*Taino v. Bow Tie Cinemas, LLC*,
No. 23-cv-05371 (VSB), 2025 WL 2652730 (S.D.N.Y. Sept. 16, 2025) ... 2, 9

*United States v. City of New York*,
481 F. Supp. 4 (S.D.N.Y. 1979) ... 14

*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) ... 5

**Statutes**

18 U.S.C. § 2710 ....................................................................................................... 5
NY Gen. Bus. Law § 671 ....................................................................................... 3, 15
NY Gen. Bus. Law § 672 ................................................................................. 5, 12, 13
NY Gen. Bus. Law § 673 ....................................................................................... 2, 12
NY Gen. Bus. Law § 674 ....................................................................................... 2, 13

Defendant Reading International, Inc. ("Defendant" or "Reading"), through undersigned counsel, moves to dismiss Counts I and II of Plaintiff Haley Berryman's ("Plaintiff") First Amended Class Action Complaint (the "FAC") for failure to state a claim under Federal Rule of Civil Procedure ("Rule") 12(b)(6). In the alternative, should the Court consider Count I to have been previously answered despite the filing of the superseding FAC, Defendant moves for judgment on the pleadings as to Count I under Rule 12(c).[1]

## I. INTRODUCTION

Plaintiff alleges that Reading knowingly disclosed to Meta Platforms, Inc. ("Facebook")—the parent company of the social media service Facebook—personally identifiable information ("PII") about individuals' video viewing habits. Plaintiff alleges that this information, which she contends was disclosed without her consent, was transmitted through the Facebook Pixel, a functional software code that allegedly collects users' data. This Court is well familiar with such allegations, as Plaintiff's claim here mirrors the claims alleged in *Golden v. NBCUniversal Media, LLC*, No. 1:22-cv-09858-PAE, 2025 WL 2530689 (S.D.N.Y. Sept. 3, 2025), among other VPPA Facebook Pixel cases.

In that case, the plaintiff similarly alleged that PII concerning her video consumption was disclosed to Facebook in violation of the VPPA because of the defendant's use of the Facebook Pixel. *See id.* at *1 ("The data consisted of (1) a sequence of characters, letters, and numbers,

---

[1] The Court can consider the motion under Rule 12(b)(6) or 12(c), particularly where Rule 12(g) requires joinder where practicable. *See, e.g.*, *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 398 (S.D.N.Y. 2007) ("[E]ven if RDI's answer to the original complaint bars it from filing a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court may consider the motion under Rule 12(c). Indeed, the Second Circuit has held that converting a motion under these circumstances 'makes eminently good sense because a motion for judgment on the pleadings is the direct descendant of that ancient leper law of the common law, the 'speaking demurrer.' Moreover, the standard of review under both provisions is the same.").

which, when interpreted, would identify the user's video title and uniform resource locator ('URL' or web address), and (2) the user's Facebook identification number ('FID' or 'Facebook ID'), a unique sequence of numbers linked to the user's Facebook profile."). But such claims are foreclosed by the Second Circuit's recent decision construing the VPPA in *Solomon v. Flipps Media, Inc.*, 136 F.4th 41 (2d. Cir. 2025). This is because the information alleged to have been disclosed is not determinable by an "ordinary person." *Id.* at 51-52 (adopting "ordinary person" standard). In short, the VPPA applies to PII that is "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Id.* As now held in numerous cases, allegations that "a Facebook pixel had disclosed a video user's FID and video URLs to Facebook" are not the type of readily identifiable PII protected by the VPPA. *See id.*; *see also Taino v. Bow Tie Cinemas, LLC*, No. 23-cv-05371 (VSB), 2025 WL 2652730 (S.D.N.Y. Sept. 16, 2025); *Golden*, 2025 WL 2530689; *Nixon v. Pond5, Inc.*, No. 1:24-cv-05823 (JLR), 2025 WL 2030303 (S.D.N.Y. July 21, 2025); *Hughes v. National Football League*, No. 24-2656, 2025 WL 1720295 (2d Cir. June 20, 2025).

For the same reasons here, Reading requests this Court dismiss Count I of the FAC.

Plaintiff's New York Video Consumer Protection Act claim ("NY VCPA") fails to state a claim for similar reasons. Moreover, by the clear terms of the NY VCPA, it applies only to "rentals" or "sales" of videos, and not to the happenstance *viewing* of a free video on a website. Indeed, it is telling that Plaintiff's Count II claim for relief fails entirely to identify the only two prohibitions contained in the NY VCPA: pertaining to the wrongful disclosure of video tape "rental" records, N.Y. G.B.L. § 673, and to the wrongful disclosure of video tape "sales" records, N.Y. G.B.L. § 674. The legislative findings underscore that the NY VCPA applies to those who "rent" out or sell videos, which Plaintiff does not allege occurred here. *See* N.Y. G.B.L. § 671 ("It

is the intent of the legislature by enactment of this article to protect the personal privacy of individuals and their families who rent video cassette tapes and movies and similar audio visual materials."). The NY VCPA does not extend carte blanche to all potential video viewing online, and indeed, there has been no amendment ever seeking to have it do so.

## II. RELEVANT ALLEGATIONS

Reading is alleged to own and operate Angelika Film Centers—movie theaters showing independent and international films (the "Angelika"). FAC ¶ 2. Reading is also alleged to operate AngelikaFilmCenter.com, which enables cinephiles to purchase tickets to shows at the Angelika, and also peripherally learn about films and view movie trailers. *Id.*

### A. PLAINTIFF'S VPPA ALLEGATIONS

Plaintiff alleges that AngelikaFilmCenter.com utilizes Facebook's Tracking Pixel, which is a piece of code that Plaintiff alleges tracks individuals and the types of "actions" (or "events") said individuals take. FAC ¶ 40. For each "action," Plaintiff alleges that the Facebook Tracking Pixel collects the website's metadata and the pages an individual specifically visits. *Id.* ¶ 41. As to AngelikaFilmCenter.com specifically, Plaintiff alleges that the Facebook Tracking Pixel on the Website transmits two distinct components to Facebook—the Uniform Resource Locator (or "URL") and whether the specific website the individual visits contains a link to a video. *Id.* ¶ 45.

Plaintiff alleges further that the title for the movie is contained in the URL and that when a person selects a particular date and showtime for the movie depicted on the webpage containing the movie trailer, and completes the checkout process to purchase said ticket, a new purchase event is transmitted to Facebook. *Id.* ¶¶ 45-51. Plaintiff does not allege that any "video viewed" event is transferred or recorded. Indeed, Plaintiff alleges only that the purchase event—for the ticket,

not the viewing of any video—"discloses to Facebook the fact that a consumer purchased a movie ticket, the currency used to purchase the ticket, and the amount spent on the ticket." *Id.* ¶ 52.

Plaintiff further alleges that when an event occurs while the individual is logged into Facebook, AngelikaFilmCenter.com sends cookie information to Facebook that *Facebook* matches with an encrypted Facebook ID specific to the individual. *Id.* ¶¶ 54-63. Thus, according to Plaintiff, Facebook is able to pair the cookie information with Facebook's ID to determine the viewing history of individuals. *Id.*

Plaintiff alleges on a conclusory basis that through the collection of metadata and with knowledge of Facebook's ID, "Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior." *Id.* ¶ 74. But the specific facts Plaintiff alleges do not identify any of the information transmitted by Reading as to the identity of any specific video viewed by Plaintiff.

### B. PLAINTIFF'S NY VCPA ALLEGATIONS

Plaintiff separately alleges that Reading violated New York's General Business Law § 671 *et seq.*, by "disclos[ing] to a third party, Facebook, Plaintiff's and the Class members' personally identifiable information." *Id.* ¶ 113 (alleging that "Defendant utilized the Facebook Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like their Facebook IDs, along with Plaintiff's event data, like the title of the videos she viewed").

Plaintiff acknowledges that the NY VCPA and VPPA "are substantially similar," *id.* ¶ 24, but contends that "[s]ignificantly, however, the NY VCPA defines the term 'personally identifiable information' differently than the VPPA," *id.* ¶ 25. Further acknowledging that courts agree the VPPA is "not well drafted," *id.* ¶ 26, Plaintiff nevertheless contends that the New York Legislature *intentionally* chose to define "personally identifiable information" to "mean[] any" information

which identifies a person rather than "includes" information which identifies a person, *id.* ¶¶ 25, 28. According to Plaintiff, because of this difference, "the Court need not engage in any guesswork about [ ] what an 'ordinary person' who lacks any intellectual curiosity might be able to figure out without the aid of online resources" or "with the help of 'modern technology'" as compared to sophisticated technology companies. *Id.* ¶ 30 (citing *Solomon*, 136 F.4th at 48; *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985-86 (9th Cir. 2017); *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016)). Plaintiff further alleges that the New York Legislature intended to pass a broader bill to account for the fact that the VPPA allows disclosure of personally identifiable information in certain circumstances. FAC ¶ 33. Specifically, Plaintiff alleges the NY VCPA was passed to address "unsolicited direct mail advertisements." *Id.* ¶ 34.

As a foundational matter, the FAC ***erroneously*** alleges that the "[t]he VPPA and the NY VCPA define 'video tape service provider' . . . identically." *Id.* ¶ 24. Not so.

**The NY VCPA definition of "video tape service provider":**

> The term "video tape service provider" means any person engaged in the business of rental of prerecorded video cassette tapes or similar audio visual materials, or any person or other entity to whom a disclosure is made pursuant to section six hundred seventy-three of this article but only with respect to the information contained in the disclosure.

N.Y. G.B.L. § 672(4).

**The VPPA's definition of "video tape service provider":**

> [T]he term "video tape service provider" means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials, or any person or other entity to whom a disclosure is made under subparagraph (D) or (E) of subsection (b)(2), but only with respect to the information contained in the disclosure.

18 U.S.C. § 2710(a)(4).

Based on this erroneous conflation of definitions, Plaintiff contends that Reading is a "video tape service provider" under the NY VCPA, FAC ¶ 110, and knowingly disclosed personal information in violation of the NY VCPA, *id.* ¶ 113. Tellingly, Plaintiff does not identify a specific section of the NY VCPA that was allegedly violated. *See generally id.* ¶¶ 110-118 (failing to identify either of the two prohibitory sections, Sections 673 or 674).

## III. LEGAL STANDARD

### A. MOTION TO DISMISS

To survive a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although a court must accept all factual allegations in the complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. Ultimately, if the plaintiff's allegations "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* at 570.

### B. MOTION FOR JUDGMENT ON THE PLEADINGS

A court considers a motion for judgment on the pleadings in substantively the same manner as a motion to dismiss. *See Kalin*, 526 F. Supp. 2d at 398 (stating the "standard of review under both [Rule 12(b)(6) and 12(c)] is the same, and in considering either motion the court 'must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor.'" (citation omitted)).

## IV. ARGUMENT

### A. PLAINTIFF'S VPPA CLAIM SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

To bring a VPPA claim, a plaintiff must plausibly allege that: "(1) a defendant is a 'video tape service provider,' (2) the defendant disclosed personally identifiable information concerning any customer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015). The term "personally identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). Noting that this definition is unclear, the Second Circuit has further defined "personally identifiable information" to mean "information that would allow an ordinary person to identify a consumer's video-watching habits, but not information that only a sophisticated technology company could use to do so." *Solomon*, 136 F.4th at 52. Accordingly, "to survive a motion to dismiss, plaintiffs must 'plausibly allege[] that [the defendant]'s disclosure of [information] would, with little or no extra effort, permit an ordinary recipient to identify [the plaintiff]'s video-watching habits.'" *Salazar v. National Basketball Association*, No. 1:22-cv-07935 (JLR), 2025 WL 2830939, at *3 (S.D.N.Y. Oct. 6, 2025) (quoting *Solomon*, 136 F.4th at 52)).

Understanding the complex nature of the Facebook Pixel, the Second Circuit had no trouble determining that the sequencing necessary to even attempt to determine video titles, let alone identification of the individual's Facebook ID, were beyond the ordinary person contemplated by the passage of the VPPA. *See Solomon*, 136 F.4th at 54 (holding that it is implausible that an ordinary person would look at the phrase contained in the exemplar and understand it to refer to a video title, to understand "with little or no extra effort" the highlighted portion to be a video title

as opposed to any of the other combinations of words within the code," or to "identify [the person] though [their] FID," let alone know how to "access the information on the Pixel's PageView"). Shortly afterwards, the Section Circuit affirmed in *Hughes v. National Football League* that "*Solomon* effectively shut the door for Pixel-based VPPA claims." *Hughes v. National Football League*, No. 24-2656, 2025 WL 1720295, at *2-3 (2d Cir. June 20, 2025) (rejecting the argument that "a viewer's FID can be identified based on the string of numerals following the 'c_user' field" since it was "not plausible that an ordinary person, without [ ] annotation . . . , would see the 'c_user' phrase on [this communication] and conclude that the phrase was a person's FID") (alterations and omission in original) (quoting *Solomon*, 136 F.4th at 54)).

Plaintiff's allegations regarding the Facebook Pixel mirror those in *Solomon* and its progeny. For example, Plaintiff alleges that "[w]hen a visitor watches a video or completes the movie ticket purchasing process on Defendant's Website while logged into Facebook, Defendant compels a visitor's browser to transmit the c_user cookie to Facebook for each distinct Facebook Tracking Pixel event" and that this "c_user cookie contains that visitor's unencrypted Facebook ID." FAC ¶ 54. Plaintiff further alleges that Facebook "uses the fr and _fbp cookies to identify users." *Id.* ¶ 56. This alleged cookie data consists of strings of letters and numbers:

**Figure 7**

| Name | Value | Domain |
|---|---|---|
| datr | IKMTZDnp92T5Bkqwh2LEBedt | .facebook.com |
| sb | FXEXZF66qmf7QYrBRI0wetan | .facebook.com |
| c_user | 1528550551 | .facebook.com |
| m_ls | %7B%22c%22%3A%7B%221%... | .www.facebook.com |
| ps_n | 0 | .facebook.com |
| xs | 24%3ATWFeKjQ4G0FB5A%3A2... | .facebook.com |
| fr | 1IYeBwHTStqeUQZr6.AWUOHm... | .facebook.com |

*Id.* ¶ 54. Plaintiff further alleges that "Facebook [not an ordinary person] uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles." *Id.* ¶ 60. And

Plaintiff alleges that "[t]hrough the Facebook Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Facebook to know, among other things, what videos a user has watched on Defendant's Website." *Id.* ¶ 63.

But these are the exact same kind of allegations rejected in *Solomon* and subsequent District Court decisions. *See Solomon*, 136 F.4th at 55 (citing *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 283 (3d Cir. 2016) ("To an average person, an IP address or a digital code in a cookie file would likely be of little help in trying to identify an actual person."); *see also Golden v. NBCUniversal Media, LLC*, No. 22-cv-09858 (PAE), 2025 WL 2530689, at *6-7 (S.D.N.Y. Sept. 3, 2025) (dismissing Pixel-based VPPA claims because allegations that 'a person with the right tools can use and FID to identify a specific Facebook user" did not satisfy the ordinary-person standard based on *Solomon*, *Hughes*, and *Nixon*); *Taino v. Bow Tie Cinemas, LLC*, No. 23-cv-05371 (VSB), 2025 WL 2652730, at *7-8 (S.D.N.Y. Sept. 16, 2025) (dismissing Pixel-based VPPA claims based on allegations that were "essentially identical . . . to the allegations made by the plaintiff in *Solomon*"). Indeed, all that Plaintiff has actually alleged is that Facebook, using the otherwise incomprehensible coding contained in the cookie data, can pair all of the information together to allegedly identify users and their browsing habits. *See Golden*, 2025 WL 2530689, at *7 ("[D]isclosures comprehensible only to Facebook or other sophisticated actors are not [personally identifiable information].").

Moreover, Plaintiff's allegation that the Pixel PageView "discloses the URL and whether the webpage features a video" is similarly insufficient to even pled that a video was *viewed*. The lengthy and cumbersome URLs contained in Figures 4 and 5 (FAC ¶¶ 46-47) both include the word "ticketing" such that the URLs contained in the PageView appear to refer to *ticket purchases* for the in-theater movie screening, which this Court has held do not support application of the

VPPA, rather than to any movie trailers purportedly viewed. *See* ECF No. 39 at 7 ("A movie theater operator does not rent or sell films; rather, it sells *tickets* to theatergoers. Nor does a movie theater 'deliver' films to theatergoers.").

**Figure 5**




FAC ¶ 47 (highlight added).

Indeed, Reading does not see any information regarding a video *view* that has been disclosed at all. Plaintiff in fact *admits* as much by acknowledging that, in actuality, "[c]ollectively, Figures 4 through 6 notify Facebook [again, not an ordinary person] that a consumer spent $7.19 to *purchase a ticket* to Defendant's screening of the Barbie movie at Defendant's movie theater on January 31, 2024." FAC ¶ 53 (emphasis added). Here again, this refers solely to movie ticket purchases, which do not support a VPPA claim. Accordingly, Plaintiff's FAC is based on an improper conflation of having purchased a ticket to support her

claim that video views were disclosed. That conflation should not be tolerated, particularly where this Court has dismissed the VPPA claim based on ticket purchases.

Stated simply, "[t]here is no basis for the Court to reach a different result here. Because an ordinary person would not plausibly be able to identify Plaintiff's video-watching habits as a result of the Pixel transmissions, Plaintiff has not plausibly alleged that [Defendant] disclosed personally identifiable information in violation of the VPPA." *Salazar*, 2025 WL 2830939 at *5.

**B. PLAINTIFF'S NY VCPA CLAIM SHOULD BE DISMISSED**

Plaintiff's NY VCPA claim fails for two straightforward reasons.

*1. The NY VCPA applies only to "rentals" and "sales"*

First, and as a definitional matter, the NY VCPA applies only to "rentals" and "sales" of video cassette tapes or similar audio visual materials. There is <u>no</u> prohibition applying to viewing free videos nor does the NY VCPA apply to the "delivery" of online videos, which is the only basis upon which Plaintiff's VPPA claim initially survived. *See* ECF No. 39 at 6 ("Here, Berryman's Complaint alleges that Reading qualifies as a 'video tape service provider' . . . because it delivers 'hundreds of videos on its website[.]'"). The legislative support that Plaintiff attaches as Exhibit A to the FAC confirms the NY VCPA's limited application to "rentals" and "sales." *See, e.g.*, FAC, Ex. A at PAGEID 12 of 26 (the Attorney General stating that the "bill would protect the personal privacy of consumers who *purchase* or *rent* prerecorded video cassette tapes or similar audiovisual materials" (emphasis added)). Indeed, the legislative support is replete with comments on the "rental" and "purchases" of video cassette tapes and similar audio visual materials for viewing on video cassette recorders in the home. *Id.* at PAGEID 10 of 26 (stating "[a]lmost half of all U.S. households are equipped with a video cassette recorder" and that "Americans spend hundreds of millions of dollars on renting and buying movies for home viewing."). These limitations are important, and it is telling that Plaintiff does not (and cannot) allege she rented or

purchased any video she viewed. For these reasons, her claim under the NY VCPA should be dismissed.

*i. Section 673 applies only to video tape rental records*

Section 673 of the NY VCPA is titled the "Wrongful disclosure of video tape rental records" and provides that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief provided in [Section 675] of this article." "Video tape service provider" is a defined term under the statute, meaning "any person engaged in the business of rental of prerecorded video cassette tapes or similar audio visual materials . . . ." N.Y. G.B.L. § 672(4). Plaintiff's FAC, at Paragraph 110, *erroneously* rewrites the definition as if it mirrored the federal definition of "video tape service provider" under the VPPA. *Compare* N.Y. G.B.L. § 672(4) (omitting "delivery") *with* 18 U.S.C. § 2710(a)(4) (including "delivery"). Important here, the word "delivery" that Plaintiff attempts to rely upon to claim that Reading is a "video tape service provider" under New York law *does not appear in Section 672(4) of the NY VCPA*.

Accordingly, and setting aside Plaintiff's erroneous definition contained in Count II of the FAC, both by its title and by the correct defined terms Section 673 applies only to video "rentals." While "rental" itself is not defined, it commonly means "an amount paid or collected as rent," "something that is rented," "an act of renting," or "a business that rents something." Merriam-Webster Online Dictionary, Rental, available at https://www.merriam-webster.com/dictionary/rental (last visited October 10, 2025). "Rent," as a noun, commonly is understood to mean "the amount *paid* by a hirer of personal property to the owner for the use thereof." Merriam-Webster Online Dictionary, Rent, available at https://www.merriam-webster.com/dictionary/rent (last visited October 10, 2025) (emphasis added).

Tellingly, so obvious is the misapplication of this specific provision that Plaintiff herself does not even attempt to allege that she "rented" the videos she claims to have viewed. Again, all that Plaintiff alleges is that she "viewed video clips using Defendant's website." FAC ¶ 114.

*ii. Section 674 applies only to video tape sales records*

Section 674 contains the only other prohibition contained in the NY VCPA. It is titled the "Wrongful disclosure of video tape sales records" and prohibits a "video tape seller" from knowingly disclosing, "to any person, personally identifiable information concerning any consumer of such seller." N.Y. G.B.L. § 674(1). "Video tape seller" is defined to mean "any person engaged in the business of selling prerecorded video cassette tapes or similar audio visual materials[.]" N.Y. G.B.L. § 672(5). It is elemental that "selling" refers to the exchange of value such as money and a change in ownership rights. *See* Merriam-Webster Online Dictionary, Sell, available at https://www.merriam-webster.com/dictionary/sell (last visited October 10, 2025).

And just like there is no allegation that Reading rented the videos that Plaintiff allegedly viewed, there is no allegation that Reading "sold" the videos to Plaintiff either. *See generally* FAC. In fact, the only alleged item "sold" was the *ticket* that Plaintiff purchased to the public showing of a movie. *See* FAC ¶ 15 (alleging that Reading is liable under the New York Arts and Cultural Affairs Law "for a minimum of fifty dollars in statutory damages for each ticket sold").

*2. Plaintiff does not plausibly identify any PII that was disclosed*

Second, Plaintiff's NY VCPA allegations fail because, for the same reasons stated above, Plaintiff fails to identify any PII that was knowingly disclosed in violation of the NY VCPA. Here, Plaintiff acknowledges that the VPPA was poorly worded and suggests that the Second Circuit's decision in *Solomon* turned on the fact the definition in the VPPA stated "includes" and that had it only used "means any," like the NY VCPA, a different holding would have resulted. *See* FAC

¶ 28. Plaintiff's argument finds no support in the law and the Court should apply an equal understanding of the NY VCPA as the VPPA.[2]

The *Solomon* decision did not turn on the fact that the word "includes" was used. Indeed, in that case, the parties *agreed* that Congress intended the VPPA to cover not just information that, by itself, identifies [by name] a consumer's video-viewing history, but also information *capable* of being used to do so. *Solomon*, 136 F.4th at 51-52. This is the only element for which "includes" was material. *Id.* at 52 ("The words 'include[ ]' and 'identifiable' suggest that personally identifiable information includes information that *can be used* to identify a person,' a well as information that, standing alone, identifies a person."). Nevertheless, the Second Circuit adopted the "ordinary person" standard that proved fatal to plaintiff's claims based on the fact the definition in its entirety was "more naturally read as referring to information that would permit an ordinary person to learn another individual's video-watching history," and that "the specific context in which those words are used suggests that the definition encompasses information that would permit an ordinary person to identify a specific individual's video-watching behavior, as opposed to information that only a technologically sophisticated third party could use to identify specific customers." *Id.* Still further, the Second Circuit held that "the broader context of the statute as a whole squarely supports the conclusion that liability under the VPPA should be limited to the disclosure of information that would permit an ordinary person to learn a specific individual's video-watching history" because it "was enacted in 1988" when the internet was in its infancy and

[2] While Plaintiff alleges that "any" "imports no limitation," citing *Kimmel v. State*, 29 N.Y.3d 386, 393 (2017), FAC ¶ 29, the term "includes" is similarly understood to be a term of enlargement and not of limitation. *See In re Lehman Brothers Holdings Inc.*, 855 F.3d 459, 473 (2d Cir. 2017) (stating "the term 'includes' is not a limiting term'" (internal alterations omitted)); *U.S. v. City of New York*, 481 F. Supp. 4, 6 (S.D.N.Y. 1979) ("the word 'includes' is usually a term of enlargement, and not of limitation." (citation omitted)).

the VPPA had never been amended since its inception. *Id.* at 52-53. Those some reasons apply with equal force to the passage (and failure to amend) the NY VCPA.

The declaration of legislative findings and intent confirms that its concern was the "data *containing* the *identities* of consumers who have rented video tapes and movies and the titles of the videos rented." N.Y. G.B.L. § 671 (emphasis added). It does not refer to data that a sophisticated person *might* use to *try* to determine the identity of the consumer. Further underscoring the immaterial change from "including" to "means any," a Memorandum in Support of Legislation from 1995 provided that the purpose of the NY VCPA would be to "prohibit video tape service providers from disclosing to any person personally identifiable information concerning the consumer, *including* information which identifies a person as having rented or obtained specific video materials or services from a video tape service provider." FAC, Ex. A at PAGEID 9 of 26, 12 of 26 (from the Attorney General) (emphasis added), 18 of 26 (memorandum for the Governor, by the New York Department of Law). The fact that everyone understood "means any" to mean "includes" underscores that a similar result should follow in the NY VCPA.

And whereas Plaintiff acknowledges the Jurassic nature of the VPPA, the NY VCPA is no less prehistoric. The "Justification" for the bill was based on retail establishments that devoted all or part of their business to the "sale or rental" of pre-recorded video tapes and movies based on the fact that "[a]lmost half of all U.S. households are equipped with a video cassette recorder" and "Americans spend hundreds of millions of dollars on renting and buying movies for home viewing." *Id.* at PAGEID 10 of 26.; *see also id.* at PAGEID 11 of 26 (stating that "[c]onsumers should be entitled to view movies and tapes of their own choosing within their own homes"). Plaintiff nevertheless attempts to have this Court apply the NY VCPA—passed with specific reference to "video cassette recorders" in the home—to complex and otherwise indiscernible

cookie data in the Facebook Pixel. If the NY VCPA were intended to apply to this extreme development in technology, it would have certainly been amended to account for greater privacy concerns. *See Solomon*, 136 F.4th at 53 ("The decision not to amend the VPPA suggests that Congress believed that the VPPA 'serves different purposes, and protects different constituencies, than other, broader privacy laws. This is especially notable when we compare the VPPA to other, later privacy statutes that included a more expansive definition of personally identifiable information or related terms." (internal quotation omitted)).

Perhaps perfectly demonstrating why the NY VCPA should be understood in the same context as the VPPA, the type of harm that was expressly intended to be avoided with the NY VCPA was the obtaining of "names and addresses of individual customers along with the titles of the movies they have rented or purchased," which could be "obtained at the press of a button." FAC, Ex. A at PAGEID 11 of 26. The specific examples of abuse noted by those in support of the legislation were *lists* that investigators were easily able to obtain and print out without effort. *Id.* (identifying instances concerning Oliver North, Judge Robert Bork, and the McCarthy era in which investigators obtained lists of books checked out of public libraries). It is incredulous that Plaintiff even contends the NY VCPA was nevertheless passed to account for advancements like the cookie data as alleged here.

## V. CONCLUSION

For the reasons stated herein, Reading respectfully requests the Court dismiss the VPPA and NY VCPA claims from the FAC.

DATED this 20th day of October, 2025

**GREENBERG TRAURIG, LLP**

By: *<u>/s/ Mark E. Ferrario</u>*
Mark E. Ferrario, Esq.
Nevada Bar. No. 1625
Tyler Andrews, Esq.
Nevada Bar No. 9499
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002
Email: ferrariom@gtlaw.com
tyler.andrews@gtlaw.com

Sarah E. Atlas
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: atlass@gtlaw.com

*Attorneys for Reading International, Inc.*