**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HALEY BERRYMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>READING INTERNATIONAL, INC.,<br><br>Defendant. | Civil Action No. 1:24-cv-00750-PAE<br><br>Hon. Paul A. Engelmayer |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNT I OF THE FIRST AMENDED COMPLAINT**

Dated: November 3, 2025

**BURSOR & FISHER, P.A.**
Philip L. Fraietta
50 Main Street, Suite 475
White Plains NY 10606
Telephone: 914-874-0708
Facsimile: (914) 206-3656
E-Mail: pfraietta@bursor.com

Alec M. Leslie
1330 Avenue of the Americas, 32nd Floor
New York, NY 100019
Telephone: (646) 837-7126
Facsimile: (212) 989-9163
E-Mail: aleslie@bursor.com

Stefan Bogdanovich
1990 N. California Blvd., 9th Floor
Walnut Creek, CA 94595
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: sbogdanovich@bursor.com

*Attorneys for Plaintiff and the Putative Class*

# TABLE OF CONTENTS

PAGE(S)

INTRODUCTION ........................................................................................................ 1

ARGUMENT ........................................................................................................ 5

I. READING DISCLOSED PLAINTIFF'S PII BY DISCLOSING HER FIRST AND LAST NAME ALONG WITH THE TITLES OF THE MOVIE TRAILERS SHE ACCESSED ........................................................................................................ 5

   A. Reading Disclosed The Consumer's Identity By Disclosing Her First And Last Name (Along With Her Email) ........................................................................................................ 5

   B. Reading Disclosed The Video's Identity By Sharing The Title Of The Movie Trailer ........................................................................................................ 10

   C. Reading Knew Facebook Would Connect The Two By Activating "Advanced Matching" ........................................................................................................ 14

CONCLUSION ........................................................................................................ 15

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Ambrose v. Bos. Globe Media Partners LLC*,
2022 WL 4329373 (D. Mass. Sept. 19, 2022) .......... 10

*Archer v. NBCUniversal Media, LLC*,
2025 WL 2601509 (C.D. Cal. July 2, 2025) .......... 10

*Balestrieri v. SportsEDTv, Inc.*,
2025 WL 2776356 (N.D. Cal. Sept. 16, 2025) .......... 10

*Collins v. Pearson Educ., Inc.*,
721 F. Supp. 3d 274 (S.D.N.Y. 2024) .......... 5, 14

*Digital Realty Tr., Inc. v. Somers*,
583 U.S. 149 (2018) .......... 13

*Edmundson v. Klarna, Inc.*,
85 F.4th 695 (2d Cir. 2023) .......... 3, 12

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) .......... Passim

*Garcia v. Bandai Namco Ent. Am. Inc.*,
2025 WL 2451033 (C.D. Cal. Aug. 7, 2025) .......... 10

*Golden v. NBCUniversal Media, LLC*,
688 F. Supp. 3d 150 (S.D.N.Y. 2023) .......... 1, 4, 6, 13

*Golden v. NBCUniversal Media, LLC*,
2025 WL 2530689 (S.D.N.Y. Sept. 3, 2025) .......... 5, 7, 11

*Goldstein v. Fandango Media, LLC*,
2023 WL 3025111 (S.D. Fla. Mar. 7, 2023) .......... 10

*Goodman v. Hillsdale College*,
2025 WL 2941542 (W.D. Mich. Oct. 17, 2025) .......... 10

*Hughes v. Nat'l Football League*,
2025 WL 1720295 (2d Cir. June 20, 2025) .......... 7

*In re Hulu Priv. Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) .......... 9

*In re Hulu Priv. Litig.*,
2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ........ 9

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016) ........ Passim

*Jancik v. WebMD LLC*,
2025 WL 560705 (N.D. Ga. Feb. 20, 2025) ........ 14, 15

*Lebakken v. WebMD, LLC*,
640 F. Supp. 3d 1335 (N.D. Ga. 2022) ........ 10

*Plotsker v. Envato Pty Ltd.*,
2025 WL 2481422, n.7 (C.D. Cal. Aug. 26, 2025) ........ 10

*Salazar v. Nat'l Basketball Ass'n*,
118 F.4th 533 (2d Cir. 2024) ........ Passim

*Sellers v. Bleacher Rep., Inc.*,
2023 WL 4850180 (N.D. Cal. July 28, 2023) ........ 4, 12, 13

*Solomon v. Flipps Media, Inc.*,
136 F.4th 41 (2d Cir. 2025) ........ Passim

*United States v. Rahimi*,
602 U.S. 680 (2024) ........ 9

**STATUTES**

18 U.S.C. § 2710(a) ........ 4, 11, 12

18 U.S.C. § 2710(b) ........ 1, 7

New York Arts & Cultural Affairs Law § 25.07(4) ........ 1

**OTHER AUTHORITIES**

S. Rep. No. 112-258 (2012) ........ 8

# INTRODUCTION

Defendant Reading International, Inc's ("Reading") motion to dismiss Count I of the First Amended Complaint (violation of the Video Privacy Protection Act ("VPPA")) rests almost entirely on the Second Circuit's recent decision in *Solomon v. Flipps Media, Inc.*, 136 F.4th 41 (2d Cir. 2025). *See generally* Memorandum of Law in Support of Defendant's Motion to Dismiss (ECF No. 62) ("MTD").[1] But *Solomon* and its progeny exclusively involved the disclosure of Facebook IDs ("FIDs"). This case involves the disclosure of Plaintiff's first and last name, along with the titles of movie trailers she obtained. First Amended Complaint ("FAC") ¶ 71; *see also id.* ¶¶ 64-73, 86, and 90, and Figure 20. The text of the VPPA expressly says that "names … of consumers" along with either the "title, description, or subject matter of any … audio visual material," qualify as "personally identifiable information." 18 U.S.C. § 2710(b)(2)(D). And "the statute's express terms control." *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 550 (2d Cir. 2024); *accord Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 161, n.10 (S.D.N.Y. 2023) ("*Golden I*") (Engelmayer, J.) (interpreting PII by reference to the (b)(2)(D) exception). This is dispositive and warrants denying Reading's motion to dismiss Count I.

Plaintiff alleges that "Defendant's Website also uses 'Advanced Matching.' When activated, the Facebook Tracking Pixel will 'look for recognizable form field and other sources on your website that contain information *such as first name, last name and email.*'" FAC ¶ 64 (emphasis added). "To subscribe to Defendant's Website, a user can create an account. Defendant's account webpage contains form fields for first name, last name, email address[.]" *Id.* ¶ 69. "Berryman subscribed to Defendant's Website by creating an account and answered the

[1] Reading does not seek dismissal of Count III of the First Amended Complaint (violation of New York Arts & Cultural Affairs Law § 25.07(4)) and Plaintiff does not oppose Reading's request to dismiss Count II of the FAC (violation of the New York Video Consumer Protection Act).

following information requests depicted in Figure 20." *Id.* ¶ 86; *see also id.*, Fig. 20 (below).

**Figure 20**




"Defendant discloses [to Facebook] a subscriber's email address, first name, and last name when inputted into any of the above form fields, enabling Facebook to then match those identifiers with that subscriber's subsequent activity on the site." FAC ¶ 71.

*Solomon* and its progeny concerned a different disclosure entirely. In those cases, no names were allegedly disclosed, just FID numbers. *Solomon* held that information is PII if it "would readily permit an ordinary person to identify a specific individual's video-watching behavior." 136 F.4th at 52. Based on the screenshots plaintiff in that case provided, the *Solomon* court held "it is not plausible that an ordinary person … would see the 'c_user' phrase … and conclude that the phrase was a person's FID" or necessarily know "*how* … [to] use an FID to identify Solomon." *Id.* at 54; *see id.* at 46 (reproduced below).[2]




In other words, FIDs were static digital identifiers and "the ordinary person standard []

[2] For avoidance of doubt, Plaintiff reserves the right to ask an appellate court to revisit *Solomon*. But for this present motion, we need not reach that issue because *Solomon* is distinguishable.

hold[s] that static digital identifiers were not personally identifiable information protected from disclosure by the VPPA because an ordinary person … could not use the static digital identifiers to identify a specific individual's video-watching habits." *Id.* at 50. Here, however, Reading disclosed more than just "static digital identifiers." It also disclosed names and emails.

Under *Solomon*, this is PII. *Solomon* said it was "adopt[ing] the *Third and Ninth Circuits'* ordinary person standard." *Solomon*, 136 F.4th at 51 (emphasis added). And under the ordinary person standard, "[n]ames … of course, still qualify." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017). And "an email address may very well readily enable an 'ordinary person' to identify an individual." *Id*. Reading cannot avoid this conclusion by nitpicking lines of codes from Plaintiff counsel's web browser. "[T]he statute views disclosure from the perspective of the disclosing party." *Solomon*, 136 F.4th at 52 (quoting *Eichenberger*, 876 F.3d at 985). And from Reading's perspective, before it activated Advanced Matching, Facebook told it the tool "will 'look for recognizable form field and other sources on your website that contain information such as first name, last name and email.'" FAC ¶ 64 (quoting Facebook's Business Help page). Ordinary people in Reading's shoes would thus know they were disclosing names and emails.

Reading also argues that the URL "www.angelikafilmcenter.com/villageeast/film/barbie?date=2024-01-3" does not reveal a consumer's video consumption history, but a consumer's "movie ticket purchase." *See* MTD 9-10. This argument ignores factual allegations, mixes the issues, and conflates statutory terms. As the FAC notes, "the webpage contain[s] the video movie trailer." FAC ¶ 51. Thus, an ordinary person who sees a "View Content" event with that clean URL can readily discover the consumer navigated to a page where they could view the *Barbie* movie trailer content. As the Circuit Judge that authored the *Solomon* opinion noted, "the 'average internet user' … [has] some familiarity with how to navigate to a website." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 704 (2d Cir. 2023). *See* FAC, Fig. 5 (next page).




Reading nevertheless protests that reaching a webpage containing a movie trailer is "insufficient to even ple[a]d that a video was viewed." MTD at 9. "But [Reading] has not identified any statutory text or case authority making liability turn on whether the plaintiff whose video access was disclosed had actually watched the video(s) at issue." *Golden I*, 688 F. Supp. 3d at 161 (rejecting same argument); *accord Sellers v. Bleacher Rep., Inc.*, 2023 WL 4850180, at *3 (N.D. Cal. July 28, 2023) (same). Rather, the VPPA simply defines PII as including "information that identifies a person as having '*requested or obtained* specific video materials or services.'" *Sellers*, 2023 WL 4850180, at *3 (quoting 18 U.S.C. § 2710(a)(3)) (emphasis added). And a person can "obtain" a video material or service without having ever "actively elected to view videos." *Id*. "The statute, after all, was prompted by disclosure of the list of videos Judge Bork rented—not those he had viewed." *Golden I*, 688 F. Supp. 3d at 161.

In short, Reading offers no textual, structural, or precedential basis for concluding that names lose their status as identifiers simply because they are transmitted via website code rather than printed on paper. *Solomon*'s concern was that sophisticated technology companies could identify individuals from data points that would be meaningless to ordinary persons. 136 F.4th at 52. But there is nothing sophisticated about recognizing "Haley Berryman" as a name or understanding that "www.angelikafilmcenter.com/villageeast/film/barbie" refers to the movie

*Barbie*. So Reading's renewed bid to dismiss Plaintiff's VPPA claim should again be denied.

## ARGUMENT

### I. READING DISCLOSED PLAINTIFF'S PII BY DISCLOSING HER FIRST AND LAST NAME ALONG WITH THE TITLES OF THE MOVIE TRAILERS SHE ACCESSED

"There are [] 'three distinct elements' in the PII definition: 'the consumer's identity; the video material's identity; and the connection between them.'" *Collins v. Pearson Educ., Inc.*, 721 F. Supp. 3d 274, 286 (S.D.N.Y. 2024) (Engelmayer, J.); *accord Golden v. NBCUniversal Media, LLC*, 2025 WL 2530689, at *6 (S.D.N.Y. Sept. 3, 2025) ("*Golden II*"). All three are present here. Reading (1) disclosed "the consumer's identity" by sharing Plaintiff's name and email, (2) disclosed "the video material's identity" by disclosing its title in a clean and simple URL, and (3), ensured Facebook made a "connection between them" by activating Advanced ***Matching***. On every metric, this case differs from *Solomon* and illustrates why dismissal is improper.

| | *Solomon* | This Case |
|---|---|---|
| Consumer's Identity | FID: "'c_user=123456' or 'c_user=00000000.'"<br><br>*Solomon*, 136 F.4th at 54. | Name: Haley Berryman<br><br>Email: haleyrberryman@gmail.com<br><br>FAC ¶ 71, 86. |
| Video's Identity | URL: "'title% 22% 3A% 22-% E2% 96% B7% 20The% 20Roast% 20of% - 20Ric% 20Flair'."<br><br>*Solomon*, 136 F.4th at 54. | URL: "film/barbie/"<br><br>FAC, Fig. 5 |
| Connection Between the Two | "FITE configured the Pixel on its website to include PageView."<br><br>*Solomon*, 136 F.4th at 45. | Reading activated "Advanced ***Matching***."<br><br>FAC ¶ 64 (emphasis added). |

#### A. Reading Disclosed The Consumer's Identity By Disclosing Her First And Last Name (Along With Her Email)

In *Solomon*, "to interpret what information Congress intended to cover as capable of' identifying an individual' under the VPPA," the Second Circuit "adopt[ed] the Third and Ninth

Circuits' ordinary person standard." *Solomon*, 136 F.4th at 48 and 51 (quotation marks omitted). Under this standard, "personally identifiable information applies only to the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Id*. at 49. Here, Reading disclosed consumers' first and last names and email address. FAC ¶ 71. Ordinary people can identify others by name or email.

As the Third Circuit explained, there is a "spectrum" of information, only some of which is "sufficiently 'personally identifying' for their disclosure to trigger liability under the Video Privacy Protection Act." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 282 (3d Cir. 2016):

> At one end of the spectrum, of course, is a person's actual name. Then there are pieces of information, such as a telephone number or a physical address, which may not by themselves identify a particular person but from which it would likely be possible to identify a person by consulting publicly available sources, such as a phone book or property records. Further down the spectrum are pieces of information, like social security numbers, which are associated with individual persons but might not be easily matched to such persons without consulting another entity, such as a credit reporting agency or government bureau…
>
> [S]tatic digital identifiers—fall[] even further down the spectrum. To an average person, an IP address or a digital code in a cookie file would likely be of little help in trying to identify an actual person.

*In re Nickelodeon*, 827 F.3d at 282–83.

As the Ninth Circuit clarified, under the ordinary person standard, "Names and addresses, of course, still qualify." *Eichenberger*, 876 F.3d at 986. We know this must be so because the VPPA lists "the names and addresses of consumers," coupled with "the title, description, or subject matter of any… audio visual material" as an example of PII in the (b)(2)(D) exception. *Golden I*, 688 F. Supp. 3d at 161, n.10 (interpreting the term PII by reference to this same exception and noting that even the subject matter of a video would suffice). The statute provides:

> "(2) A video tape service provider may disclose ***personally identifiable information*** concerning any consumer…
>
> (D) to any person if the disclosure is solely of the ***names and addresses of consumers*** and if—
>
> (i) the video tape service provider has provided the consumer with the opportunity, in a clear and conspicuous manner, to prohibit such disclosure; and
>
> (ii) the disclosure does not identify the ***title, description, or subject matter of any video tapes or other audio visual material***…"

18 U.S.C. § 2710(b) (emphases added).

"[T]he statute's express terms control." *Salazar*, 118 F.4th at 550.

Relying on a non-precedential, unpublished decision, Defendant counters that "*Solomon* effectively shut the door for Pixel-based VPPA claims." MTD at 8 (quoting *Hughes v. Nat'l Football League*, 2025 WL 1720295, at *2 (2d Cir. June 20, 2025)). This paints with too broad a brush. In both *Solomon* and *Hughes*, along with every subsequent district court decision Reading relies on, the courts only considered whether "an FID uniquely identifies a Facebook user." *Golden II*, 2025 WL 2530689, at *5. And in *Solomon*, "the court adopted the ordinary person standard—holding that static digital identifiers were not personally identifiable information protected from disclosure by the VPPA because an ordinary person … could not use the static digital identifiers to identify a specific individual's video-watching habits." *Solomon*, 136 F.4th at 50. The *Solomon* court was "not persuaded that an FID is vastly different from the unique device identifiers in *Nickelodeon*, 827 F.3d at 262, or the Roku device serial numbers in *Eichenberger*, 876 F.3d at 979." *Id*. at 55 (cleaned up). None of these cases concerned the disclosure of names. This case does. FAC ¶ 71.

Moreover, as *Solomon* acknowledged, "the statute views disclosure from the perspective of the disclosing party. It looks to what information a video service provider discloses, not to what the recipient of that information decides to do with it." *Solomon*, 136 F.4th at 52 (quoting *Eichenberger*, 876 F.3d at 985). And here, the "disclosing party"—Reading—would know that

by choosing to activate "Advanced Matching" on its website, it would be enabling Facebook "to look for recognizable form field and other sources on your website that contain information such as first name, last name and email." FAC ¶ 64 (emphasis added). Indeed, Reading programed exactly these form fields into its website. *See* Fig. 20. So any ordinary person in Reading's shoes would thus know they were disclosing names and emails.

No court has held that the disclosure of a person's name would lose its status as PII under 18 U.S.C. § 2710 (b)(2)(D) simply because it was disclosed online. To the contrary, Congress amended the VPPA in 2012 because it recognized that "the Internet has similarly revolutionized *how Americans share information*." S. Rep. 112-258, at 2 (emphasis added); *accord Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 545 (2d Cir. 2024) (discussing same legislative history). And Congress noted that the 1988 law still applied to the disclosure of "movie or television preferences through social media sites." S. Rep. 112-258 at 3. In case that was not clear enough, Congress expressly named "social networking sites, like Facebook." *Id*. at 2. And so the point of the 2012 amendment was to "clarify that a video tape service provider may obtain a consumer's informed, written consent to disclose video viewing information to a third party on an ongoing basis and that such consent may be obtained through the Internet." *Id*. at 5-6. This is exactly the type of consent which Plaintiff alleges she never gave. FAC ¶ 106.

The Second Circuit recognized this when discussing the same 2012 legislative history. *Salazar*, 118 F.4th at 553. It closed its opinion by noting that "[t]he VPPA is no dinosaur statute … Our modern means of consuming content may be different, but the VPPA's privacy protections remain as robust today as they were in 1988." *Id*. at 553. This was not a pump fake. *Salazar* said there very well "may be breathing room in the statute to explore what exactly is 'personally identifiable information.'" *Id*. at 549, n.10. To that end, both the Third and Ninth Circuits also recognized that under the ordinary person test, "modern technology may indeed

alter—or may already have altered—what qualifies under the statute." *Eichenberger*, 876 F.3d at 986; *accord In re Nickelodeon*, 827 F.3d at 290, n.177. "[I]f technology were to develop permitting an ordinary person to … reveal the identity of the person whose computer was associated with that IP address, the same facts alleged here might well result in a different outcome than the one we reach today." *In re Nickelodeon*, 827 F.3d at 290, n.177. "These precedents were not meant to suggest a law trapped in amber." *United States v. Rahimi*, 602 U.S. 680, 691 (2024). And *Solomon* made clear it was "adopt[ing] the *Third and Ninth Circuits'* ordinary person standard." 136 F.4th at 51 (emphasis added).

That the information here was transmitted through lines of code is immaterial. "Code is a language, and languages contain names." *In re Hulu Priv. Litig.*, 2014 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014) ("*Hulu I*"). "No one would deny that I would violate the VPPA by passing someone an encrypted list of Judge Bork's video rentals—if my recipient and I both understood that we would use a mutually intelligible code." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1096 (N.D. Cal. 2015) ("*Hulu II*"). A disclosure of PII is still a disclosure of PII, regardless of whether it is told in English, Spanish, or JavaScript.[3] Indeed, the Third Circuit in *In re Nickelodeon* approving cited *Hulu I* as case involving what "might qualify as [disclosing] personally identifiable information." *In re Nickelodeon*, 827 F.3d 289, n. 174 (citing 2014 WL 1724344, at *5). The disclosure in *Hulu I* involved "sending a coded request to Facebook's servers." *In re Nickelodeon*, 827 F.3d 289, n. 174 (quoting *Hulu I*, 2014 WL 1724344, at *5).

It no surprise then that at least five district courts—applying the ordinary person standard after *Solomon*—have acknowledged the decision and nevertheless continued to hold that sending

---

[3] *See* https://developers.facebook.com/docs/meta-pixel/get-started/ ("The Meta Pixel is a snippet of JavaScript code"); https://en.wikipedia.org/wiki/JavaScript ("JavaScript is a programming language and core technology of the Web … Ninety-nine percent of websites use JavaScript.")

coded disclosures to Facebook would qualify.[4] "Considering how code is the primary communication medium for data sharing technologies … the Court finds it plausible that an ordinary person could identify Plaintiff based on the information shared by Defendant's Facebook Pixel technology." *Garcia v. Bandai Namco Ent. Am. Inc.*, 2025 WL 2451033, at *8 (C.D. Cal. Aug. 7, 2025).

And numerous other courts have likewise found Plaintiffs adequately alleged the disclosure of "PII" through a "website['s]… use of Facebook's … Advanced Matching tool." and "disclosure of their first name, last name." *Ambrose v. Bos. Globe Media Partners LLC*, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1342 (N.D. Ga. 2022) (disclosure of email addresses via Advanced Matching); *Goldstein v. Fandango Media, LLC*, 2023 WL 3025111, at *4 (S.D. Fla. Mar. 7, 2023) (disclosure of email addresses via Advanced Matching).

### B. Reading Disclosed The Video's Identity By Sharing The Title Of The Movie Trailer

Reading also "disclosed to a third party, Facebook … the title of the videos [Plaintiff] viewed." FAC ¶ 103. "Advertisers [like Reading] control what actions—or, as Facebook calls it, 'events'—the Facebook Tracking Pixel will collect." FAC ¶ 41. And here, Reading purposefully configured the Pixel to transmit both the "PageView" and "View Content," events. *Id.* ¶¶ 45-47. Both of these disclosed the URL of the page, and "[t]he title for the video is contained in the URL." *Id.* ¶ 48. *See, e.g.*, Figure 5 (next page).

[4] *Balestrieri v. SportsEDTv, Inc.*, 2025 WL 2776356, at *9 (N.D. Cal. Sept. 16, 2025); *Goodman v. Hillsdale College*, 2025 WL 2941542, at *8 (W.D. Mich. Oct. 17, 2025); *Plotsker v. Envato Pty Ltd.*, 2025 WL 2481422, at *8, n.7 (C.D. Cal. Aug. 26, 2025); *Archer v. NBCUniversal Media, LLC*, --- F. Supp. 3d ----, 2025 WL 2601509, at *5 (C.D. Cal. July 2, 2025); *Garcia v. Bandai Namco Ent. Am. Inc.*, 2025 WL 2451033, at *8 (C.D. Cal. Aug. 7, 2025).

Pixel Location: Hide

https://www.angelikafilmcenter.com/villageeast/film/barbie?date=2024-01-31

As noted, PII includes "information which identifies a person as having requested or obtained *specific video materials or services*." 18 U.S.C. § 2710(a)(3) (emphasis added). And even under *Solomon*, it is not beyond the ken of the ordinary person to figure out which "specific video materials or services" this particular URL is referring to. For starters, the Third Circuit in *In re Nickelodeon* listed "'http://www.nick.com/shows/penguins-of-madagascar'" as an example of "URLs that revealed which videos a child watched." 827 F.3d at 275. Just like the URL in *In re Nickelodeon* prefaced the title of *Penguins of Madagascar* with "/shows/," to indicate it was a show, likewise here, the URL in Figure 5 prefaced movie *Barbie* with "/film/" to indicate it was a film. As such, "an ordinary person would look at the phrase … and understand it to be a video title." *Solomon*, 136 F.4th at 54. Moreover, like the URL in *In re Nickelodeon*, which only contained hash marks for spaces in listing the title of the video, the URL here features the full length of the movie title, followed by a "?date=2024-01-31" to signify the date the film was being screened in Angelika's East Village location. Finally, like the URL example in *In re Nickelodeon*, the URL here is simple, short, and set off on its own under a "Pixel Location," tab, such that it "would be intelligible to an ordinary person." *Golden II*, 2025 WL 2530689, at *7.

In contrast, the URL at issue in *Solomon* was depicted in a long GET request that required highlighting just to find the title. *See* 136 F.4th at 46 (below):




The *Solomon* court expressed concern that "[t]he words of the title, however, are interspersed with many characters, numbers, and letters. It is implausible that an ordinary person would look at the phrase 'title% 22% 3A% 22-% E2% 96% B7% 20The% 20Roast% 20of% -

20Ric% 20Flair'—particularly if the highlighting in Box A is removed—and understand it to be a video title." 136 F.4th at 54.

Moreover, unlike the URL in *Solomon*, which was buried within another "facebook.com/tr/" URL in the middle of a large GET request, the URL depicted in the complaint here is listed on its own, which readily permits "any third party [to] copy and paste that locator into a web browser and determine the video that the subscriber watched." FAC ¶ 48. As the Third Circuit in *In re Nickelodeon* noted, "if technology were to develop permitting an ordinary person to type [the URL] into a search engine and reveal the identity of the" video, that may very well qualify under the statute. 827 F.3d at 290, n.177; *accord Eichenberger*, 876 F.3d at 986 (same observation). Here, it has. Indeed, the same Circuit Judge that authored *Solomon* held in another case that "the 'average internet user' … [has] some familiarity with how to navigate to a website." *Edmundson*, 85 F.4th at 704.

Reading also argues that the URL does not reveal a consumer's video consumption history, but a consumer's "movie ticket purchase." *See* MTD 9-10. However, "the webpage contain[s] the video movie trailer." FAC ¶ 51. And an ordinary person using his or her web browser to visit this page would readily determine that.

Reading next argues that navigating to the movie trailer page or buying a movie ticket is "insufficient to even ple[a]d that a video was viewed." MTD at 9. That is besides the point. The disclosure that prompted the passage of the VPPA, "identif[ying] [the] 146 films that Judge Robert Bork and his family had rented from a video store," would likewise fail to establish that any of the Borks placed a tape in their VHS player and pressed play. *Salazar*, 118 F.4th at 544. Congress never used words "viewed" or "watched" in the definition of PII. Rather, Congress used the words "*requested or obtained* specific videos materials or services." *Sellers*, 2023 WL 4850180, at *3 (quoting 18 U.S.C. § 2710(a)(3)) (emphasis added). And a person can "obtain" a

video material or service without having ever "actively elected to view videos." *Id*. This court reached the same conclusion in *Golden I*, 688 F. Supp. 3d at 161, noting that there did not appear to be "any statutory text or case authority making liability turn on whether the plaintiff whose video access was disclosed had actually watched the video(s) at issue."

And even setting aside the movie trailer allegation, Reading's *second* and *separate* disclosure that a specific person spent "$7.19 to purchase a ticket to Defendant's screening of the Barbie movie at Defendant's movie theater," MTD at 10, in Figure 6 of the FAC, *independently* establishes a second disclosure of PII. The VPPA defines PII as including information which identifies a person as having "*requested or obtained* specific video materials or *services*." 18 U.S.C. § 2710 (a)(3) (emphasis added). By buying a ticket to see a "screening of the Barbie movie," Plaintiff is both *requesting* and *obtaining* a *video service*. That is PII as the VPPA defines it. And "the statute's express terms control." *Salazar*, 118 F.4th at 550.

Reading's reliance on the Court's prior order finding it would not be VTSP for its "role as a brick-and-mortar film operator," mixes issues and conflates statutory terms. ECF No. 39. The VTSP definition covers "*rental, sale, or delivery* of… audio visual *materials*." 18 U.S.C. 2710 § (a)(4) (emphases added). The PII definition covers "*request*[ing] or *obtain*[ing] *specific* video materials *or services*." 18 U.S.C. 2710 § (a)(4) (emphases added). "Congress's decision to use different words in different definitions strongly signals its intent to convey different meanings." *Salazar*, 118 F.4th at 548. "Congress chose to *deviate* from any parallelism" between the VTSP, PII, and consumer definitions. *Id*. And so the Second Circuit in *Salazar* rejected an attempt to import the VTSP definition's "audio-visual" limitation into the definition of consumer. *See id.* So too here, Reading's argument appears to try to import the VTSP definition's "rental, sale, or, delivery," limitation into the definition of PII. This is impermissible. "When a statute includes an explicit definition, we must follow that definition." *Digital Realty*

*Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018) (citation omitted).

### C. Reading Knew Facebook Would Connect The Two By Activating "Advanced Matching"

The third piece of the PII puzzle is the "connection between" "the consumer's identity" and the "video material's identity." *Collins*, 721 F. Supp. 3d at 286. Here, the whole point of why a company like Reading installs the Pixel on its site is so that Facebook "tracks the people and type of actions they take." FAC ¶ 40. The Pixel also enables Reading to "control how the Facebook Tracking Pixel identifies visitors." *Id*. ¶ 42. They can toggle the Pixel to collect "IP addresses, information about the web browser, page location, document, referrer" or "a Pixel ID and cookie." *Id*. ¶ 42. "Other courts, analyzing comparable if not identical allegations of disclosures by defendants to Facebook via Facebook's Pixel, have found an adequate connection between the user's identity and the specific video material at issue." *Collins*, 721 F. Supp. 3d at 289 (collecting cases).

Here, however, Reading went one step further. The problem with regular Pixel settings is that the c_user containing the consumer's Facebook ID can only be sent "while [that consumer] is logged into Facebook." FAC ¶ 54. In other words, for the FID to be disclosed via this cookie, consumers would need to be "simultaneously (1) logged into their own Facebook accounts on the same (2) device and (3) browser." *Jancik v. WebMD LLC*, 2025 WL 560705, at *6 (N.D. Ga. Feb. 20, 2025). To bypass all these variables and better ensure PII was disclosed, Reading activated Advanced Matching. FAC ¶ 64.

When activated, Advanced Matching on Reading's website discloses the "first name, last name, and email" that consumers type in when signing up or signing into to angelikafilmcenter.com to Facebook. *See id.* ¶¶ 64, 71. This information is then combined "'along with the event, or action, that took place.'" *Id*. ¶ 64. Indeed, the connection is readily apparent from the name: Advanced ***Matching***.

As another court observed, when a website like angelikafilmcenter.com "utilize[es] an 'Advanced Matching' process … Facebook may still have associated Event Data with individual Facebook profiles—based on the [names and] email addresses [defendant] provided—*even if the user was never logged into Facebook*." *Jancik*, 2025 WL 560705, at *6. This did not occur by accident. Reading actively enabled it because it wanted the matching to happen. FAC ¶ 64.

At bottom, if *Solomon* prohibits any online disclosure, it would be Reading's disclosure of names and movie titles through its use of the "Advanced Matching" tool. As *Solomon* notes, the ordinary person standard exists to avoid situations where "a video tape service provider's liability would turn on circumstances outside of its control." *Solomon*, 136 F.4th at 52. Here, however, Reading was in complete control. It did not slip and fall and have a list of customer names and videos fly out of its fingers. It purposefully activated Facebook's Advanced Matching tool, knowing perfectly well that by doing so, it would be enabling Facebook to *match* consumers' video consumption history with their names and emails. This cannot stand.

## CONCLUSION

For these reasons, Reading's motion to dismiss Plaintiff's VPPA claim should be denied.

Dated: November 3, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: ___*/s/ Philip L. Fraietta*___
Phillip L. Fraietta

**BURSOR & FISHER, P.A.**
Philip L. Fraietta
50 Main Street, Suite 475
White Plains NY 10606
Telephone: 914-874-0708
Facsimile: (914) 206-3656
E-Mail: pfraietta@bursor.com

Alec M. Leslie
1330 Avenue of the Americas, 32nd Floor

New York, NY 100019
Telephone: (646) 837-7126
Facsimile: (212) 989-9163
E-Mail: aleslie@bursor.com

Stefan Bogdanovich
1990 N. California Blvd., 9th Floor
Walnut Creek, CA 94595
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: sbogdanovich@bursor.com

*Attorneys for Plaintiff and the Putative Class*

**CERTIFICATION OF WORD COUNT**

I hereby certify that the word count of this memorandum of law complies with the word limits set by Local Civil Rule 7.1(c) (the "Rule"). According to Microsoft Word, the word-processing system used to prepare this memorandum, the total word count for all printed text that counts towards the limits imposed in the Rule is 4480 words.

*/s/ Philip L. Fraietta*