UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

HALEY BERRYMAN, *individually and on behalf of all others similarly situated*,

                              Plaintiff,

              -v-

READING INTERNATIONAL, INC.,

                              Defendant.

24 Civ. 750 (PAE)

OPINION & ORDER

------------------------------------------------------------

PAUL A. ENGELMAYER, District Judge:

This decision resolves a second motion to dismiss in this putative class action, which centers on a claim that defendant Reading International, Inc. ("Reading"), a movie theater chain operator, violated the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). In its initial decision, issued in January 2025, the Court sustained the VPPA claim brought by plaintiff Haley Berryman on behalf of a putative class. *See* 763 F. Supp. 3d 596 (S.D.N.Y. 2025) ("MTD Decision"). Three months later, however, the Second Circuit decided *Solomon v. Flipps Media, Inc.*, 136 F.4th 41 (2d Cir. 2025), which interpreted "personally identifiable information" under the VPPA, holding that the statute is not violated by the disclosure of information that would not reveal to an ordinary person the video-watching behavior of a specific individual.

In anticipation of a renewed motion to dismiss based on *Solomon*, the Court authorized Berryman to file a First Amended Complaint, which she did. Dkt. 58 ("FAC"). It alleges that Reading disclosed private data about Berryman's online viewing consumption to Meta Platforms, Inc. ("Facebook") without her knowledge or consent, and that this information was transmitted through the Facebook Pixel (the "Pixel"), a tool that enables advertisers to track the actions that users take on their websites in order to create targeted advertisements. The FAC

claims violations of the VPPA and New York Video Consumer Privacy Act, N.Y. General Business Law § 671 ("NY VCPA").[1]

Reading moves to dismiss both claims under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants that motion.

## I. Background[2]

The Court incorporates by reference the facts recounted in the MTD Decision. *See* 763 F. Supp. 3d at 600–01. The following summary focuses on the factual allegations—including the limited new ones added by the FAC—necessary to resolve the limited issues presented.

### A. The Website and Facebook Pixel

Reading owns and operates Angelika Film Centers ("Angelika"), a nationwide movie theater chain that features independent and foreign films. FAC ¶ 22. It also owns and operates Angelika's website, AngelikaFilmCenter.com (the "Website"), which permits users to view movie trailers, search for information about films, subscribe to a newsletter, and purchase movie theater tickets. *Id.*

Reading installed the Pixel—a tracking tool developed by Facebook—on the Website. *Id.* ¶ 45. The Pixel enables advertisers like Reading to select website events (*e.g.*, a user's views,

---

[1] In a claim of a different nature, the FAC also alleges that Reading failed to disclose to Berryman the total cost of its theater tickets, inclusive of ancillary fees, at the outset of the online purchasing process, in violation of § 25.07(4) of the New York Arts and Cultural Affairs Law ("NYACAL"). In the MTD Decision, the Court denied Reading's motion to dismiss that claim. *See* 763 F. Supp. 3d at 604–07. Reading does not move against that claim here.

[2] The following facts are drawn primarily from the FAC. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For purposes of resolving the motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the FAC as true, drawing all reasonable inferences in Berryman's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

2

clicks, and purchases) that they wish to track. *Id.* ¶ 41. When the Pixel captures such an event, it transmits a record to Facebook, which processes, analyzes, and assimilates it into datasets that Reading can use to run targeted ads. *Id.* ¶ 40.

B.     **The Pixel's Tracking and Data Transmission**

The Pixel tracks three distinct events on the Website. First, it tracks the webpages that a user viewed ("PageView") by transmitting a page's Uniform Resource Locator ("URL") and whether it features a video. *Id.* ¶ 46. Second, it tracks a user's engagement with video content ("ViewContent") by transmitting a URL and whether the webpage features a video. *Id.* ¶ 47. Third, it tracks a user's purchases ("Purchase") by transmitting that a ticket was purchased, the currency used to purchase the ticket, and the amount spent on the ticket. *Id.* ¶¶ 51–52. As an illustration, the FAC reproduces the following screenshots of these three events, respectively. *Id.* ¶¶ 46–47, 51.



3





Taken together, these events "notify Facebook that a consumer spent $7.19 to purchase a ticket to [Reading's] screening of the *Barbie* movie at [Reading's] Village East Theater on January 31, 2024." *Id.* ¶ 53.

4

The Pixel transmits cookies to Facebook that connect events to users.[3] *Id.* ¶¶ 54–55. If a user is logged into Facebook while using the Website, the user's browser transmits the "c_user" cookie, which contains the user's unencrypted Facebook ID ("FID"), a unique identifier that Facebook assigns to each user.[4] *Id.* ¶ 54. The Pixel also transmits, *inter alia*, the "fr" cookie, which contains an encrypted FID and browser identifier, and the "_fbp" cookie, which contains an unencrypted value that uniquely identifies a browser.[5] *Id.* ¶ 56. In contrast, if a user navigates the Website after recently logging out of Facebook, the Pixel does not transmit the c_user cookie, but does transmit the fr and _fbp cookies. *Id.* ¶¶ 55–56.

The Pixel also collects information through "Advanced Matching." *Id.* ¶ 64. That tool enables the Pixel to search for recognizable fields on the Website that contain information such as a user's first name, last name, and email address. *Id.* For instance, the Website allows users to subscribe by creating an account, which requires them to input their first name, last name, email address, birthday, zip code, preferred theater, and password. *Id.* ¶ 69. The Website also allows users to sign up for the Angelika newsletter, which requires them to input their email address. *Id.* ¶ 68. The Pixel transmits that information to Facebook along with the event that took place. *Id.* ¶ 64. Such information is "hashed," which means it is converted into a "computed summary of digital data" that "cannot be reversed back into the original data." *Id.*

---

[3] A cookie is "a small file or part of a file stored on an Internet user's computer, created and subsequently read by a website server, and containing personal information (such as a user identification code, customized preferences, or a record of pages visited)." *Cookie*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/cookie.

[4] An "ordinary" user can find a Facebook profile by appending an FID to the end of Facebook.com. FAC ¶ 62.

[5] A browser is "a computer program used for accessing sites or information on a network (such as the Internet)" (*e.g.*, Google Chrome or Safari). *Browser*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/browser.

### C. Berryman's Experience

On October 5, 2022, Berryman subscribed to the Website by creating an account. *Id.* ¶ 86. She used the Website to watch movie trailers and purchase movie tickets. *Id.* ¶ 87.

Berryman has had a Facebook account since approximately 2013. *Id.* She alleges that, when she watched videos on the Website, the Pixel transmitted to Facebook her event data and identifying information. *Id.* ¶ 88.

### D. Procedural History

On February 1, 2024, Berryman filed the initial Complaint, alleging violations of the VPPA and NYACAL. Dkt. 1 ("Compl.").[6] On April 5, 2024, Reading moved to dismiss or, in the alternative, to strike the Complaint's class allegations. Dkt. 10. As to the VPPA claim, Reading argued that it did not qualify as a "video tape service provider" and that Berryman did not qualify as a "consumer" under the statute. *Id.* at 1 (citing 18 U.S.C. § 2710(a)). Reading did not then argue that the information it had allegedly disclosed to Facebook did not constitute "personally identifiable information." *Id.* On January 28, 2025, in the MTD Decision, the Court denied Reading's motions, while narrowing an aspect of the VPPA claim. *See* 763 F. Supp. 3d at 603.

On May 1, 2025, the Second Circuit decided *Solomon*, *supra*, which dismissed a Pixel-based VPPA claim because it was not plausibly alleged that the information the defendant disclosed to Facebook via the Pixel would enable an "ordinary person" to identify the plaintiff's "video-watching habits." *Solomon*, 136 F.4th at 54 (citation omitted). On September 4, 2025, after attempts to settle this case had failed, the Court held a conference, at which, in anticipation

---

[6] The Complaint invoked subject matter jurisdiction based both on the VPPA and on 28 U.S.C. § 1332(d). Compl. ¶¶ 10–12.

of a renewed motion to dismiss based on *Solomon*, it authorized Berryman to amend the Complaint.  *See* Dkt. 57 (case management plan).

On October 6, 2025, Berryman filed the FAC.  Dkt. 58.  Apart from modest factual modifications, it added a claim under the NY VCPA.  *Id.* ¶¶ 109–18.  On October 20, 2025, Reading moved to dismiss the FAC's VPPA and NY VCPA claims.  Dkt. 62 ("Mot.").  On November 3, 2025, Berryman opposed the motion to dismiss only as to the VPPA claim. Dkt. 64 ("Opp'n").  On November 10, 2025, Reading replied.  Dkt. 65 ("Reply").

## II.  Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  That tenet, however, "is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

7

**III.    Discussion**

Reading moves to dismiss the VPPA and NY VCPA claims under Rule 12(b)(6). Berryman does not oppose dismissal of the NY VCPA claim. Opp'n at 1 n.1. The Court accordingly dismisses that claim and focuses the following analysis on the VPPA claim.

**A.    Applicable Law**

The VPPA was enacted in 1988 after a newspaper profile disclosed the video rental history of Supreme Court nominee Robert Bork. *See Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 544 (2d Cir. 2024) (citing S. Rep. No. 100-599, at 5–6 (1988)), *cert. denied*, 223 L. Ed. 2d 272 (Dec. 8, 2025). Seeking "to preserve personal privacy with respect to the rental, purchase, or delivery of video tapes or similar audio visual materials," the VPPA creates a private right of action for consumers to sue video tape service providers who disclose personally identifiable information about consumers' video-watching habits. *Id.* at 545 (quoting S. 2361, 100th Cong. (1988)). Under the Act, "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person[.]" 18 U.S.C. § 2710(b)(1). As further defined by the Act,

> (1) "consumer" means any renter, purchaser, or subscriber of goods or services from a video tape service provider; . . .
>
> (3) "personally identifiable information" includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider; and
>
> (4) "video tape service provider" means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials[.]

*Id.* § 2710(a). For information to qualify as personally identifiable information ("PII") under the VPPA, it thus must reveal "three distinct elements: (1) the consumer's identity, (2) the video

8

material's identity, and (3) the connection between them." *Golden v. NBCUniversal Media, LLC*, No. 22 Civ. 9858 (PAE), 2025 WL 2530689, at *6 (S.D.N.Y. Sept. 3, 2025) (citing *id.*).

In *Solomon*, the Second Circuit interpreted PII under the statute. It held that the VPPA "cover[s] not just information that, by itself, identifies a consumer's video-viewing history, but also information *capable of* being used to do so." *Solomon*, 136 F.4th at 51 (emphasis in original). In so holding, the Circuit adopted the "ordinary person" standard used in the Third and Ninth Circuits, under which PII is "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Id.* at 49 (quoting *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 267 (3d Cir. 2016)); *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017).[7] It stated that PII "encompasses information that would allow an ordinary person to identify a consumer's video-watching habits, but not information that only a sophisticated technology company could use to do so." *Solomon*, 136 F.4th at 52. Therefore, to survive a motion to dismiss, a complaint bringing a VPPA claim must plausibly allege that the defendant's disclosure of information "would, with little or no extra effort, permit an ordinary recipient to identify [the plaintiff's] video-watching habits." *Id.* at 54 (quoting *In re Nickelodeon*, 827 F.3d at 284).

Applying that standard, the Circuit dismissed a Pixel-based VPPA claim akin to that alleged here. Later, the Circuit reached the same conclusion, again on similar factual allegations, in *Hughes v. National Football League*, 2025 WL 1720295 (2d Cir. June 20, 2025) (summary

---

[7] The First Circuit, in contrast, has adopted a "reasonable foreseeability" standard, under which PII is "not limited to information that explicitly names a person," but also includes information disclosed to a third party that is "reasonably and foreseeably likely to reveal which . . . videos [the plaintiff] has obtained." *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016).

9

order). It stated that "*Solomon* effectively shut the door for Pixel-based VPPA claims." *Id.* at *2.

B.   Analysis

Reading argues that the FAC's allegations mirror those in *Solomon* and its progeny, and thus require dismissal. Mot. at 8. That is correct.[8]

The FAC's allegations are virtually indistinguishable from those in *Solomon*. The FAC alleges, in sum, that Reading disclosed Berryman's video viewing history by causing the Pixel to transmit (1) URLs containing movie titles, and (2) cookies containing her FID and other identifying information. FAC ¶¶ 45–55. In *Solomon*, the defendant—a digital streaming company—was similarly alleged, via the Pixel, to have disclosed to Facebook "the URL and title of each video that a user accesse[d] . . . along with that user's FID." *Solomon*, 136 F.4th at 45. The Second Circuit held that it was implausible that an ordinary person could, on the basis of those disclosures, discern the actual identity of the user and her video selections. *Id.* at 54–55. As to the user's identity, the Circuit stated, it was implausible that an ordinary person "would see the 'c_user' phrase . . . and conclude that the phrase was a person's FID." *Id.* at 54. And, even if an ordinary person would so conclude, the complaint was "devoid of any details about *how* an ordinary person would use an FID to identify" the user. *Id.* (emphasis in original). As to the user's video selections, the Circuit stated, it was implausible that an ordinary person could decipher the video title in the URL, because it was "interspersed with many characters, numbers and letters." *Id.* Accordingly, it was not plausibly alleged that an ordinary person could, "with

---

[8] Because the FAC fails on this basis, the Court does not reach Reading's second argument for dismissal—that, as alleged, Reading disclosed that the user purchased a movie ticket but not the user's video consumption history. See Mot. at 9–10; Reply at 4–5.

10

little or no extra effort," identify a user's viewing history based on the Pixel's disclosures. *Id.* at 54–55. That reasoning applies with full force here.[9]

Berryman attempts, in two ways, to distinguish this case from *Solomon*. Both fail.

First, Berryman cites the fact that, unlike the complaint in *Solomon*, her FAC alleges that Reading had activated "Advanced Matching." Opp'n at 1–3 (citing FAC ¶ 64). But the opaque description of that feature in the FAC does not explain how it would enable an ordinary person to link an identifiable consumer to their video-watching habits. On the contrary, the FAC alleges that the first name, last name, email address, and other identifying information collected by the Pixel via Advanced Matching is "hashed" *before* it is disclosed to Facebook. FAC ¶ 64. In other words, the information is converted from a format that would be readable to an ordinary person (*e.g.*, "Haley Berryman," and "haleyrberryman@gmail.com," Opp'n at 5) to a "computed summary of digital data" that "cannot be reversed back to the original data," FAC ¶ 64. That data thus has meaning at most to Facebook, which may have the formal capability eventually to derive the user's identity from the hashed value.[10] And even if the resultant hash were a format comprehensible to an ordinary person and revealing of the Angelika subscriber's identity—

---

[9] Berryman cites out-of-Circuit cases applying the ordinary person standard to find that a Pixel's transmission to Facebook disclosed PII under the VPPA. Those courts, however, are not bound by Second Circuit precedent. And they acknowledged that, in sustaining VPPA claims similar to the one dismissed in *Solomon*, they were in conflict with that decision. *See, e.g., Goodman v. Hillsdale Coll.*, 2025 WL 2941542, at *8 (W.D. Mich. Oct. 17, 2025) ("[*Solomon*] does not bind this Court, and the factual inferences made there by the Second Circuit are simply unpersuasive."); *Plotsker v. Envato Pty Ltd.*, 2025 WL 2481422, at *8 n.7 (C.D. Cal. Aug. 26, 2025) ("This Court therefore declines to adopt the approach of the Second Circuit in *Solomon*."); *Balestrieri v. SportsEdTV, Inc.*, 2025 WL 2776356, at *9 (N.D. Cal. Sept. 16, 2025) ("*Solomon* is neither on point nor controlling."). This Court is bound by *Solomon*.

[10] The webpage cited by the FAC for the definition of "hash," FAC ¶ 64, states that "[i]t could take a supercomputer years to reverse the hash back into the input." *Hash*, PC Mag, https://www.pcmag.com/encyclopedia/term/hash.

11

which it is not—it would not reveal the "connection between" that identity and the videos she viewed. *Golden*, 2025 WL 2530689, at *6. The FAC's allusion to Advanced Matching thus does not cure its deficiency under *Solomon*. *See Simon v. Scripps Networks, LLC*, No. 24 Civ. 8175, 2025 WL 3167915, at *7 (S.D.N.Y. Nov. 13, 2025) (allegations of PII disclosure based on Advanced Matching "fare no better" than allegations based on transmission of user's FID, where complaint did not allege how an ordinary person "could identify and somehow convert this hashed data back into an understandable format and connect that information" to users).[11]

Second, Berryman attempts to distinguish this case from *Solomon* because the titles in the URLs disclosed by Reading are not "interspersed with many characters, numbers, and letters." Opp'n at 11–12 (quoting *Solomon*, 136 F.4th at 54). But the example URL cited in the FAC contains a one-word movie title ("Barbie"). FAC ¶¶ 46–47.[12] The FAC is silent as to how a

---

[11] Berryman argues that Reading's alleged use of Advanced Matching satisfies *Solomon* because "[o]rdinary people in Reading's shoes would . . . know they were disclosing names and emails." Opp'n at 3 (citing *Solomon*, 136 F.4th at 52). This confuses the standard stated in *Solomon*, which asked not whether an ordinary person in the shoes of a technology company would know what it was disclosing, but whether an ordinary person could "learn another individual's video watching history" based on that disclosure. 136 F.4th at 52. In any event, the VPPA requires not only disclosure of a user's identity but a link between it and the user's viewing history. *See, e.g., Eichenberger*, 876 F.3d at 985 ("Congress likely had in mind" scenario where video rental store manager "disclosed the name and address of a customer—along with a list of the *videos that the customer had viewed*" (emphasis added)). The FAC's allegations about Advanced Matching do not plausibly allege such a link.

[12] The FAC's screenshots differ from those in other VPPA complaints because they omit the raw computer code that the Pixel allegedly transmits to Facebook. *See, e.g., Solomon*, 136 F.4th at 46; *Taino v. Bow Tie Cinemas, LLC*, No. 23 Civ. 5371, 2025 WL 2652730, at *3 (S.D.N.Y. Sept. 16, 2025); *Joiner v. NHL Enters., Inc.*, No. 23 Civ. 2083, 2025 WL 2846431, at *2 (S.D.N.Y. Aug. 29, 2025). Reading did not address this point in moving to dismiss, so it is unclear whether this omission further undermines Berryman's pleadings. Although the Court does not rely on this point here, the screenshots reflected in Figures 4 and 5, FAC ¶¶ 46–47, appear to reflect a more polished format than the raw data that Reading transmits to Facebook via the Pixel. If so, that would further complicate Berryman's claim that the data disclosed here

multi-word movie title transmitted to Facebook by Reading would present.  It does not allege that it would present differently than in *Solomon*, where, problematically, such titles were interspersed with characters, numbers, and letters.  And even if movie titles were discernable within the long URLs here, *see* FAC ¶¶ 46–47, these, without more, would not reveal the user's video-*watching* habits.  A reference to a movie within a URL does not reveal the user's connection to it—*e.g.*, whether a ticket was purchased, film was viewed, or some other interaction occurred.  *See* Mot. at 9–10 (noting that URLs contain the word "ticketing" such that they appear to refer to ticket purchases rather than movies or trailers viewed); *see, e.g.*, *Taino v. Bow Tie Cinemas, LLC*, No. 23 Civ. 5371, 2025 WL 2652730, at *8 (S.D.N.Y. Sept. 16, 2025) (implausible that ordinary person could decipher URL containing title, "Venom-Let-There-Be-Carnage," where it was "[b]uried" in code, which made it unclear whether title referred to movie trailer watched or ticket purchased).  This attempt to distinguish the FAC's allegations from those in *Solomon* thus also fails.

    Accordingly, the Court finds—consistent with the analyses in numerous district court decisions applying *Solomon* to similar allegations—that the FAC does not plausibly allege that Reading disclosed PII in violation of the VPPA.  *See, e.g.*, *Salazar v. Nat'l Basketball Ass'n*, No. 22 Civ. 7935, 2025 WL 2830939, at *5 (S.D.N.Y. Oct. 6, 2025) (dismissing VPPA claim where "allegations mirror those found insufficient in *Solomon* and *Hughes*, as well as in post-*Solomon* decisions considering Pixel-based VPPA claims"); *Nixon v. Pond5, Inc.*, No. 24 Civ. 5823, 2025 WL 2030303, at *5 (S.D.N.Y. July 21, 2025) (same); *Golden*, 2025

---

makes the user's identity and viewing habits more accessible to the ordinary person than that in *Solomon*.

13

WL 2530689, at *7 (same); *Simon*, 2025 WL 3167915, at *7–8 (same); *Taino*, 2025 WL 2652730, at *8 (same).[13]  The Court dismisses the VPPA claim.

## CONCLUSION

For the foregoing reasons, the Court grants the motion to dismiss the FAC's claims under the VPPA and the NY VCPA.  The Clerk of Court is respectfully directed to terminate the motion pending at docket 61.

By separate Order today, the Court directs the parties to file a joint letter regarding next steps in this case as to the remaining claim, under the NYACAL.

SO ORDERED.

*Paul A. Engelmayer*
_____
PAUL A. ENGELMAYER
United States District Judge

Dated: March 12, 2026
       New York, New York

---

[13] Berryman has not sought leave to amend or proposed any amendments to the FAC.  The dismissal is thus without further leave to amend.  *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 126 (2d Cir. 2013) ("While leave to amend under the Federal Rules of Civil Procedure is 'freely granted,' no court can be said to have erred in failing to grant a request that was not made." (citing Fed. R. Civ. P. 15(a) and *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011))); *see also Hughes*, 2025 WL 1720295, at *3 (denying plaintiff's request for remand to enable amendment of complaint's Pixel-based VPPA claim where "amendment would likely be futile").